**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITSUI O.S.K. LINES, LTD., | Case No. 11-2861 SC |
| Plaintiff, | ORDER DENYING MOTIONS TO PARTIALLY DISMISS SECOND AMENDED COMPLAINT |
| v. | |
| SEAMASTER LOGISTICS, INC.; TOLL GLOBAL FORWARDING (AMERICAS) INC.; AMERICAN GLOBAL LOGISTICS LLC; KESCO CONTAINER LINE, INC.; KESCO SHIPPING, INC.; and DOES 1 through 20, | |
| Defendants. | |

## I.   **INTRODUCTION**

Now before the Court are two motions to partially dismiss the Second Amended Complaint, ECF No. 72 ("SAC"), of Plaintiff Mitsui O.S.K. Lines, Ltd. ("MOL"), a Japanese corporation.  Specifically, the motions seek dismissal of the SAC's fourth and fifth claims, arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962 (d).  The first motion to dismiss was brought by Defendants Seamaster Logistics, Inc. ("Seamaster") and Toll Global Forwarding (Americas) Inc., formerly named Summit Logistics International, Inc. ("Summit"), and the second was brought by Defendant American Global Logistics LLC ("AGL") (collectively, "Moving Defendants").

Both motions are fully briefed.  ECF Nos. 77 ("SM/SL MTD"), 78-1 ("AGL MTD"), 80 ("MOL Opp'n"), 82 ("SM/SL Reply"), 84 ("AGL

1    Reply"). Pursuant to Civil Local Rule 7-1(b), both motions are

2    suitable for decision without oral argument. For the reasons set

3    forth below, the Court DENIES both motions.

4

5    **II.   BACKGROUND**

6        The Court assumes familiarity with Magistrate Judge James's

7    October 19, 2011 Order dismissing MOL's original Complaint. ECF

8    No. 38. Therefore, the Court will only briefly summarize the case,

9    supplementing Judge James's account with allegations contained in

10   the SAC. The Court recounts additional, specific allegations as

11   part of the discussion sections below, and takes all of the SAC's

12   well-pleaded allegations as true. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662,

13   679 (2009).

14       MOL is a Vessel Operating Common Carrier ("VOCC") -- that is,

15   an ocean shipper -- operating between foreign and U.S. ports,

16   including the Port of Oakland. Moving Defendants are, in industry

17   parlance, "NVOCCs," that is, Non-Vessel Operating Common Carriers.

18   Like MOL, they are shippers, but unlike MOL, they do not operate

19   seafaring vessels. NVOCCs such as the Moving Defendants

20   essentially are trucking companies that engage only in inland or

21   "door" carriage, while VOCCs like MOL may engage in ocean shipping.

22   <u>See</u> SAC ¶ 16.

23       Sometimes, in addition to providing ocean carriage, MOL is

24   hired to arrange inland carriage. <u>See id.</u> On those jobs, called

25   "through" or "door-to-door" carriage, MOL pays NVOCCs to arrange

26   for the inland leg (or legs) of the trip on MOL's behalf. <u>Id.</u> MOL

27   alleges that Defendants engaged in a scheme to charge MOL for

28   unnecessary or nonexistent inland carriage. In essence, MOL

**United States District Court**
For the Northern District of California

1   alleges that Defendants routinely represented to MOL that they had

2   performed inland carriage to or from a port serviced by MOL, but in

3   actuality third parties would make the inland shipments. As a

4   result, MOL allegedly was induced into paying for inland carriage

5   that it never received. <u>See id.</u> ¶¶ 24-31. MOL alleges that some

6   of this conduct occurred in inland China and some in the United

7   States. <u>See</u> MOL Opp'n at 7-8 (identifying allegations of SAC which

8   purportedly pertain to U.S. conduct).

9         The SAC's fourth and fifth claims assert that, by using postal

10   mail, faxes, and the Internet to communicate with and bill MOL in

11   connection with these shipments, Defendants engaged in wire and

12   mail fraud -- predicate acts that can support civil RICO liability

13   under 18 U.S.C. §§ 1962(c) and (d), respectively.[1] <u>See</u> SAC ¶¶ 78-

14   91. Moving Defendants' position, in brief, is that MOL cannot

15   state viable RICO claims against them because the case primarily

16   concerns conduct that took place in inland China and effected MOL

17   in Japan, and that, under <u>Morrison v. National Australia Bank Ltd.</u>,

18   --- U.S. ---, 130 S. Ct. 2869 (2010), RICO has no extraterritorial

19   application.

