United States District Court
For the Northern District of California

1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9  MITSUI O.S.K. LINES, LTD.,        )  Case Nos. 11-cv-02861-SC
                                     )
10            Plaintiff,             )
                                     )
11        v.                         )  ORDER RE: SUMMIT US'S
                                     )  MOTION TO ALTER OR AMEND
12  SEAMASTER LOGISTICS, INC., SUMMIT)  THE JUDGMENT
   LOGISTICS INTERNATIONAL, INC.,    )
13  KESCO CONTRAINER LINE, INC.; KESCO)
   SHIPPING, INC., and DOES 1 through)
14  20,                             )
                                     )
15            Defendants.            )
                                     )
16                                   )
                                     )
17  _____)

18

19  I.   **INTRODUCTION**

20       The Court issued Findings of Fact ("FF") and Conclusions of

21  Law ("CL") in the above-captioned matter on March 21, 2013.  ECF

22  No. 261.[1]  Among other things, the Court found Defendants Summit

23  Logistics International ("Summit US") and Kesco Container Line,

24  Inc. ("Kesco") liable for intentional misrepresentation and

25  conspiracy.  Because Summit US and Kesco had conspired together,

26  the Court held them jointly and severally liable.  The Court

27  _____

28  [1] Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc., 11-CV-
   02861-SC, 2013 WL 1191213, 2013 U.S. Dist. LEXIS 40466 (N.D. Cal.
   Mar. 21, 2013).

**United States District Court**
For the Northern District of California

1   ultimately entered judgment against Summit US and Kesco for

2   $8,284,393.11.  ECF No. 262.  Now Summit US moves to alter or amend

3   the judgment pursuant to Federal Rule of Civil Procedure 59(e).[2]

4   ECF No. 273 ("Mot.").  Summit US argues that the Court erred by

5   finding it liable for torts completed before it joined the

6   conspiracy.  The motion is fully briefed, ECF Nos. 285 ("Opp'n"),

7   288 ("Reply").

8

9   **II.   BACKGROUND**

10          **A.   Factual Background**

11          Plaintiff Mitsui OSK Lines, Ltd. ("MOL"), a Vessel Operating

12  Common Carrier, operates ships that carry cargo between foreign

13  ports and the United States.  Defendants Summit US and Kesco, Non-

14  Vessel Operating Common Carriers ("NVOCC"), contracted for space on

15  MOL's vessels and resold that space to their own customers.  When

16  moving cargo from Asia to the United States, MOL sometimes arranged

17  trucking for its NVOCC customers through third-party truckers.  For

18  example, at the behest of its customers, MOL paid third parties for

19  trucking between factories in inland China to ports in Hong Kong.

20  MOL would recover the trucking costs by charging its customers a

21  higher rate for through carriage.

22          In this case, Kesco and Summit US conspired with Michael Yip,

23  a high-level MOL employee, to induce MOL to pay for trucking that

24  never actually occurred.  Under this so-called "Shenzhen door

25  arrangement," Summit US and Kesco requested that MOL arrange for

26

27  _____

28  [2] Summit US does not mention Rule 59 in its motion, but it does
    cite to the rule in its reply in support of the motion.  Reply at
    1.  As MOL does not take issue with this omission in its opposition
    brief, neither will the Court.

2

**United States District Court**
For the Northern District of California

1   trucking between Shenzhen and Hong Kong and nominated Rainbow

2   Trucking ("Rainbow") to perform the trucking services.  MOL would

3   pay Rainbow and charge Summit US and Kesco for each truck move.

4   Because the price MOL paid to Rainbow was less than the extra

5   charge to Defendants, MOL would lose money on each truck move.

6   Unbeknownst to MOL, Rainbow did not actually perform any trucking

7   and kicked back a portion of MOL's payments to Defendants to

8   compensate them for requesting and paying for trucking services

9   that they did not actually need.[3]

10       The Shenzhen door arrangement began sometime in 2000.  At that

11  time, Yip proposed the arrangement to one of Kesco's high-level

12  officers, Raymond Cheng.  Cheng carried out the scheme at Kesco

13  with the help of two of his subordinates, Winnie Lau and Geoff

14  Tice.  Lau booked the fake truck moves, and Tice negotiated

15  trucking rates with MOL representatives.

