United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MITSUI O.S.K. LINES, LTD.,

Plaintiff,

v.

SEAMASTER LOGISTICS, INC., SUMMIT LOGISTICS INTERNATIONAL, INC., KESCO CONTRAINER LINE, INC.; KESCO SHIPPING, INC., and DOES 1 through 20,

Defendants.

Case No. 11-cv-02861-SC

ORDER GRANTING SUMMIT LOGISTICS INTERNATIONAL, INC.'S MOTION TO ALTER OR AMEND THE JUDGMENT

## I. INTRODUCTION

The Court issued Findings of Fact ("FF") and Conclusions of Law ("CL") in the above-captioned matter on March 21, 2013. ECF No. 261.[1] Among other things, the Court found Defendants Summit Logistics International ("Summit US") and Kesco Container Line, Inc. ("Kesco") liable for intentional misrepresentation and conspiracy. Specifically, the Court found that the defendants had conspired together to induce Plaintiff Mitsui O.S.K. Lines, Ltd.

[1] Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc., 11-CV-02861-SC, 2013 WL 1191213, 2013 U.S. Dist. LEXIS 40466 (N.D. Cal. Mar. 21, 2013).

United States District Court
For the Northern District of California

("MOL") to pay for fake truck shipments. The Court held Summit US and Kesco jointly and severally liable for the entire scheme, which ran from 2000 through June 2010. Summit US subsequently filed a motion to alter or amend the judgment pursuant to Rule 59(e). ECF No. 273 ("Mot."). In an Order issued on May 30, 2013, the Court agreed with Summit US's argument that Summit US could not be held liable for torts completed before it joined the conspiracy. However, the Court deferred ruling on the motion and asked for supplemental briefing on whether Summit US could be held liable for shipments completed before its incorporation under a theory of successor liability. ECF 296 ("May 30 Order"). The Court also requested supplemental briefing on the issue of whether the Court had held the defendants liable for damages attributable to shipments made after June 2010. Summit US and MOL have since filed supplemental briefs on these issues. ECF Nos. 298 ("Summit Liability Br."), 300 ("MOL Damages Br."), 301 ("MOL Liability Br."), 303 ("Summit Damages Br."). The matter is now appropriate for determination without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons set forth below, Summit US's motion to alter or amend the judgment is GRANTED.

## II. BACKGROUND

### A. Factual Background

MOL is a vessel-operating common carrier ("VOCC") that operates ships that carry cargo between foreign ports and the United States. Defendants Summit US and Kesco are non-vessel operating common carriers ("NVOCC(s)") that contracted for space on MOL's vessels and re-sold that space to their own customers. When

United States District Court
For the Northern District of California

moving cargo from Asia to the United States, MOL sometimes arranged trucking for its NVOCC customers through third-party truckers. For example, at the behest of its customers, MOL sometimes paid third parties for trucking between factories in inland China to ports in Hong Kong. MOL would recover the trucking costs by charging its customers a higher rate for through carriage.

In this case, Kesco and Summit US conspired with Michael Yip, a high-level MOL employee, to induce MOL to pay for trucking that never actually occurred. Under this so-called "Shenzhen door arrangement," Summit US and Kesco requested that MOL arrange for trucking between inland ports (typically in Shenzhen) and Hong Kong, and nominated Rainbow Trucking ("Rainbow") to perform the trucking services. MOL would pay Rainbow and charge Summit US and Kesco for each truck move. Because the price MOL paid to Rainbow was less than the extra charge to Defendants, MOL would lose money on each truck move. Unbeknownst to MOL, Rainbow did not actually perform any trucking, but it kicked back a portion of MOL's payments to Defendants to compensate them for requesting and paying for trucking services that they neither needed nor used.[2]

The Shenzhen door arrangement began sometime in 2000. At that time, Yip proposed the arrangement to one of Kesco's high-level officers, Raymond Cheng. Cheng carried out the scheme at Kesco with the help of two of his subordinates, Winnie Lau and Geoff Tice. Lau booked the fake truck moves, and Tice negotiated trucking rates with MOL representatives.

///

[2] Findings of Fact paragraphs 10 through 68 provide a more detailed description of the Shenzhen door arrangement and Defendants' involvement in the scheme.