20

21   **III. <u>LEGAL STANDARD</u>**

22         A motion to dismiss under Federal Rule of Civil Procedure

23   12(b)(6) "tests the legal sufficiency of a claim." <u>Navarro v.</u>

24

25   [1] Section 1962(c) provides: "It shall be unlawful for any person
employed by or associated with any enterprise engaged in, or the
26   activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of
such enterprise's affairs through a pattern of racketeering
27   activity or collection of unlawful debt." Section 1962(d) makes it
unlawful to conspire to do so. Section 1961(1) enumerates
28   prohibited racketeering activities (or "predicate acts"), which
include mail and wire fraud.

United States District Court
For the Northern District of California

1  <u>Block</u>, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based

2  on the lack of a cognizable legal theory or the absence of

3  sufficient facts alleged under a cognizable legal theory."

4  <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir.

5  1988). "When there are well-pleaded factual allegations, a court

6  should assume their veracity and then determine whether they

7  plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S.

8  at 679. However, "the tenet that a court must accept as true all

9  of the allegations contained in a complaint is inapplicable to

10 legal conclusions. Threadbare recitals of the elements of a cause

11 of action, supported by mere conclusory statements, do not

12 suffice." <u>Id.</u> (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

13 555 (2007)). The allegations made in a complaint must be both

14 "sufficiently detailed to give fair notice to the opposing party of

15 the nature of the claim so that the party may effectively defend

16 against it" and "sufficiently plausible" such that "it is not

17 unfair to require the opposing party to be subjected to the expense

18 of discovery." <u>Starr v. Baca</u>, 633 F.3d 1191, 1204 (9th Cir. 2011).

19

20 IV.  <u>**DISCUSSION**</u>

21     A.  **Morrison <u>and Its Progeny</u>**

22     Moving Defendants have not challenged the sufficiency of MOL's

23 factual allegations. <u>See</u> SM/SL Reply at 7-8 (acknowledging that

24 MOL's claims are sufficiently pled). Instead, Moving Defendants

25 rest their challenge to MOL's RICO claims on <u>Morrison</u>, a securities

26 action, and the handful of cases that have applied its reasoning in

27 the RICO context. Because the post-<u>Morrison</u> RICO cases have yet to

28 settle on a single approach, the Court will briefly survey the

4

1  field.  It concludes that <u>European Community v. RJR Nabisco, Inc.</u>,

2  No. 02-CV-5771 (NGG)(VVP), 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011),

3  supplies the governing rule in this case.

4       **1.   Territoriality in the Securities Context**

5       In <u>Morrison</u>, the Supreme Court considered whether § 10(b) of

6  the Securities and Exchange Act of 1934 has extraterritorial

7  application.  130 S. Ct. at 2876-77.  The <u>Morrison</u> plaintiffs, all

8  Australian nationals, had purchased stock in an Australian bank on

9  an Australian stock exchange.  Their complaint alleged that

10 officers of the bank's U.S. subsidiary had, in the United States,

11 made fraudulent statements that caused some of the subsidiary's

12 assets to appear more valuable than they really were.  <u>Id.</u> at 2876.

13 On these facts, the Court addressed the question of whether the

14 Australian plaintiffs had a viable cause of action under § 10(b),

15 given the long-standing presumption against extraterritorial

16 application of domestic laws.  <u>Id.</u> at 2877-78.

17      The court held that they did not.  Rejecting tests that

18 various circuit courts had developed for ascertaining the

19 extraterritorial application of statutes, <u>id.</u> at 2878-81, the court

20 articulated the presumption against extraterritoriality in robust

21 terms: "When a statute gives no clear indication of an

22 extraterritorial application, it has none."  <u>Id.</u> at 2878.  The

23 court then turned to the language of the Exchange Act, observing

24 that "the objects of the statute's solicitude" were "transactions

25 in securities listed on domestic exchanges, and domestic

26 transactions in other securities . . . ."  <u>Id.</u> at 2884.  "It is

27 those transactions that the statute seeks to regulate . . . ; it is

28 parties or prospective parties to those transactions that the

**United States District Court**
For the Northern District of California

1   statute seeks to protect . . . ."  <u>Id.</u> (citations omitted).  On

2   that basis, the court concluded that Congress did not intend for

3   the Exchange Act to possess extraterritorial reach.