16       Much of the cargo moving under the Shenzhen door arrangement

17  was connected to Fashion Merchandising Inc. ("FMI"), a company that

18  performed warehousing and trucking services for a number of garment

19  manufacturers, including Jones Apparel.  FMI and Kesco were

20  strategic partners.  FMI acted as Kesco's sales agent in the United

21  States, Kesco acted as FMI's local handling agent in Hong Kong, and

22  the two companies had a profit sharing agreement.  Tice, a key

23  player in the Shenzhen door arrangement, worked for both Kesco and

24  FMI at various times.

25       In 2006, FMI was acquired by the newly formed Summit Group,

26  which owned a number of other subsidiaries, including Summit US's

27  _____

28  [3] Findings of Fact paragraphs 10 through 68 provide a more detailed
    description of the Shenzhen door arrangement and Defendants'
    involvement in the scheme.

**United States District Court**
For the Northern District of California

1  predecessor.   After the acquisition, Kesco continued to act as the

2  local handling agent for the Jones Apparel business.   It also

3  continued to move Jones Apparel cargo under the Shenzhen door

4  arrangement.   Tice eventually transitioned to the Summit Group,

5  where he continued to negotiate Shenzhen trucking rates without

6  informing MOL that no trucking was actually taking place.

7       In 2008, the Summit Group and its subsidiaries went through a

8  strategic bankruptcy.   The companies were eventually liquidated,

9  and their assets were purchased by TriDec Acquisition Co., Inc.

10  ("TriDec"), which was managed by a number of Summit Group

11  executives.   The bankruptcy and the TriDec acquisition did not

12  interrupt the operations of the former Summit Group companies.   The

13  same managers continued to run the companies before, during, and

14  after the bankruptcy.   Throughout the process, these companies

15  continued to accept customer bookings, issue bills of lading, and

16  manage the movement of cargo.   Summit US was incorporated in March

17  2008 and primarily serviced beneficial cargo owners.   From May 2008

18  through the end of 2008, Summit US used Kesco as its handling agent

19  in Hong Kong.   Kesco booked many of Summit US's shipments using the

20  Shenzhen door arrangement.

21       In an effort to completely transition the Jones Apparel

22  business from Kesco to Summit US, Summit US created Summit

23  Logistics International (SCM HK) Limited ("Summit SCM") in 2009.

24  Summit SCM was a joint venture between Summit US and the three

25  principal owners of Kesco.   The joint venture commenced operations

26  in January 2009 and supplanted Kesco as the agent in Hong Kong for

27  Summit US shipments.   Two of the principal managers of the Shenzhen

28  door arrangement at Kesco were brought on to run Summit SCM.   Cheng

was initially hired as a consultant to assist with the start-up of Summit SCM's operations, and Lau was later hired to run day-to-day operations. Lau continued to report to Cheng at Kesco after she moved from Kesco to Summit SCM. In January 2009, Cheng nominated Rainbow to perform Summit SCM's trucking. Under the direction of Lau and Cheng, Summit SCM took part in the Shenzhen door arrangement.

Kesco and Summit terminated the Shenzhen door arrangement in June 2010, when MOL inexplicably raised its rates for Shenzhen trucking.

**B.   Procedural History**

MOL brought the instant action on June 10, 2011. MOL's second amended complaint, the operative pleading in this matter, asserts causes of action for, inter alia, intentional misrepresentation and conspiracy. ECF No. 72. The Court held a bench trial on this matter from January 28 through February 19, 2013. In addition to hearing oral arguments, the Court requested pre- and post-trial briefs, which the parties submitted. ECF Nos. 172 ("Summit Pre-Trial Br."), 193 ("MOL Pre-Trial Br."), 253 ("MOL Post-Trial Br.") 255 ("Summit Post-Trial Br."). In its pre-trial brief, MOL argued that, under California law, all of the defendants should be held jointly and severally liable as coconspirators. MOL Pre-Trial Br. at 28. Summit US did not substantively address the conspiracy issue in its briefing, but, at closing arguments, its counsel asserted that MOL had failed to clearly explain who had conspired with whom. Summit US also suggested that it could not have conspired with Kesco since the two organizations were competitors. The parties disputed whether Summit US could be held liable

United States District Court
For the Northern District of California

for shipments moving under the Shenzhen door arrangement prior to Summit US's incorporation in March 2008. Summit US argued that it could not be held liable for actions taken prior to its corporate existence and, in any event, MOL had not asserted a claim for successor liability. MOL countered that its second amended complaint adequately pleaded facts to put Summit on notice of a claim for successor liability. MOL Post-Trial Br. at 22. In the alternative, MOL moved to amend its complaint to add such a cause of action. ECF No. 254.