United States District Court
For the Northern District of California

Much of the cargo moving under the Shenzhen door arrangement was connected to Fashion Merchandising Inc. ("FMI"), a company that performed warehousing and trucking services for a number of garment manufacturers, including Jones Apparel. FMI and Kesco were strategic partners. FMI acted as Kesco's sales agent in the United States, Kesco acted as FMI's local handling agent in Hong Kong, and the two companies had a profit sharing agreement. Tice, a key player in the Shenzhen door arrangement, worked for both Kesco and FMI at various times.

In 2006, FMI was acquired by the newly formed Summit Group, which is not a defendant in this case. After the acquisition, Kesco continued to act as the local handling agent for the Jones Apparel business. It also continued to move Jones Apparel cargo under the Shenzhen door arrangement. Tice eventually transitioned to the Summit Group, where he continued to negotiate Shenzhen trucking rates without informing MOL that no trucking was actually taking place.

In 2008, the Summit Group and its various subsidiaries, including FMI, went through a strategic bankruptcy. The companies were eventually liquidated, and their assets were purchased by TriDec Acquisition Co., Inc. ("TriDec"), which was managed by a number of Summit Group executives. The bankruptcy and the TriDec acquisition did not interrupt the operations of the former Summit Group companies. The same managers continued to run the companies before, during, and after the bankruptcy. Throughout the process, these companies continued to accept customer bookings, issue bills of lading, and manage the movement of cargo. Summit US was incorporated in March 2008 and primarily serviced beneficial cargo

owners. From May 25, 2008 through the end of 2008, Summit US used Kesco as its handling agent in Hong Kong. Kesco booked many of Summit US's shipments using the Shenzhen door arrangement.

In an effort to completely transition the Jones Apparel business away from Kesco, Summit US created Summit Logistics International (SCM HK) Limited ("Summit SCM") in 2009. Summit SCM was a joint venture between Summit US and the three principal owners of Kesco. The joint venture commenced operations in January 2009 and supplanted Kesco as the agent in Hong Kong for Summit US shipments. Two of the principal managers of the Shenzhen door arrangement at Kesco were brought on to run Summit SCM. Cheng was initially hired as a consultant to assist with the start-up of Summit SCM's operations, and Lau was later hired to run day-to-day operations. Lau continued to report to Cheng at Kesco after she moved from Kesco to Summit SCM. In January 2009, Cheng nominated Rainbow to perform Summit SCM's trucking. Under the direction of Lau and Cheng, Summit SCM took part in the Shenzhen door arrangement.

Kesco and Summit terminated the Shenzhen door arrangement in June 2010, when MOL inexplicably raised its rates for Shenzhen trucking. Kesco ceased operations in December 2010. MOL represents that Kesco is now a dead company and suggests that Kesco is essentially judgment-proof.

**B. Procedural History**

MOL brought the instant action on June 10, 2011. MOL's second amended complaint, the operative pleading in this matter, asserts causes of action for, inter alia, intentional misrepresentation and conspiracy. ECF No. 72 ("SAC"). The Court held a bench trial from

United States District Court
For the Northern District of California

January 28 through February 19, 2013. In addition to hearing oral arguments, the Court requested pre- and post-trial briefs, which the parties submitted. ECF Nos. 172, 193, 253, 255. In its pre-trial brief, MOL argued that, under California law, all of the defendants should be held jointly and severally liable as co-conspirators. Summit US did not substantively address the conspiracy issue until after judgment was rendered.

In their post-trial briefs, the parties disputed whether Summit US could be held liable for shipments moving under the Shenzhen door arrangement prior to Summit US's incorporation in March 2008. Summit US argued that it could not be held liable for actions taken prior to its corporate existence and, in any event, MOL had not asserted a claim for successor liability. MOL countered that its second amended complaint adequately pleaded facts to put Summit US on notice of a claim for successor liability. MOL Post-Trial Br. at 22. In the alternative, MOL moved to amend its complaint to add such a cause of action. ECF No. 254.

In its Findings of Fact and Conclusions of Law, the Court found in favor of MOL on its claims for intentional misrepresentation and conspiracy, holding Summit US and Kesco jointly and severally liable for $8,294,393.11. With respect to MOL's conspiracy claim, the Court found that Kesco had entered a conspiracy with Yip as early as 2000, when Yip and Cheng agreed to the Shenzhen door arrangement. The Court also found that Summit US joined the conspiracy as late as 2009 through Summit SCM, its joint venture with the Kesco partners. The Court held that, as co-conspirators, Summit US and Kesco could be held jointly and

United States District Court
For the Northern District of California

severally liable for the entire conspiracy, including acts committed in furtherance of the conspiracy prior to Summit US's incorporation. CL at 61-62 (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)). As a result, the Court found that it did not need to reach the issue of successor liability. Id. at 68-69.