4       The <u>Morrison</u> court also rejected the argument that the case

5   called only for <u>domestic</u> application of § 10(b).  The court

6   acknowledged that plaintiffs had alleged some U.S. conduct, but

7   this did not make their proposed application of § 10(b) domestic

8   rather than extraterritorial: "[I]t is a rare case of prohibited

9   extraterritorial application that lacks <u>all</u> contact with the

10  territory of the United States.  But the presumption against

11  extraterritorial application would be a craven watchdog indeed if

12  it retreated to its kennel whenever <u>some</u> domestic activity is

13  involved in the case."  <u>Id.</u> (emphasis in original).

14          **2.   Cases Addressing Territoriality in the RICO Context**

15      Since <u>Morrison</u> made it clear that the presumption against

16  extraterritoriality is a canon of construction applicable to any

17  statute, <u>id.</u> at 2878-79, a half-dozen courts have applied its

18  reasoning in the RICO context.[2]  These courts have uniformly held

19  that RICO is silent as to its extraterritorial application and

20  that, under <u>Morrison</u>, it therefore has none.  <u>See</u>, <u>e.g.</u>, <u>In re</u>

21  <u>Toyota</u>, 785 F. Supp. 2d at 913; <u>Norex</u>, 631 F.3d at 32.  Further,

22  these courts have broadly agreed that, while the "object" of the

23  Exchange Act's "solicitude" considered in <u>Morrison</u> was domestic

24  securities transactions, in the RICO context "it is the

---

25  [2] <u>Cedeño v. Intech Group, Inc.</u>, 733 F. Supp. 2d 471, 474 (S.D.N.Y.
26  2010); <u>Norex Petroleum Ltd. v. Access Industries, Inc.</u>, 631 F.3d
    29, 32 (2d Cir. 2010); <u>European Cmty.</u>, 2011 WL 843957; <u>United</u>
27  <u>States v. Philip Morris USA, Inc.</u>, 783 F. Supp. 2d 23, 28-29
    (D.D.C. 2011); <u>In re Toyota Motor Corp.</u>, 785 F. Supp. 2d 883, 913
28  (C.D. Cal. 2011); <u>CGC Holding Co., LLC v. Hutchens</u>, 2011 WL
    5320988, at *14, --- F. Supp. 2d --- (D. Colo. 2011).

**United States District Court**
For the Northern District of California

1   'enterprise' that is the object of the statute's solicitude, and

2   the 'focus' of the statute."  <u>European Cmty.</u>, 2011 WL 843957, at

3   *5.  Specifically, "the focus of RICO is on the enterprise as the

4   recipient of, or cover for, a pattern of criminal activity."

5   <u>Cedeño</u>, 733 F. Supp. 2d at 474.  RICO "seeks to regulate

6   'enterprises' by protecting them from being victimized by or

7   conducted through racketeering activity."  <u>European Cmty.</u>, 2011 WL

8   843957, at *5.[3]

9        Beyond these points, however, the cases' reasoning diverges.

10  <u>Cf.</u> <u>In re Toyota</u>, 785 F. Supp. 2d at 914-15 (surveying cases and

11  observing that "[i]t is unclear how <u>Morrison</u>'s logic, which

12  evaluates the 'focus' of the relevant statute, precisely translates

13  to RICO").  This divergence has been obscured to a certain degree

14  by factual differences between the cases, specifically, their

15  varying mixtures of foreign and domestic elements.  Some cases have

16  been relatively clear-cut: Post-<u>Morrison</u> courts have had no

17  difficulty concluding that far-flung foreign schemes conducted by

18  foreign actors and implicating only incidental U.S. conduct are

19  fundamentally extraterritorial and thus beyond the reach of RICO.[4]

20

21  [3] <u>See</u> <u>also</u> <u>Philip Morris</u>, 783 F. Supp. 2d at 28-29 (citing <u>Cedeño</u>,
    733 F. Supp. 2d at 473) (RICO "is focused on how a pattern of
22  racketeering activity affects an enterprise"); <u>In re Toyota</u>, 785 F.
    Supp. 2d at 914 (same); <u>but</u> <u>see</u> <u>CGC Holding Co.</u>, 2011 WL 5320988,
23  at *14 ("The focus of [RICO] is the racketeering activity, i.e., to
    render unlawful a pattern of domestic racketeering activity
24  perpetrated by an enterprise.").