The Court found in favor of MOL on its claims for intentional misrepresentation and conspiracy, holding Summit US and Kesco jointly and severally liable for $8,294,393.11. With respect to MOL's conspiracy claim, the Court found that Kesco had entered a conspiracy with Yip as early as 2000, when Yip and Cheng agreed to the Shenzhen door arrangement. The Court also found that Summit US joined the conspiracy as late as 2009 through Summit SCM, its joint venture with the Kesco partners. The Court held that, as coconspirators, Summit US and Kesco could be held jointly and severally liable for the entire conspiracy, including acts committed in furtherance of the conspiracy prior to Summit US's incorporation. CL at 61-62 (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)). As a result, the Court found that it did not need to reach the issue of successor liability. Id. at 68-69.

## III. <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 59(e), a party may move to alter or amend the judgment no later than twenty-eight days after the entry of the judgment. "Since specific grounds for a

**United States District Court**
For the Northern District of California

1   motion to amend or alter are not listed in the rule, the district

2   court enjoys considerable discretion in granting or denying the

3   motion.  However, reconsideration of a judgment after its entry is

4   an extraordinary remedy which should be used sparingly." <u>McDowell</u>

5   <u>v. Calderon</u>, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (quoting 11

6   Charles Alan Wright et al., Federal Practice and Procedure § 2810.1

7   (2d ed. 1995)).  There are generally four grounds for granting a

8   Rule 59(e) motion: "(1) if such motion is necessary to correct

9   manifest errors of law or fact upon which the judgment rests; (2)

10  if such motion is necessary to present newly discovered or

11  previously unavailable evidence; (3) if such motion is necessary to

12  prevent manifest injustice; or (4) if the amendment is justified by

13  an intervening change in controlling law." <u>Id.</u>

14

15  IV.   <u>DISCUSSION</u>

16        A.   **Conspiracy and Joint and Several Liability**

17        Summit US's primary argument is that the Court erred by

18  holding it jointly and severally liable for torts completed before

19  Summit US actually joined the conspiracy.  Mot. at 3.  MOL responds

20  that the Court need not consider the merits of this argument

21  because it was not raised before judgment was entered and that, in

22  any event, Summit US's substantive arguments concerning the

23  controlling law are incorrect.

24        As an initial matter, the Court finds that Summit US's motion

25  is not procedurally improper.  It is true that Summit US could have

26  (and probably should have) provided briefing on the issue of joint

27  and several liability for conspiracy prior to judgment.  After all,

28  MOL raised the issue in its pre-trial brief.  However, the

**United States District Court**
For the Northern District of California

importance of the joint and several liability issue did not become apparent until the Court found both Kesco and Summit US liable for intentional misrepresentation and conspiracy.  Further, the Court recognizes that it instructed the parties to keep their post-trial briefs short and to focus only on the issues that each party believed to be "very important."  In any event, if the Court did err in applying the law on this issue, a Rule 59(e) motion is the appropriate means for addressing that error.

Accordingly, the Court turns to the merits of Summit US's motion, which hinges on whether a coconspirator may be held liable for torts completed before it joined the conspiracy.  The Court reviews two of the lead cases cited by both parties on this issue, de Vries v. Brumback, 53 Cal. 2d 643 (Cal. 1960), and Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571 (Cal. Ct. App. 1995).  The Court then reviews some of the distinctions between conspiracy liability in civil and criminal law.  Based on this analysis, the Court concludes that it erred in finding Summit US liable for torts committed and completed before it joined the conspiracy.

In de Vries, the defendant was sued for his participation in a conspiracy to dispose of property stolen from the plaintiff's jewelry store.  Hours after the robbery, but before all of the stolen property could be fenced, the defendant agreed to join the conspiracy and took possession of the greater part of the stolen property.  De Vries, 53 Cal. 2d at 646.  The court found immaterial the question of whether all of the stolen property ever came into the defendant's possession, since the defendant joined the conspiracy while it was still ongoing and the purpose of the

conspirators was to convert all of the stolen property.  Id. at 650.  Accordingly, the court held that the defendant was a joint tortfeasor, liable for all of the stolen property.