Summit subsequently filed a motion to alter or amend the judgment pursuant to Rule 59(e).[3] Summit US argued that the Court had erred in two ways: (1) by holding Summit US jointly and severally liable for torts completed before it entered the conspiracy, and (2) by holding Summit US and Kesco liable for shipments made between July 2010 and December 2010, after the termination of the conspiracy. In a May 30, 2013 Order, the Court agreed with Summit US on both counts, but deferred entering an amended judgment pending supplemental briefing on two major issues: (1) whether Summit US could be held liable for the acts of the Summit Group under a theory of successor liability and (2) what portion of the damages previously awarded were attributable to shipments made after June 2010. The Court found that the issue of successor liability was now relevant since Summit US could no longer be held liable for pre-2008 shipments under the principles of conspiracy law.

## III. DISCUSSION

As discussed above, the Court has already found that Summit US may not be held jointly and severally liable for torts completed before it entered the conspiracy and that neither Summit US nor Kesco may be held liable for shipments made after June 2010, the

[3] That motion is fully briefed. ECF Nos. 285, 288.

United States District Court
For the Northern District of California

date the conspiracy ended. Thus, the issues remaining before the Court are: (1) whether Summit US is liable for the acts of its purported predecessor; (2) if not, whether Summit US may still be held liable for Shenzhen door shipments made between the time of its incorporation in 2008 and formation of Summit SCM in 2009; and (3) the total damages attributable to Summit US and Kesco.

**A. Successor Liability**

MOL contends that Summit US should be held liable for shipments made under the Shenzhen door arrangement as early as 2006, when the Summit Group began operations. Summit US disagrees, arguing that it cannot be held liable for the acts of its predecessor. For the reasons set forth below, the Court finds that MOL's attempt to impose successor liability on Summit US is procedurally improper. Further, the Court finds that even if MOL could assert a claim for successor liability, it has failed to prove that claim.

**1. Procedural Considerations**

As a procedural matter, MOL may assert a claim for successor liability if such a claim is properly pled in its SAC, or if MOL establishes that its SAC may be amended to conform to the evidence adduced at trial. As set forth below, the Court finds that neither condition applies here.

A claim for successor liability must generally be pled in a manner which comports with the requirements of Federal Rule of Civil Procedure 8. See Owens v. Bank of Am., N.A., 11-cv-4580-YGR, 2012 U.S. Dist. LEXIS 154435, at *15-16 (N.D. Cal. Oct. 25, 2012). Here, MOL did not expressly assert a claim for successor liability in its SAC, the operative pleading in this matter. MOL contends

that the SAC makes it clear that MOL was seeking to recover damages from Summit US for a period of time that pre-dates its incorporation in 2008. MOL Liability Br. at 16. However, the portions of the SAC cited by MOL indicate that the alleged conspiracy pre-dated 2008, not that MOL seeks to hold Summit US liable for the acts of its predecessor. See SAC ¶¶ 6, 79, 86. MOL also argues that allegations of successor liability should be reviewed under the liberal notice pleading standards of Rule 8. MOL Liability Br. at 17. But the authority cited by MOL addresses pleadings that expressly allege that one party is the successor-in-interest of another and that the successor should be held liable for the acts of its predecessor. See Chao v. Concrete Mgmt. Res., L.L.C., 08-2501-JWL, 2009 WL 564381, at *1-2 (D. Kan. Mar. 5, 2009). MOL's pleading is far less clear about the scope of liability alleged.