25  [4] <u>See</u> <u>Cedeño</u>, 733 F. Supp. 2d 471 (Venezuelan actors allegedly
    conspired to imprison Venezuelan national in Venezuela); <u>Norex</u>, 631
26  F.3d 29 (conspiracy by Russian nationals to seize control over
    Russian oil industry through widespread bribery and institutional
27  corruption in Russia); <u>European Cmty.</u>, 2011 WL 843957 (South
    American and Russian cartels allegedly operated labyrinthine
28  international money laundering and smuggling scheme involving
    illicit distribution abroad of U.S.-made cigarettes).

**United States District Court**
For the Northern District of California

1  But in other cases, the balance of foreign and domestic elements

2  has not been so one-sided.  In those cases, district courts --

3  starting from the premise that RICO has no extraterritorial

4  application -- have had to decide whether applying RICO to the

5  facts before them would result in an impermissible extraterritorial

6  application or a permissible domestic one.  Or, to state the matter

7  in Morrison's memorable terms, these courts have had to decide how

8  much or what kind of domestic conduct sends the watchdog back to

9  its kennel.  Morrison does not say, and the cases evince differing

10  approaches.[5]

11      The challenge of applying Morrison in RICO cases stems from

12  the difficulty of ascertaining where a RICO enterprise is located.

13  This difficulty was not present in the securities context from

14  which Morrison arose.  When the Morrison court determined that only

15  "transactions in securities listed on domestic exchanges, and

16  domestic transactions in other securities" were properly subject to

17  the Exchange Act, 130 S. Ct. at 2884, it could rely on courts to

18  identify the place where an alleged transaction occurred: Though

19  securities transactions may occur in volume, each one occurs in a

20  [5] See Philip Morris, 783 F. Supp. 2d 23 (where English cigarette

21  manufacturer allegedly conspired to deceive American public about
   health effects of smoking, district court dismissed RICO claims,

22  despite enterprise's "tremendous impacts" on United States, because
   English defendant's domestic conduct was "isolated" and not by

23  itself actionable under RICO); In re Toyota, 785 F. Supp. 2d at
   914-15 (dismissing RICO claims as insufficiently pled but observing

24  that well-pled allegations of "enterprise operating in the United
   States, consisting largely of domestic 'persons,' engaging in a

25  pattern of racketeering activity in the United States, and damaging
   Plaintiffs abroad, . . . might well state a claim consistent with

26  Morrison's holding"); CGC Holding Co., 2011 WL 5320988, at *14
   (where Canadian nationals allegedly engaged in an enterprise "to

27  extract money from [U.S. plaintiffs] through a phony loan scheme,"
   plaintiffs stated cognizable RICO claim because "the racketeering

28  activity of the enterprise . . . was directed at and largely
   occurred within the United States").

Case3:11-cv-02861-SC Document89 Filed05/10/12 Page9 of 20

readily ascertained place at a readily ascertained time.

RICO enterprises are different. They are not discrete events; they are groups of people.[6] As such, they do not "occur" in a place in the way that transactions do. They have an entirely different and, especially in the case of association-in-fact enterprises, more amorphous structure:

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods -- by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.

Boyle v. United States, 556 U.S. 938, 948 (2009). An association-in-fact enterprise need only have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946.

Because the very notion of an association-in-fact enterprise is "expansive," id. at 944, some alleged enterprises may be difficult to pin to a location. Nevertheless, because RICO applies only to domestic enterprises, courts will be called upon to determine whether a particular RICO enterprise, whatever its structure, is extraterritorial or domestic, which implies a rough

---

[6] RICO defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C § 1961(4). The latter type of enterprise -- the kind that is not a legal entity -- is commonly called an "association-in-fact" or "associated-in-fact" enterprise. E.g., Cedeño, 733 F. Supp. 2d at 472; In re Toyota, 785 F. Supp. 2d at 900.

**United States District Court**
For the Northern District of California

determination of the location of the enterprise.  The enterprise's location need not be targeted with pinpoint accuracy: The relevant question is simply whether the enterprise is extraterritorial or not.[7]

### 3.   The Nerve Center Test

The only case to squarely propose a principled way to determine the territoriality of a RICO enterprise is European Community.  The European Community court recognized that "[b]ecause the 'focus' of RICO is the 'enterprise,' a RICO 'enterprise' must be a 'domestic enterprise.'"  2011 WL 843957, at *6 (citing Morrison, 130 S. Ct. at 2884).  The court acknowledged the lack of precedent "suggesting how a court may determine the geographic location of a RICO enterprise."  Id.  It then analogized the inquiry to "determin[ing] the geographic location of a corporation."  Id.  The court turned for guidance to Hertz Corp. v. Friend, --- U.S. ---, 130 S. Ct. 1181 (2010).  In that case, the Supreme Court set forth a "nerve center" test for ascertaining the