The California Court of Appeal later distinguished de Vries in Kidron.  In that case, the plaintiff's former business partners allegedly defrauded the plaintiff of his rights to a television series and then entered a distribution agreement for the series with Movie Acquisition Corp. ("MAC").  Kidron, 40 Cal. App. 4th at 1574-75.  The plaintiff sued MAC for conspiracy to defraud.  The court held that, unlike the defendant in de Vries, MAC did not join the alleged conspiracy "while the underlying tort was continuing." Id. at 1595.  As a matter of law, the conspiracy was completed and actionable when plaintiff's former business partners obtained control of the concept for the television series.  This occurred months before MAC received any kind of notice of the plaintiff's fraud claim.

Summit US argues that the instant action is more like Kidron than de Vries.  Summit US essentially asks the Court to view the Shenzhen door arrangement as a series of torts, with each shipment moving under the arrangement giving rise to a separate claim for intentional misrepresentation.  See Mot. at 5.  Summit US argues that each of these torts was completed as soon as MOL paid Rainbow for the shipment, which generally occurred within weeks or months after Summit US or Kesco booked the shipment.  Id.  Accordingly, Summit US reasons that it cannot be held liable for Shenzhen door shipments booked and paid for before Summit US joined the conspiracy.  Summit US contends that the Court erred in holding it liable for Shenzhen door shipments booked by Kesco between 2000 and

**United States District Court**
For the Northern District of California

1   2008 since the Court found that Summit US did not join the

2   conspiracy until 2009.

3        MOL argues that the Court should not focus on when the

4   underlying torts were completed, but on whether the conspiracy and

5   its purpose had terminated by the time Summit US joined in 2009.

6   In MOL's view, de Vries stands for just this proposition.  Further,

7   MOL contends that Kidron is distinguishable since the purpose of

8   the conspiracy alleged in that case had been fully achieved before

9   the late-joining party got involved with the matter.  In contrast,

10  MOL argues, the Shenzhen door arrangement was still ongoing when

11  Summit US joined the conspiracy as late as 2009.

12       MOL's interpretation of the case law is unpersuasive.  Even if

13  some language in de Vries implies that the court was focused on the

14  status of the conspiracy rather than that of the underlying tort,

15  the facts of that case are substantially different than those

16  presented here.  In de Vries, the defendant joined the conspiracy

17  "within a few hours after the robbery[,] . . . and with full

18  knowledge of the prior acts of his coconspirators, actively

19  participated in the overall purpose to convert all of the stolen

20  property to their use and benefit."  53 Cal. 2d at 643.  In this

21  case, Summit US joined the conspiracy several years after its

22  inception.  Further, by the time Summit US joined the conspiracy,

23  Kesco had already successfully moved thousands of shipments under

24  the Shenzhen door arrangement.

25       MOL cites a number of other cases applying California law on

26  civil conspiracy.  Opp'n at 8-9 (citing Ally Bank v. Castle, 11-CV-

27  896 YGR, 2012 WL 3627631 (N.D. Cal. Aug. 20, 2012); Wyatt v. Union

28  Mortg. Co., 24 Cal. 3d 773 (Cal. 1979); Peterson v. Cruickshank,

United States District Court
For the Northern District of California

144 Cal. App. 2d 148 (Cal. Ct. App. 1956)).  Two of these cases state the general principle that a person who enters a conspiracy may be held liable for torts commenced before he or she enters into the conspiracy; however, they do not address the liability of a late-joining conspirator for completed torts.  See Ally Bank, 2012 WL 3627631, at *10 (citing de Vries); Peterson, 144 Cal. App. 2d at 168-69.  The other case merely stands for the proposition that the statute of limitations for civil conspiracy does not begin to run until the completion of the last overt act taken in furtherance of the conspiracy.  Wyatt, 24 Cal. 3d at 787-88.  It is unclear why this principle has any relevance to the scope of liability for late-joining coconspirators.

MOL also cites two cases applying federal law in the criminal conspiracy context.  Opp'n at 10 (citing United States v. Bibbero, 749 F.2d 581 (9th Cir. 1984); United States v. Umagat, 998 F.2d 770 (9th Cir. 1993)).  Both cases involve late-joining coconspirators who were held criminally liable for drug shipments completed before they joined the conspiracy.  However, there are relevant distinctions between criminal and civil conspiracy.  "The gist of the crime of conspiracy is the agreement to commit the unlawful act, while the gist of the tort is the damage resulting to the plaintiff from an overt act or acts done pursuant to the common design."  De Vries, 53 Cal. 2d at 649.  In civil law, conspiracy is not an independent tort, and "tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort."  Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11 (Cal. 1994).