MOL's pleading defects are not necessarily fatal, since Federal Rule of Civil Procedure 15(b) allows the amendment of pleadings during and after trial. Pursuant to Rule 15, MOL moved to correct its pleadings to conform with the evidence adduced at trial. ECF No. 254. Rule 15(b)(2) provides that a Court may rule on an issue not raised by the pleadings where that issue is tried by parties' express or implied consent. Summit US did not expressly consent to Plaintiff's claims for successor liability, and its repeated objections to MOL's proffer of evidence of successor liability throughout trial indicates that the issue was not tried by implied consent. See, e.g., Tr. 986-987, 1453-1455, 1630. Rule 15(b)(1) applies to situations where an opposing party objects to evidence that is not within the issues raised in the

pleadings. The rule provides that, in such cases, "[t]he Court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the Court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(b)(1). The Court finds that allowing MOL to amend now would prejudice Summit US. At one point early in the trial, MOL represented that it was introducing evidence concerning the predecessor companies merely for background, Tr. at 87, and at a later point the Court sustained Summit US's relevance objections to evidence concerning the predecessor companies, id. at 1454-55. Accordingly, Summit US may have been working under the assumption that it did not need to introduce evidence concerning successor liability.

Trial objections aside, Summit US would be prejudiced if the Court now allowed MOL to amend its pleading. As discussed in Section III.A.2 infra, successor liability raises distinct evidentiary issues, including whether the successor is a mere continuation of the predecessor and whether the successor paid adequate consideration for the predecessor. Because MOL's pleading did not put Summit US on notice of its claims for successor liability, Summit US did not have an opportunity to develop these issues during discovery or at trial.

For these reasons, the Court finds that MOL's assertion of successor liability is procedurally improper and DENIES MOL's motion to amend its pleadings.

**2. Substantive Considerations**

Even if MOL could assert a cause of action for successor liability, the Court finds that MOL failed to prove it at trial.

United States District Court
For the Northern District of California

The decision whether to impose successor liability involves broad equitable considerations. See Ray v. Alad Corp., 19 Cal. 3d 22, 34 (Cal. 1977); see also Rosales v. Thermex-Thermatron, Inc., 67 Cal. App. 4th 187, 196 (Cal. Ct. App. 1998). Each case of successor liability must be assessed on its own unique set of facts. See CenterPoint Energy, Inc. v. Super. Ct., 157 Cal. App. 4th 1101, 1122 (Cal. Ct. App. 2007). Under California law, a corporation that purchases the assets of another does not assume the liabilities of the selling corporation unless: "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." Ray, 19 Cal. 3d at 28.

MOL focuses on the third ground for liability, arguing that Summit US is a "mere continuation" of the Summit Group, though MOL has yet to identify which particular Summit Group subsidiary constitutes the predecessor company. In Ray, the California Supreme Court held that courts should only impose liability under the mere continuation theory where the plaintiff shows "one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." Id. at 29. There does not appear to be any dispute that the second criterion is satisfied here. After the Summit Group companies went into bankruptcy, their assets were

United States District Court
For the Northern District of California

purchased by TriDec, which was managed and owned by the same individuals who managed and owned the Summit Group. Summit US, a subsidiary of TriDec, was managed by some of these same individuals.

The parties do dispute whether MOL must show that insufficient consideration was paid for the Summit Group. The California Supreme Court has yet to issue an unequivocal ruling on this issue. As noted above, in Ray, the court held that a plaintiff must show "one or both" of the factors involving insufficient consideration and the identity of officers. Id. Since Ray was decided, several courts have held that inadequate consideration is an essential ingredient or a crucial factor in assessing successor liability. See Katzir's Floor & Home Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1150 (9th Cir. 2004) (inadequate consideration is an "essential ingredient"); CenterPoint, 157 Cal. App. 4th at 1121 ("crucial factor"); Franklin v. USX Corp., 87 Cal. App. 4th 615, 625 (Cal. Ct. App. 2001) ("crucial factor"); Maloney v. Am. Pharm. Co., 207 Cal. App. 3d 282, 288-89 (Cal. Ct. App. 1988) ("essential ingredient").

As MOL points out, one recent case has held that a showing of inadequate consideration is not necessary to establish successor liability. In Cleveland v. Johnson, 209 Cal. App. 4th 1315, 1320-23 (Cal. Ct. App. 2013), the defendant took money that the plaintiff had invested in ISI, the defendant's internet provider business, and used that money to fund a similar business, IS West. Around the time of the asset transfer, ISI declared bankruptcy. Id. at 1324. The plaintiff sued defendant and IS West for, among other things, breach of contract, alleging that the defendants had

United States District Court
For the Northern District of California

"hijack[ed]" his investment "for [their] own use and profit without the burden of the obligations owed to [the plaintiff]." Id. The jury returned a verdict for the plaintiff. Id. at 1325. The defendants appealed, arguing that IS West could not be held liable as a successor of ISI because there was no evidence IS West paid inadequate consideration for the transferred assets. Id. at 1326. The court of appeal held that the plaintiff did not need to show inadequate consideration, reasoning that previous cases merely hold that "no single factual element, standing alone, would establish or negate successor liability." Id. at 1334. The court also noted that the jury's verdict was sustainable on the separate ground that successor liability could be imposed where "the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." Id. (quoting Ray, 19 Cal. 3d at 28).