---

[7] The location of the associated racketeering activity is a different question, and not dispositive of the issue of the enterprise's territoriality.  "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576, 583 (1981).  "RICO is not a recidivist statute designed to punish someone for committing a pattern of multiple criminal acts.  Rather, it prohibits the use of such a pattern to impact an enterprise . . . ." Cedeño, 733 F. Supp. 2d at 473.  Accordingly, the question before this Court is not where the predicate acts alleged by MOL took place, but rather the territoriality of the alleged enterprise itself. See id. at 474; European Cmty., 2011 WL 843957, at *5.  The propriety of focusing the territoriality inquiry on the enterprise rather than the racketeering is confirmed by the fact that RICO defines the term "enterprise" to include legal entities.  18 U.S.C. § 1961(4).  In such cases, the territoriality of the RICO enterprise clearly would not depend on the location where predicate acts occurred but on the location of the legal entity, that is, of the enterprise itself. The Court sees no reason why the analysis should differ for association-in-fact enterprises.

**United States District Court**
For the Northern District of California

state citizenship of a corporation for purposes of diversity
jurisdiction. <u>Hertz</u>, 130 S. Ct. at 1192-94. The <u>European</u>
<u>Community</u> court, applying <u>Hertz</u> principles, suggested that courts
should focus on the RICO enterprise's "brains" as opposed to its
"brawn," that is, on "the decisions effectuating the relationships
and common interest of its members, and how those decisions are
made," as compared to the location where the consequences of those
decisions transpire. 2011 WL 843957, at *6. The court appeared to
recognize that the inquiry will sometimes yield artificially
simplified results, "i.e., [a] single place of business for a
corporation, though there may be many," but stated that "the test
is still instructive . . . ." <u>Id.</u>

This Court agrees. The nerve center test provides a familiar,
consistent, and administrable method for determining the
territoriality of RICO enterprises in cases such as the one at bar,
which blend domestic and foreign elements. It permits district
courts deciding RICO cases like this one to analogize to the larger
body of cases that use the nerve center test to identify a
corporation's state court citizenship for diversity purposes.
Further, the nerve center test has the virtue of recognizing that a
RICO enterprise is analytically distinct from the pattern of
predicate acts associated with it -- a distinction that the earlier
cases have sometimes blurred. <u>E.g.</u>, <u>CGC Holding Co.</u>, 2011 WL
5320988, at *14 (determining that RICO enterprise was domestic
because the "racketeering activity of the enterprise . . . was
directed at and largely occurred within the United States"). In
short, the test aligns the focus of the court's inquiry with the
focus of RICO: "the enterprise as the recipient of, or cover for, a

**United States District Court**
For the Northern District of California

1  pattern of criminal activity." Cedeño, 733 F. Supp. 2d at 474.  To

2  the extent that previous post-Morrison RICO cases -- none of which

3  are binding precedent on this Court -- have focused on the

4  nationality of a RICO enterprise's constituent members, the

5  location of racketeering activity, the location of "effects," or

6  the location or quantity of ambiguously defined "conduct," this

7  Court parts ways with them.

8       **B.   Application of Nerve Center Test**

9       The nerve center test ascertains the territoriality of an

10  association-in-fact RICO enterprise by examining the alleged

11  "decisions effectuating the relationships and common interest of

12  [the enterprise's] members, and how those decisions are made."

13  European Cmty., 2011 WL 843957, at *6.  This requires the Court

14  first to examine the structure of the enterprise alleged by MOL.

15       **1.   Structure of the Alleged RICO Enterprise**

16       "To state a claim under § 1962(c), a plaintiff must allege (1)

17  conduct (2) of an enterprise (3) through a pattern (4) of

18  racketeering activity." Odom v. Microsoft Corp., 486 F.3d 541, 547

19  (9th Cir. 2007) (internal quotation marks omitted).[8]  Presently,

20  this Court is concerned only with the second element, that of the

21  enterprise.  Moving Defendants have not challenged the sufficiency

22  of MOL's allegations of the "enterprise" element.  Nevertheless,

23  because MOL's pleading could be clearer in connecting its

24  allegations to its claims, the Court recounts the allegations that

25  _____

26  [8] MOL also asserts a claim under subsection (d) of § 1962.
Subsection (d) simply makes it unlawful to conspire to violate the
preceding three subsections.  Since Moving Defendants' § 1962(d)

27  liability depends on MOL making out a viable claim under § 1962(c),
and Moving Defendants have raised no specific challenge to the

28  conspiracy element of MOL's § 1962(d) claim, the Court focuses on §
1962(c) exclusively.