11

**United States District Court**
For the Northern District of California

These distinctions are important for the purposes of the instant motion.  While a criminal defendant "who joins a pre-existing conspiracy is bound by all that has gone on before in the conspiracy," United States v. Saavedra, 684 F.2d 1293, 1301 (9th Cir. 1982), "an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy," Levine v. United States, 383 U.S. 265, 266 (1966). The criminal cases cited by MOL, Bibbero and Umagat, address a defendant's liability for conspiracy, not liability for any underlying substantive offense.  Accordingly, Bibbero and Umagat's statements concerning retroactive liability are inapplicable in the context of civil law, where a defendant cannot be held liable for conspiracy absent underlying tort liability.  Cf. United States v. Garcia, 497 F.3d 964, 967 n.1 (9th Cir. 2007) (The proposition that a coconspirator is responsible for prior acts of an ongoing conspiracy "is correct only in the context of establishing vicarious liability for acts establishing the crime of conspiracy itself rather than vicarious liability for other substantive offenses committed in the course of a conspiracy." (emphasis in the original)).

In this case, Summit US was legally incapable of committing the underlying tort of intentional misrepresentation at the inception of the conspiracy in 2000.  Summit US was not incorporated until 2008, and its predecessor was not formed until 2006.  Accordingly, the Court erred in holding it jointly and severally liable for acts committed before it joined the conspiracy.

**United States District Court**
For the Northern District of California

**B.   Successor Liability**

MOL contends that, if the Court reopens the judgment, it should consider imposing successor liability on Summit US. Opp'n at 12. The Court agrees that consideration of MOL's successor liability claims is now warranted. The Court previously found that it did not need to consider the issue of successor liability because Summit US could be held jointly and severally liable for all acts committed in furtherance of the conspiracy, including those committed before Summit US joined the conspiracy. As discussed in Section IV.A supra, the Court's legal conclusions concerning joint and several liability were in error. As such, the issue of successor liability is now relevant to Summit US's overall liability.

The parties briefly addressed the issue of successor liability in their post-trial briefs, as well as in their briefing on MOL's conditional motion to amend the pleadings. To avoid prejudicing either party, the Court hereby requests that the parties submit supplemental briefing on this issue. The Court invites the parties to address any issues they believe to be relevant to successor liability, but requests that they also address the following issues: (1) whether Summit US represents a mere continuation of the Summit Group or one of its subsidiaries, and whether such a finding is sufficient to trigger successor liability; (2) whether MOL has established alter ego liability between TriDec and Summit US, and whether this is necessary to establish successor liability; (3) whether MOL has proved that TriDec paid insufficient consideration for the assets of the Summit Group and whether this is necessary to establish successor liability; (4) if the Court declines to find

13

successor liability, whether the Court may still hold Summit US

liable for shipments made between March 2008 and January 2009.  The

Court has set forth a briefing schedule in Section V below.

C.   __Liability for Shipments Carried Out after July 2010__

The Court previously found that the Shenzhen door arrangement

terminated in June 2010.  At trial, MOL presented evidence of its

damages for each year of the conspiracy.  The Court used this

evidence to calculate MOL's damages.  Summit US now argues that

MOL's 2010 damage figures included shipments made after the

termination of the conspiracy in June 2010 and that the Court erred

in adopting these figures.  Mot. at 9.  However, Summit has not

identified what portion of the damages previously awarded is

attributable to shipments made after June 2010.  MOL declined to

address this point in its briefing.  Accordingly, the Court hereby

ORDERS supplemental briefing on this issue.  MOL shall provide a

breakdown of its 2010 damages in accordance with the guidance set

forth above, and Summit US shall have an opportunity to respond to

those damage figures.

///

///

///

///

///

///

///

///

///

///

United States District Court
For the Northern District of California

**V.    CONCLUSION**

For the reasons set forth above, the Court finds that it erred in holding Summit US jointly and severally liable for all shipments moving under the Shenzhen door arrangement between 2000 and 2010. The parties may submit supplemental briefing on the issue of successor liability within ten (10) days of the signature date of this Order.  Each party's brief shall not exceed twenty (20) pages. MOL shall also submit supplemental briefing on the issue of its 2010 damage figures within ten (10) days of the signature date of this Order.  Defendants may respond to MOL's damages brief within ten (10) days.  Briefs on the damages issue shall not exceed five (5) pages.

IT IS SO ORDERED.

Dated:  May 30, 2013

_____
UNITED STATES DISTRICT JUDGE