Cleveland is distinguishable. First, there is no indication that the Summit Group's assets were transferred to Summit US for the fraudulent purpose of escaping liability to MOL. Robert Agresti and Robert O'Neill, the Summit US/Summit Group principals who arranged the bankruptcy and asset transfer, testified that they had no knowledge of the Shenzhen door arrangement until this lawsuit was filed. FF ¶ 48. In contrast, successor liability was a central issue in Cleveland because the defendant invested the plaintiff's money in a successor organization to avoid the obligations owed to the plaintiff. 209 Cal. App. at 1325, 1334. Second, the court of appeals noted that Cleveland was distinct from other successor liability cases because the individual defendant and the successor corporation owed a fiduciary duty to the

United States District Court
For the Northern District of California

plaintiff. Id. at 1332 n.7. Here, there is no indication that Summit US or the Summit Group owed MOL any kind of fiduciary duty. Third, MOL had an opportunity to file a claim with the bankruptcy court. See Katzir's Floor, 394 F.3d at 1151 ("Where the predecessor files bankruptcy and its debts are discharged, . . . it is the discharge and the lack of sufficient assets that deprive the predecessor's creditors of their remedy[.]"). MOL argues that it was not aware of the fraud until 2011, three years after the bankruptcy petition was filed. However, the Court has already found that MOL had reason to investigate the Shenzhen door arrangement much earlier than it did and that a reasonable investigation would have uncovered the fraud. FF ¶ 73.

Accordingly, the Court finds that MOL must show that TriDec paid inadequate consideration for the assets of the Summit Group.[4] The Court also finds that MOL has not met its burden. There is no indication that the Summit Group bankruptcy prejudiced the company's creditors or deprived them of a remedy. In fact, very little evidence concerning the bankruptcy was introduced at trial. Since MOL cannot show inadequate consideration, it cannot establish successor liability on the part of Summit US for the bad acts of the Summit Group.

**B. Summit US's Liability for Shenzhen Door Shipments Made between May 2008 and January 2009**

MOL argues that even if the Court decides that Summit US has no successor liability for the pre-bankruptcy conduct of the Summit Group, Summit US should still be held liable for the damages

[4] Summit US argues that MOL must also show that Summit US is the alter ego of TriDec. The Court need not reach the issue since other elements of successor liability are absent.

United States District Court
For the Northern District of California

attributable to the 3,110 Shenzhen door shipments made between May 25 and December 30, 2008 -- that is, those shipments made after the bankruptcy but before the creation of Summit SCM. The Court agrees. The Court previously held that Summit US was directly involved with the conspiracy as late as 2009, through Summit SCM, its joint venture with the Kesco partners. CL at 61. However, Summit US's liability predates 2009 since Kesco, its handling agent, booked Shenzhen door shipments on behalf of Summit US during this period. FF ¶ 49.

Summit US argues that it should not be held liable for these shipments because Kesco did not inform anyone at Summit US about the Shenzhen door arrangement. Summit US Br. at 14. But regardless of whether Summit US had any direct knowledge of these shipments, it can still be held liable under the basic principles of agency law. Since Kesco was acting as Summit US's handling agent, its bad acts can be imputed to Summit US. See Black v. Bank of Am., 30 Cal. App. 4th 1, 6 (Cal. Ct. App. 1994). Further, the evidence shows that Summit US was involved in the conspiracy in the period after the bankruptcy and prior to the formation of Summit SCM. Tice actively managed the conspiracy by negotiating Shenzhen door rates with MOL on behalf of the Summit Group. Rather than making a fresh start after the 2008 bankruptcy, Summit US continued to enjoy the benefits of the conspiracy and declined to disclose the scheme to MOL. While Summit US can avoid liability for the Summit Group's misconduct, it cannot escape liability for its own actions after the Summit Group bankruptcy.