**United States District Court**
For the Northern District of California

1  comprise the enterprise element.  The Court does so solely to

2  illuminate the structure of the alleged enterprise, with an eye

3  toward applying the nerve center test.

4       "[A]n association-in-fact enterprise is simply a continuing

5  unit that functions with a common purpose." Boyle, 556 U.S. at

6  948.  To plead the "enterprise" element of a RICO claim, plaintiffs

7  must adequately allege that: (1) defendants have associated for a

8  common purpose for engaging in a course of conduct, (2) in an

9  ongoing organization, either formal or informal, and (3) the

10 various associates function as a continuing unit.  See Odom, 486

11 F.3d at 552-53.[9]

12      The enterprise alleged by MOL satisfies these minimal

13 structural requirements -- which, as the Ninth Circuit has

14 observed, are "not very demanding." Id. at 548.  MOL alleges the

15 following: Seamaster is a California corporation, Summit is a U.S.

16 corporation with its principal place of business in New Jersey, and

17 AGL is a "corporation and/or limited liability company" organized

18 under Georgia law, with its principal place of business in that

19 state.  SAC ¶¶ 4-5, 10.  Both Summit and Seamaster are part of a

20 group of companies whose corporate parent is the Toll Group

21 ("Toll"), a business entity of form unknown.  Id. ¶ 6 & n.1.[10]

22

23 [9] Odom was decided before Boyle, but the Court sees no distinction
   between the cases' respective definitions of a RICO enterprise.
24 Both cases simply applied the holding of Turkette to reject
   argument that RICO required a plaintiff to show that an enterprise
25 has a separate or "ascertainable" structure, i.e., one going beyond
   what is necessary to carry out its racketeering activities.
26 Compare Odom, 486 F.2d at 553 with Boyle, 556 U.S. at 948.  The
   Court therefore continues to recognize Odom as binding authority.

27 [10] As explained supra in the Introduction, Summit is Toll's former
28 name and Toll appears in this action as Toll Global Forwarding
   (Americas) Inc.

**United States District Court**
For the Northern District of California

1    During a period covering 2006-2007, Summit and Seamaster were spun

2    off from a corporate forebearer, the Hecny Group ("Hecny"), with

3    whom Summit and Seamaster now directly compete. <u>Id.</u> ¶ 7. Jerry

4    Huang, aka Huang Chun Jen ("Huang"), was a "key executive and

5    member of the Board of Directors" of Hecny, <u>id.</u>, and now is

6    Summit's Managing Director for the Asia Pacific Region, <u>id.</u> ¶ 8.

7        Hecny was the "longtime strategic partner" of a company called

8    Global Link Logistics, Inc. ("Global Link"), whose founder and CEO

9    was Chad Rosenberg ("Rosenberg"). <u>Id.</u> ¶ 12. Rosenberg left Global

10   Link and bought Moving Defendant AGL; Rosenberg now serves as AGL's

11   CEO. <u>Id.</u> ¶¶ 11-12, 14; Ex. I.

12       MOL alleges that the relationship between AGL on the one hand

13   and Summit and Seamaster on the other is a "strategic partnership"

14   mirroring that of Hecny and Global Link. <u>Id.</u> ¶ 15. Furthermore,

15   MOL avers that Summit/Seamaster and AGL comprise an association-in-

16   fact. <u>Id.</u> "Through Seamaster, AGL ships goods with MOL on behalf

17   of customers in the United States who are the ultimate recipient of

18   the goods." <u>Id.</u> The purpose of the relationship is "to facilitate

19   the import transportation of cargo (largely furniture and other

20   consumer goods) from Asia to the United States." <u>Id.</u> MOL alleges

21   that Summit, Seamaster, and AGL "actively conducted and

22   participated in the affairs of the enterprise" by "arranging for

23   and otherwise participating in thousands of shipments of cargo from

24   Asia to the United States." <u>Id.</u> ¶ 80. MOL alleges that the

25   partnership and related shipping activities began at least in 2007

26   and continued until at least 2011. <u>Id.</u> ¶ 79.