///

///

United States District Court
For the Northern District of California

**C. Damages**

The Court previously found that Summit US and Kesco were jointly and severally liable to MOL for $8,284,393.11. The Court now finds that the judgment should be reduced so that (1) neither Kesco nor Summit US is held liable for shipments made after June 2010, see May 30 Order at 14; and (2) Summit US is not held liable for shipments made before May 25, 2008, see Section III.A-B supra.

With respect to the first point, the Court previously held Kesco and Summit US liable for $603,149.89 in connection with Shenzhen door shipments made in 2010. It is now clear that many of these shipments were made after June 2010 -- that is, after the conclusion of the conspiracy. The total damages associated with these post-June 2010 shipments amount to $275,730.77.[5] Thus, after these post-June 2010 shipments are deducted, Kesco's total liability is $8,008,662.34. This represents the damages associated with all Summit US and Kesco Shenzhen door shipments made from 2000 through June 2010.

With respect to the second point, Summit US is jointly and severally liable for that portion of the $8,008,662.34 associated with Shenzhen door shipments made between May 25, 2008 and June 30, 2010. The evidence shows that MOL carried 7,271 Shenzhen door shipments under the Summit US service contract from May 25, 2008 through June 30, 2010. See Ex. P-264. The damages associated with

---

[5] The Court calculated this number based on Exhibits P-262 and P-264, spreadsheets which contain the Bill of Lading ("B/L") data for Kesco and Summit US shipments, respectively. Each spreadsheet was sorted oldest to newest by B/L date. The Court then took the sum of the TPO Paid Amounts (Column AQ) for all shipments made between July 1, 2010 and December 30, 2010 (rows 11719 through 12313 in Exhibit P-262, and rows 7273 through 7297 in Exhibit in P-264). The Court then converted the figure from Hong Kong dollars to US dollars by dividing the sum by 7.8.

these shipments amount to $1,987,883.33.[6] Under principles of agency and conspiracy law, Summit US is also liable for Kesco's Shenzhen door shipments between May 25, 2008 and June 30, 2010. See Section III.B supra. The total damages associated with these Kesco shipments amount to $242,648.72.[7] Thus, Summit US's total liability is the sum of these two numbers: $2,230,532.05.

The parties have suggested alternative means for calculating damages in their briefing. Summit US essentially asks the Court to offset MOL's damages by any amounts that it paid MOL for the non-existent trucking. See Summit US Damages Br. at 2-4. The Court considered and rejected this methodology in its Conclusions of Law and sees no reason to rule differently now. See CL at 74-75. As the Court previously held, it would be inequitable to credit Summit US or any of the other defendants for payments they made to conceal their fraud. See id. MOL invites the Court to revisit the issues of punitive damages and disgorgement of lost profits, which were also addressed in the Conclusions of Law. MOL Liability Br. at 19-20. The Court declines to do so.

Accordingly, the Court finds that Kesco alone is liable to MOL for $5,778,130.29 in damages. Further, Kesco and Summit US are jointly and severally liable to MOL for an additional $2,230,532.05 in damages.

---

[6] The Court derived this number by sorting Exhibit P-264 by B/L date, oldest to newest, and taking the sum of the TPO Amounts in column AQ, rows 2 through 7272. To convert from Hong Kong dollars to US dollars, the Court divided by 7.8.

[7] The Court derived this number by sorting Exhibit P-262 by B/L date, oldest to newest, and taking the sum of the TPO Amounts in column AQ, rows 10937 through 11718. As before, the Court divided by 7.8 to convert from Hong Kong dollars to US dollars.



United States District Court
For the Northern District of California

**IV. CONCLUSION**

For the foregoing reasons and the reasons set forth in the Court's May 30 Order, Defendant Summit US's motion to alter or amend the judgment is GRANTED. The Court hereby amends the judgment entered on March 21, 2013 to reduce the damages attributable to Summit US and Kesco in case number 11-cv-2861 SC. The Court holds that Kesco is liable to MOL for $5,778,130.29 in damages, and Kesco and Summit US are jointly and severally liable to MOL for an additional $2,230,532.05 in damages. The Court's findings and judgment with respect to Defendant SeaMaster Logistics, Inc. and with respect to related case number 10-cv-05591-SC remain undisturbed. The Court will separately enter an amended judgment.

IT IS SO ORDERED.

Dated: July 18, 2013

UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California