27       Taken together, these allegations describe an association-in-

28   fact enterprise, that is, "a continuing unit that functions with a

**United States District Court**
For the Northern District of California

common purpose" without being, itself, a legal entity.  <u>Boyle</u>, 556
U.S. at 948; 18 U.S.C. § 1961(4).  MOL alleges a common purpose,
namely, the import transportation of cargo from Asia to the United
States.  MOL further alleges an ongoing organization.  An ongoing
organization is nothing more than "a vehicle for the commission of
two or more predicate crimes" which need not have any particular
formal organization.  See <u>Odom</u>, 486 F.3d at 552.  MOL alleges that
Seamaster/Summit and AGL form a strategic partnership which engages
in the allegedly wrongful shipping practices described in the SAC,
practices which are furthered by the alleged mail and wire frauds.
While MOL does not allege that the partners are bound by any formal
agreement or structure, they are not required to do so.  See <u>id.</u>
Further, the presence of Huang and Rosenberg in both the previous
Hecny/Global Link partnership and the current alleged partnership
between Seamaster, Summit, and AGL supports a reasonable inference
that these corporations serve, at least to a significant degree, to
effectuate the purposes of an informal alliance of businesspeople.
Lastly, MOL's allegations describe an enterprise that satisfies the
continuity requirement.  This requirement "focuses on whether the
associates' behavior was 'ongoing' rather than isolated activity."
<u>Odom</u>, 486 F.3d at 553 (quoting <u>United States v. Patrick</u>, 248 F.3d
11, 19 (1st Cir. 2001)).  MOL's allegation that the partnership, as
well as the shipping activities at the center of this case, were
ongoing at least from 2007 to 2011 easily satisfies this standard.

### 2.   Territoriality of the Alleged RICO Enterprise

Having described the alleged RICO enterprise, the Court now
applies the nerve center test to determine whether RICO applies to
it.  This test examines the "decisions effectuating the

15

United States District Court
For the Northern District of California

1  relationships and common interest of [the enterprise's] members,

2  and how those decisions are made." European Cmty., 2011 WL 843957,

3  at *6.  Focusing on the brains rather than the brawns of the

4  enterprise, id., the Court concludes that the enterprise alleged

5  here is a domestic one.

6       The Court first observes that all three Moving Defendants are

7  U.S. corporations.  Their domestic legal status is not by itself

8  dispositive.  See supra p. 12 (rejecting notion that "nationality

9  of a RICO enterprise's constituent members" determines

10 territoriality).  Their domestic status tends to show, however,

11 that the decision making necessary to effectuate the alleged

12 association-in-fact enterprise's common purpose occurred

13 substantially within the territory of the United States.

14      Additionally, MOL alleges that Seamaster, Summit, and AGL

15 "arranged" shipments in the United States.  The location where the

16 shipping actually took place is merely evidence of where the

17 enterprise exercised its "brawn."  It is the activity of arranging

18 the allegedly illicit shipments that indicates where the enterprise

19 exercised its "brains."  MOL alleges that these shipments were

20 arranged in substantial part within the United States, which, in

21 combination with the U.S. status of the alleged enterprise's member

22 corporations, supports a reasonable inference in MOL's favor, i.e.,

23 that the enterprise's nerve center was domestic.

24      Even if the Court were to read the allegations of the

25 complaint in a light less favorable to MOL -- and in the procedural

26 posture of this case, the Court must do the opposite -- MOL has

27 alleged, at minimum, an enterprise with one foot in China and one

28 in the United States.  This is more than the merely incidental

**United States District Court**
For the Northern District of California

1  domestic activity which, <u>Morrison</u> warned, would do nothing to shake
2  the watchdog from its post.  <u>See</u> <u>Morrison</u>, 130 S. Ct. at 2884.  On
3  the contrary, MOL alleges a cross-national enterprise that uses
4  U.S. corporations as cover for a pattern of racketeering
5  activities.  These allegations are enough to assert the existence
6  of a domestic enterprise to whose activities RICO applies.  <u>See</u>
7  <u>Cedeño</u>, 733 F. Supp. 2d at 474.

8      Moving Defendants' arguments to the contrary are unavailing.
9  Apparently following the "conduct" approach that some earlier cases
10 took, but which this Court has declined to follow, <u>see</u> <u>supra</u>
11 Section IV.A.3, AGL characterizes this case as being "primarily" or
12 "at its core" about conduct in inland China.  AGL MTD at 2, AGL
13 Reply at 4.  AGL argues, in essence, that because the bulk of the
14 allegations in the SAC relate to conduct in China, the alleged RICO
15 enterprise must be extraterritorial.  As MOL points out, AGL
16 essentially ignores MOL's allegations of U.S. conduct.  But even if
17 AGL had accurately characterized MOL's allegations, the location of
18 "conduct" is simply not the test.  The location of the enterprise
19 is.  AGL's position would supplant the relatively principled nerve
20 center test with one that invites courts to adopt a "know-it-when-
21 they-see-it" approach to territoriality, with predictably
22 unpredictable results.  This Court declines to adopt that approach.

23     For their part, Seamaster and Summit urge the Court to dismiss
24 MOL's RICO claims because MOL alleges "an international, not
25 domestic, RICO enterprise."  SM/SL Reply at 4.  This argument
26 misapprehends the holding of <u>Morrison</u>.  That case teaches that
27 "<u>some</u> domestic activity" will not save an otherwise
28 extraterritorial RICO claim -- not that <u>any</u> international activity

17

1  will doom an otherwise domestic claim.  See Morrison, 130 S. Ct. at

2  2884 (emphasis in original).  Essentially, Seamaster and Summit

3  argue that even though MOL alleges an enterprise with domestic ties

4  substantial enough to make it at least "international," such an

5  enterprise is not truly domestic because the extraterritorial

6  elements somehow matter more.  Adopting this position would require

7  the Court to engage in the sort of conduct-weighing analysis that

8  it has already declined to undertake.  When a RICO plaintiff

9  alleges a combination of domestic and foreign elements (e.g.,

10 conduct, effects, actors), a court needs some way to determine

11 whether the domestic elements outweigh the foreign for purposes of

12 the territoriality inquiry.  This implies a determination about

13 which elements are relatively important.  Such a determination

14 could be made on an ad hoc basis after examining the (often prolix

15 and complex) allegations of the RICO complaint.  But this Court

16 believes that the analysis calls instead for a consistent method

17 that cuts through extraneous matter to the heart of the issue.  The

18 nerve center test meets this need.  In the RICO context, as well as

19 in the corporate citizenship context from which it is derived, the

20 nerve center test takes a sprawling network of decision makers and

21 actors and reduces it, for legal purposes, to a single, simplified

22 location.  This simplification is a feature, not a bug.  Seamaster

23 and Summit's position would unhelpfully muddy the analysis: Whereas

24 the relevant categories under Morrison are "extraterritorial" and

25 "not," Seamaster and Summit would add a third category -- "both."

26 In such situations, courts would be stuck making ad hoc

27 determinations about territoriality without a reliable guide.

28     The Court also rejects Seamaster and Summit's argument that

**United States District Court**
For the Northern District of California

1   MOL's RICO claims are impermissibly extraterritorial because MOL,

2   as a Japanese company, feels the effects of the alleged scheme in

3   Asia.  SM/SL Reply at 4.  <u>Morrison</u> repudiated the "effects" tests

4   adopted by various circuits and replaced it with one that focuses,

5   in the securities context, on the location of the alleged

6   transaction, and, in the RICO context, on the location of RICO's

7   object of solicitude, the enterprise as a cover for or victim of

8   racketeering activity.  <u>Cedeño</u>, 733 F. Supp. 2d at 474.  <u>Morrison</u>'s

9   holding bars courts from refusing to apply RICO simply because the

10  scheme's effects are felt abroad; it does not suggest that courts

11  may <u>deny</u> relief for that reason.  It is true that "MOL

12  unambiguously seeks application of RICO to remedy harmful effects

13  felt outside the United States."  SM/SL Reply at 4.  Such

14  application is entirely permissible under <u>Morrison</u>, because the

15  enterprise causing those foreign effects is a domestic one.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**V.    CONCLUSION**

Moving Defendants have not challenged MOL's RICO claims on any grounds other than the presumption against extraterritoriality. Having concluded for the foregoing reasons that this challenge does not succeed, the Court accordingly DENIES the partial motions to dismiss brought, respectively, by Defendants Seamaster Logistics, Inc., and Toll Global Forwarding (Americas) Inc., formerly named Summit Logistics International, Inc., and by American Global Logistics LLC.  Plaintiff Mitsui O.S.K. Lines, Ltd.'s RICO claims remain undisturbed, as do the other, unchallenged claims of the Second Amended Complaint.

IT IS SO ORDERED.

Dated: May 10, 2012

UNITED STATES DISTRICT JUDGE