1   EMARD DANOFF PORT TAMULSKI & WALOVICH LLP
    Eric Danoff (60915)
2   Katharine Essick (219426)
    49 Stevenson Street, Suite 400
3   San Francisco, CA  94105
    Telephone:     (415) 227-9455
4   Facsimile:     (415) 227-4255
    E-Mail:        edanoff@edptlaw.com
5                  kessick@edptlaw.com

6   Attorneys for Defendants
    SEAMASTER LOGISTICS, INC. and
7   TOLL GLOBAL FORWARDING
    (AMERICAS) INC.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11  MITSUI O.S.K. LINES, LTD.,                Case No.:  10 CV 5591 SC
                                              Case No.:  11 CV 2861 SC
12            Plaintiff,                       (Consolidated)

13       vs.                                  **OPENING BRIEF BY DEFENDANTS
                                              SEAMASTER LOGISTICS, INC. AND
14  SEAMASTER LOGISTICS, INC., et al.,        TOLL GLOBAL FORWARDING
                                              (AMERICAS) INC. ON REMAND**
15            Defendants,

16                                            Trial Date:   January 28, 2013
                                              Court:        Hon. Samuel L. Conti
17  ─────────────────────────────────

18  MITSUI O.S.K. LINES, LTD.,

19            Plaintiff,

20       vs.

21  SEAMASTER LOGISTICS, INC., et al.,

22            Defendants,

23  ─────────────────────────────────
    AND RELATED COUNTERCLAIMS.
24

25

26

27

28

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

**TABLE OF CONTENTS**

I.    INTRODUCTION. ................................................................................................. 1

    A.    The procedural status of the case. .......................................................... 1

    B.    Issues to be decided upon remand. ......................................................... 2

        1.    Recalculation of damages. ............................................................ 2

        2.    RICO issues. .................................................................................. 2

II.   The proper amount of MOL's damages against SeaMaster is $666,425 and
against Summit is $889,311. ............................................................................. 2

    A.    The proper amount of MOL's damages against SeaMaster is $666,425. .............. 3

    B.    The proper amount of MOL's damages against Summit is $889,311. ................... 4

    C.    The evidence fails to support an award for space protection damages ................. 5

    D.    MOL is not entitled to an award of punitive damages. ......................................... 10

        1.    The facts of this case do not meet the requirements of California's
punitive damages statute, Civil Code §3294. ................................................. 10

        2.    California punitive damages law cannot be applied to regulate
foreign conduct. ........................................................................................... 11

        3.    MOL failed to present evidence of Defendants' financial
condition, which is essential for a punitive damages award. ........................ 12

III.  MOL cannot assert a valid RICO claim. .......................................................... 12

    A.    The rule against extraterritorial application bars MOL's RICO claim. ............... 13

        1.    RICO does not apply extraterritorially, but only to a pattern of
racketeering activity in the U.S. ................................................................ 14

        2.    In assessing extraterritoriality, only predicate acts in the U.S. that
are substantial, material, and proximately cause injury to the
plaintiff can constitute a pattern of racketeering activity in the U.S. ........ 15

        3.    The Shenzhen door arrangement took place in Hong Kong,
and the alleged U.S. connections with the arrangement were
insubstantial, immaterial, and did not proximately cause
injury to MOL. ........................................................................................ 19

    B.    MOL has failed to prove the substantive RICO elements. .................................. 21

        1.    MOL has failed to establish the proximate cause element of RICO. ......... 21

        2.    MOL has failed to prove the conduct element of RICO. ........................... 21

IV.   Conclusion. ........................................................................................................ 22

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- i -

# TABLE OF AUTHORITIES

## CASES

*Adams v. Murakami* (1991) 54 Cal. 3d 105 ................................................................ 12

*Al-Abood v. El-Shamari* (4th Cir. 2000) 217 F. 3d 225 ........................................... 21

*Anza v. Ideal Steel Supply Corp.* (2006) 547 U.S. 451 ......................................... 17-18

*Cedeño v. Intech Grp., Inc.* (S.D.N.Y. 2010) 733 F. Supp. 2d 471,
    aff'd, sub nom., *Cedeño v. Castillo* (2d Cir. 2012) 457 F. App'x 35 ........ 16, 17, 18, 19, 20

*European Community v. RJR Nabisco, Inc.* (2d Cir. 2014) 764 F. 3d 129 .................................. 15

*Hemi Grp. LLC v. City of New York* (2010) 559 U.S. 1 .............................................. 18

*High v. The Choice Mfg. Co.* (N.D. Cal. 2012) 2012 U.S. Dist. Lexis 103161 ........................... 22

*Holmes v. Sec. Investor Protection Corp.* (1992) 503 U.S. 258 ............................. 17, 21

*Hourani v. Mirtchev* (D.D.C. 2013) 943 F. Supp. 2d 159.................................... 17, 18, 20

*Kelly v. Haag* (2006) 145 Cal. App. 4th 910..................................................... 12

*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal. App. 4th 397 .................................. 11

*Kids' Universe v. In2Labs* (2002) 95 Cal. App. 4th 870.......................................... 6

*Kimm v. Lee* (E.D.N.Y. 2005) 2005 U.S. Dist. Lexis 727 ...................................... 21

*Leenders v. California Hawaiian Sugar Refining Co.* (1943) 59 Cal. App. 2d 752 ...................... 7

*Mike Davidov Co. v. Issod* (2000) 78 Cal. App. 4th 597 ......................................... 12

*Morrison v. National Australia Bank Ltd.* (2010) 561 U.S. 247............................. 16, 17

*Norex Petroleum Ltd. v. Access Indus., Inc.* (2d Cir. 2010) 631 F. 3d 29 ...................... 16, 19, 20

*Odom v. Microsoft Corp.* (9th Cir. 2007) 486 F.3d 541 ......................................... 12

*Oki Semiconductor Co. v. Wells Fargo Bank* (9th Cir. 2002) 298 F.3d 768 .................. 18, 20

*Petroleos Mexicanos v. SK Engineering & Construction Co.* (S.D.N.Y. 2013)
    2013 U.S. Dist. Lexis 107222, aff'd (2d Cir. 2014) 572 Fed. Appx. 60.................... 16, 19

*Poulos v. Caesars World, Inc.* (9th Cir. 2004) 379 F.3d 654................................... 18

*Republic of Iraq v. ABB AG* (S.D.N.Y. 2013) 920 F. Supp. 2d 517 .................... 16, 17, 18, 19, 20

*Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal. App. 4th 1679 ........................... 6

*Reves v. Ernst & Young* (1993) 507 U.S. 170 ................................................ 21, 22

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

*Sedima, S.P.R.L. v. Imrex Co., Inc.* (1985) 473 U.S. 479 .................................................. 12

*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal. App. 4th 165 ............................... 12

*State Farm Mutual Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 ................ 11

*Tymoshenko v. Firtash* (S.D.N.Y. 2013) 2013 U.S. Dist. Lexis 42754 .............................. 17, 19

*U.S. v. Philip Morris USA* (D.D.C. 2011) 783 F. Supp. 2d 23 ........................................ 17, 19

*UAW v. NLRB* (D.C. Cir. 1972) 459 F.2d 1329 .................................................................... 7

*United States v. Xu* (9th Cir. 2013) 706 F.3d 965 ................................... 2, 12, 13, 14, 16, 18, 19

*Walter v. Drayson* (9th Cir. 2008) 538 F.3d 1244 ........................................................... 22

*Ward v. Taggart* (1959) 51 Cal. 2d 736, 336 P.2d 534 ..................................................... 2

*White v. Ford Motor Co.* (9th Cir. 2002) 312 F.3d 998 .................................................... 11

*White v. Ultramar, Inc.* (1999) 21 Cal. 4th 563 .............................................................. 11

*Zazu Designs v. L'Oreal, S.A.* (7th Cir. 1992) 979 F.2d 499 ............................................ 5, 6


**STATUTES/REGULATIONS**

18 U.S.C. § 1341 .................................................................................................................. 12

18 U.S.C. § 1343 .................................................................................................................. 12

18 U.S.C. § 1962 .................................................................................................................. 12

18 U.S.C. §1962(c) .............................................................................................................. 21


Cal. Civ. Code

$\qquad$ § 3294 ....................................................................................................................... 10, 12

$\qquad$ § 3294(a) ................................................................................................................... 10

$\qquad$ § 3294(b) ................................................................................................................... 11

$\qquad$ § 3294(c)(3) ............................................................................................................... 10


FRCP Rule 12(b)(6) ............................................................................................................ 16, 17

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

# I.     INTRODUCTION.

## A.     The procedural status of the case.

On March 21, 2013, following a trial, the Court issued its Findings of Facts and Conclusions of Law (FF/CL, Dkt. No. 261, 03/21/13)[1] in a single opinion covering two consolidated cases:  the "Freight Case" (No. 10 CV 5591 SC) and the "Trucking Case" (No. 11 CV 2861 SC).

In the Freight Case, MOL sued SeaMaster Logistics, Inc. ("SeaMaster") and Summit Logistics International, Inc. ("Summit," now known as Toll Global Forwarding (Americas) Inc.) for additional freight charges that MOL contended it was owed under its service contracts with them.  The Court found for SeaMaster and Summit and ultimately awarded them attorney fees and costs.  MOL did not appeal the Judgment in the Freight Case.  No issue remains to be decided in the Freight Case.

In the Trucking Case, MOL sued SeaMaster, Summit, and Kesco Container Line (among others) for alleged misrepresentations related to "Shenzhen door arrangements" concerning trucking in China.  The Court found in favor of MOL and against SeaMaster, Summit, and Kesco on the claims of intentional and negligent misrepresentation.  Insofar as is presently relevant, the Court ultimately awarded MOL a total of $1,080,073 in damages against SeaMaster, $1,987,883 in damages against Summit, and $242,649 in damages for joint liability between Summit and Kesco.  The separate damage award against Kesco is not in issue.

SeaMaster and Summit appealed the Judgment in the Trucking Case, and MOL cross-appealed.  Kesco did not appeal.  On July 6, 2015, the Ninth Circuit Court of Appeals issued a Memorandum disposition.  The Court of Appeals affirmed the finding of misrepresentation against SeaMaster and Summit, reversed the damages award to MOL and remanded for recalculation, reversed the award of attorney's fees to MOL, reversed the dismissal of MOL's RICO claim and remanded the RICO issues for further proceedings, and affirmed the Court's conclusions on alleged co-conspirator liability.

---

[1] "FF/CL" refers to the Court's Findings of Fact and Conclusions of Law, Dkt. No. 261, filed 03/21/13.  References to Findings of Fact are "FF" and the numbered paragraphs.  References to conclusions of law are "FF/CL" and the page numbers where the conclusions are found.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 1 -
OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

**B.      Issues to be decided upon remand.**

        **1.      Recalculation of damages.**

SeaMaster and Summit contended on appeal that the damages awards against them overcompensated MOL for its actual loss because no credit was given for the payments they made to MOL as part of the Shenzhen door arrangement.  MOL contended that the damages award was correct because it included an amount that was roughly equivalent to the damages incurred by MOL for unreimbursed trucking costs, origin receiving charge differentials, and lost space protection premiums.  The Court of Appeals remanded the issue of damages for recalculation in accordance with California law.

        **2.      RICO issues.**

This Court had found for SeaMaster and Summit on MOL's RICO cause of action on the basis that, applying the "nerve center" test, the alleged enterprise was extraterritorial and therefore RICO could not apply.  MOL contended on appeal that the Court should have applied a "pattern of racketeering" test to the issue of extraterritoriality.  In their 2013 Post-Trial Brief, SeaMaster and Summit had contended that the Shenzhen door arrangement should be considered extraterritorial under either test, and that MOL had not proved the substantive elements of RICO liability.  The Court of Appeals remanded the RICO issues for further proceedings, with instructions to apply the racketeering-focused test set forth in *United States v. Xu* (9th Cir. 2013) 706 F.3d 965, 974 on the threshold issue of extraterritoriality.

**II.     The proper amount of MOL's damages against SeaMaster is $666,425 and against Summit is $889,311.**

The Court of Appeals addressed the damages award in its Memorandum decision at pages 4-6.  Citing *Ward v. Taggart* (1959) 51 Cal. 2d 736, 741, 336 P.2d 534, 537 for the proposition that recovery in a tort action for fraud is limited to the actual damages suffered by the plaintiff, the Court of Appeals noted that this Court acknowledged in its Findings that it awarded MOL more than it actually lost as a result of the Shenzhen door arrangement.  (FF/CL, pp. 76-77.)  The Court of Appeals disagreed that this could be done on the basis of equitable setoff, as this Court had done.  (FF/CL, pp. 74-75.)  The Court of Appeals further stated that this Court implied that

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

1    the extra award could be considered at least partially punitive rather than compensatory, and that

2    this was improper under California law.  Therefore the Court of Appeals remanded the case for

3    recalculation of damages in accordance with California law.

4         SeaMaster and Summit therefore submit a calculation of the actual damages incurred by

5    MOL.  The main difference between the amounts the Court awarded originally and the amounts

6    described below is that those below take into account the payments SeaMaster and Summit made

7    to MOL under the Shenzhen door arrangement.  (See FF ¶s 38, 39, and 55, describing

8    Defendants' payments to MOL under Yip's arrangement.)  The Court originally awarded MOL

9    "more than it lost" on the Shenzhen door arrangement by awarding MOL the full amount it paid

10   Rainbow for all the SeaMaster and Summit shipments, not the net amount that MOL lost after

11   deducting what SeaMaster and Summit paid MOL for the Rainbow trucking for those same

12   shipments.  (FF ¶39; FF/CL, pp. 74-77.)

13        Rainbow reimbursed SeaMaster and Summit for the amounts they paid to MOL for the

14   purported Rainbow trucking, but that neither increased nor decreased MOL's loss.

15   **A.      The proper amount of MOL's damages against SeaMaster is $666,425.**

16        As an example of a SeaMaster shipment, SeaMaster paid MOL a trucking "arbitrary" (i.e.,

17   payment for the Shenzhen door trucking) of $170 for a purported Shenzhen door trucking move,

18   and then MOL paid Rainbow $247 for that same move.  (Eva Chan, 1464-71[2]; Tr. Ex. D-575, p.2,

19   MOL bill of lading showing MOL's "INLD ORGN" charge to SeaMaster of $170; Tr. Ex. P-263,

20   excerpt, line 4698, column AQ, showing Rainbow's charge to MOL of HK$1925, which equals

21   US$247, for the same trucking.)  MOL's actual loss on the trucking for that shipment was the

22   difference between the two figures: $77.  The Court originally awarded MOL the full $247

23   without deducting the payment SeaMaster had made to MOL.

24        The Court found that SeaMaster made shipments under the Shenzhen door arrangement

25   from about March 5, 2009, to June 30, 2010.  (FF ¶59, 65.)  The Court found that for those

26   shipments MOL paid Rainbow a total of $1,080,073.  (FF/CL, p. 74.)  For the same shipments

27

28

---

[2] References to a name and page are to a trial witness and the relevant page of the trial transcript.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1    SeaMaster paid MOL $484,740 for the purported Shenzhen door trucking.  (Eva Chan, 1469.)

2    Thus the payment differential for the purported Shenzhen door trucking for the SeaMaster

3    shipments totals $595,333 ($1,080,073 minus $484,740).

4         To award a full amount of compensatory damages, however, the Court should add to the

5    award another element of damages: the ORC/THC differential, which the Court did not

6    previously award to MOL.  For shipments originating from Shenzhen, SeaMaster or Summit

7    would pay MOL an origin receiving charge ("ORC") in addition to freight.  The ORC for a

8    Shenzhen door shipment was the same amount as the ORC for a Shenzhen port origin shipment.

9    (Jerry Huang, 1552.)   MOL therefore incurred no loss of ORC for the shipments booked as

10   Shenzhen door that MOL actually received at a Shenzhen loadport.  The equivalent charge in

11   Hong Kong, however, was called a terminal handling charge ("THC"), which was higher than the

12   Shenzhen ORC.  (FF ¶40, 55.)  Thus MOL received less for a shipment that was booked as

13   Shenzhen door (subject to the ORC) than MOL would have received at a Hong Kong loadport

14   (subject to THC).  The Court originally denied MOL recovery for this THC/ORC differential

15   because the Court recognized that it already had overcompensated MOL by not reducing damages

16   by the overpayments from SeaMaster and Summit for the Rainbow trucking.  FF/CL, 75:16-26.

17   The correct method to compute damages is to reduce MOL's recovery by the overpayments, but

18   to add back the lost THC/ORC differential.

19        MOL claimed $71,132 from SeaMaster for the THC/ORC differential: $28,128 for the

20   A08 service contract period and $43,004 for A09 service contract period.  (MOL Post-Trial Brief,

21   Appx G.)

22        Thus the proper amount of damages to MOL for the SeaMaster shipments would be

23   $666,465, which is comprised of the $1,080,073 MOL paid to Rainbow, less the $484,740

24   SeaMaster paid to MOL for the Rainbow trucking, plus $71,132 for the THC/ORC differential.

25   **B.    The proper amount of MOL's damages against Summit is $889,311.**

26        As an example of a Summit shipment, Summit paid MOL a through rate of $2191 for a

27   shipment with a purported Shenzhen door trucking move, which was $100 more than the rate

28   would have been for a port origin move, and then MOL paid Rainbow $395 for that same move.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

- 4 -

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

(Winnie Lau, 1091-97; Tr. Ex. D-578, p. 2, MOL bill of lading showing $2191 charge for ocean freight including trucking, and Tr. Ex. D-578, p. 4, Summit SCM invoice to Rainbow for $100; Tr. Ex. P-264, excerpt, line 6992, column AQ, showing Rainbow's charge to MOL of HK$3080, which equals US$395, for the same trucking.)  MOL's actual loss on the shipment was the difference between Summit's overpayment and the amount MOL paid Rainbow: $295. Nevertheless the Court originally awarded MOL the full $395 without deducting the overpayment Summit had made to MOL.

The Court found that Summit made shipments under the Shenzhen door arrangement from May 25, 2008, to June 30, 2010.  (FF ¶¶31, 65; Order, Dkt. No. 309, 7/18/2013, p. 5.)  For these shipments MOL paid Rainbow a total of $1,987,883.  (Order, Dkt. No. 309, 07/18/13, pp. 16-17.) For these same shipments Summit paid MOL a total of $1,233,063 for the purported Shenzhen door trucking: $374,075 in 2008, $679,078 in 2009, and $179,910 in 2010.  (Winnie Lau, 1091-97; Tr. Exs. D-579, p. 1, and D-580, p.1.)  MOL's loss for the payment differential for the purported Rainbow trucking for the Summit shipments totals $754,820 ($1,987,883 minus $1,233,063).

MOL claimed $134,491 from Summit for the THC/ORC differential: $97,508 for A08 service contract year and $36,983 for the A09 service contract year.  (MOL Post-Trial Brief, Appx G.)

Thus the proper amount of damages to MOL for the Summit shipments would be $889,311, which is comprised of the $1,987,883 MOL paid to Rainbow, less the $1,233,063 Summit paid to MOL for the Rainbow trucking, plus $134,491 for the THC/ORC differential.

This amount of $889,311 is in addition to the $242,649 for which Summit is jointly liable with Kesco.

**C.      The evidence fails to support an award for space protection damages.**

A plaintiff that recovers for misrepresentation is entitled to its actual damages, not speculative additional amounts.  A court may approximate damages that are difficult to ascertain, but damages may not be determined by mere speculation or guess.  *See Zazu Designs v. L'Oreal, S.A.* (7th Cir. 1992) 979 F.2d 499, 506 ("Compensatory damages must rest on 'a just and

1  reasonable estimate of the damage based on relevant data.'…Allowance for uncertainty is one

2  thing…and rank speculation another." [citations omitted].)

3          On appeal MOL argued that even if the Court had overcompensated SeaMaster and

4  Summit for the shipments, the original damages award should be affirmed because the

5  overcompensation should be considered equivalent to what the Court might have awarded for

6  space protection damages—the charges MOL asserts it could have collected for guaranteeing

7  space on its vessels—even though the Court did not quantify any space protection damages.

8  SeaMaster and Summit assume MOL will make the same argument on remand, but that argument

9  would be wrong.

10         First, the Court's stated basis for failing to deduct the overpayments was not that they

11  roughly equaled space protection damages.  Instead the Court concluded that it could disregard

12  the overpayments on equitable grounds (FF/CL, pp. 74-75), which the Court of Appeals reversed.

13         Second, MOL never presented evidence of the value of the alleged space protection, so a

14  damages award for that would be speculative in amount.  MOL did not even propose a damages

15  figure based on space protection in the table it submitted to the Court in its post-trial briefing

16  itemizing its requested damages.  (See Appx. G ("Trucking Fraud Damages by Year") to MOL's

17  Post-Trial Brief, at Dkt. No. 253-1, pp. 102-103.)

18         Although under certain circumstances a court may award damages even when they are

19  impossible or difficult to calculate, a court may not award damages that could have been

20  calculated, even if only roughly, when the plaintiff fails to present available evidence to support

21  that rough calculation.  *Zazu Designs v. L'Oreal, S.A.* (7th Cir. 1992) 979 F.2d 499, 505-6; *see*

22  *Kids' Universe v. In2Labs* (2002) 95 Cal. App. 4th 870, 888; *Resort Video, Ltd. v. Laser Video,*

23  *Inc.* (1995) 35 Cal. App. 4th 1679, 1697.  In that event the award crosses over the line from

24  approximation to speculation.  MOL could have presented, but did not present, evidence about the

25  value it purportedly provided for space protection.  An award for space protection in this case

26  would be speculative.

27         MOL could have presented testimony, through its own employee witnesses, about the

28  price for space protection and the amount of space protection it allegedly provided to SeaMaster

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 6 -

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

and Summit, but MOL put on no such evidence.  On appeal MOL referred to testimony that its
David Prado told SeaMaster that MOL would have provided space protection for a specific price.
MOL listed Prado, an MOL employee, as a witness for trial but never put on evidence from him
or anyone else about what that space protection price was.

On appeal MOL claimed that it could not show how many containers were space
protected, but that is not so either.  This Court found that Yamby Lun, an employee of MOL in
Hong Kong who reported to Yip, was in charge of MOL decisions about space allocation.  (FF
¶37, n.5.)  MOL listed Lun as a witness for trial but never presented any testimony from her or
anyone else about how many containers, even approximately, MOL space protected.  The
"adverse inference rule," which provides that when a party has relevant evidence within its
control but fails to produce it, that failure gives rise to an inference that the evidence is
unfavorable to it, is applicable.  *UAW v. NLRB* (D.C. Cir. 1972) 459 F.2d 1329, 1335-36;
*Leenders v. California Hawaiian Sugar Refining Co.* (1943) 59 Cal. App. 2d 752, 759 ("The
failure of a party to produce evidence presumptively in his power to produce will support the
inference that such evidence if produced would be unfavorable to his case.")

Indeed, the evidence at trial suggested that few Shenzhen door shipments actually were
space protected.  In their service contracts MOL committed to carry (and SeaMaster and Summit
promised to ship) a certain volume of cargo per contract year, called the minimum quantity
commitment ("MQC").  Each service contract stated: "MOL shall make available the vessel
capacity and equipment to carry (a) the MQC required by this Contract…"  (Tr. Ex. P-198, p. 3,
Clause 7.)  MOL executives Dennis Sheehan and David Prado verified in their testimony that in
the service contracts the carrier (MOL) commits to provide the space for the MQC volume in the
contract.  (Sheehan, 32:6-18; Prado, 2059:9-18.)

In the service contracts the MQCs were expressed in "TEUs," or twenty foot equivalent
units.  A twenty foot container would constitute one TEU; a forty foot container would constitute
two TEUs.  (Schneider, 310:13-14.)  For Summit, in the "A08" service contract, covering May
2008 to June 2009, MOL originally guaranteed space for 18,000 TEUs, but Summit shipped only
10,528 TEUs during that service contract year.  (Tr. Ex. P-13, p. 11, MOL Contract Detail

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

showing "Total MQC" of 18,000 as of the 5/20/2008 Access Date; Robert Schneider, 309:24-311:2; Tr. Ex. P-158, p. 1, "8072720A08 Total" and 10,528 "Sum of TEUs."  Near the end of the contract years MOL usually agreed to revise the MQC downward.  The revised end of year MQCs in the service contracts MOL do not show the original MQCs.  The original MQCs are shown in the MOL Contract Detail, Dkt. No. 32-2, 08/01/14, pp. 41-44.)

In the "A09" service contract, covering May 2009 to June 2010, MOL originally guaranteed space for 18,000 TEUs, but Summit shipped only 6,883 TEUs during that service contract year.  (Tr. Ex. P-13, p. 13, MOL Contract Detail showing "Total MQC" of 18,000 as of the 5/1/2009 Access Date; Tr. Ex. P-158, p. 1, "8072720A08 Total" and 6,883 "Sum of TEUs.")

Thus MOL in the service contracts had guaranteed to Summit far more space than Summit actually used.  Whether Summit actually received any extra space protection as a result of the Shenzhen door arrangement is questionable and unproven.

For SeaMaster, in the A09 service contract covering June 2009 to June 2010, MOL guaranteed space for 35,000 TEUs and SeaMaster shipped 25,704 TEUs.  (Tr. Ex. P-13, p. 7, MOL Contract Detail showing "Total MQC" of 24,000 TEUs as of the 6/5/2009 Access Date; Schneider, 318:2-10; Tr. Ex. P-158, p. 4, "8084273A09 Total" and 25,704 "Sum of TEUs.") Thus for that year MOL had guaranteed far more space to SeaMaster than it used.

For SeaMaster, in the A08 service contract covering May 2008 to June 2009, MOL guaranteed space for 24,000 TEUs and SeaMaster shipped 32,232 TEUs.  (Tr. Ex. P-13, p. 5, MOL Contract Detail showing "Total MQC" of 24,000 TEUs as of the 5/15/2008 Access Date; Schneider, 317:9-13; Tr. Ex. P-158, p. 2, "8084273A08 Total" and 32,232 "Sum of TEUs.") Thus theoretically SeaMaster could have received some extra space protection for the A08 contract year period.  But only theoretically, because MOL's witnesses testified that MOL had substantial extra space available on its ships in addition to the guaranteed space amounts, particularly during the A08 contract year period.  MOL's Sheehan testified that generally about 20% of MOL vessel space was available for shipments in excess of MQC guaranteed amounts. (Sheehan, 30:21-31:23.)  During 2008-2009, however, because of slow economic conditions MOL had a lot of empty space on its vessels.  (Sheehan, 42:5-24.)  So during mid-2008 to mid-

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 8 -

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

2009, which was the only time SeaMaster shipped any amount of TEUs above the original MQC, MOL had a lot of empty space on its ships. MOL presented no testimony about how many of those empty slots SeaMaster would have received anyway, just to fill up the MOL ships, or how many slots SeaMaster received because of the Shenzhen door arrangement. Thus whether SeaMaster actually received extra space protection, at all or in any significant amount, as a result of the Shenzhen door arrangement also is questionable and unproven.

MOL argued on appeal that the total lost charges for space protection may have roughly equaled the amounts that SeaMaster and Summit overpaid to MOL for the Rainbow trucking. MOL based this assertion on a comparison of a hypothetical space protection price (hypothetical because MOL did not put on evidence of the actual price) with the liquidated damages penalty amounts in the service contracts if SeaMaster or Summit failed to meet an MQC. This is an apples and oranges comparison. No evidence was presented that MOL's potential price for space protection was the same as, based upon, or in any way related to the liquidated damages penalty amounts in the service contracts. Also, as described above, the evidence contradicts MOL's assumption that every Shenzhen door shipment actually was space protected.

The Court made no finding that MOL incurred damages for space protection in an amount that equaled or even approximated the SeaMaster and Summit payments to MOL for the purported Rainbow trucking, and no methodology could have led to such a conclusion. It is one thing for a plaintiff to be unable to prove the precise amount of damages because the relevant evidence does not exist or because the amount is not capable of calculation, but it is another for the plaintiff to fail to present evidence that is available and that would allow calculation or approximation, and then ask the Court to grant a speculative amount in the absence of that evidence. By not presenting Prado's testimony or other evidence about the price for space protection, and not presenting Lun's testimony or other evidence about the number of Shenzhen door shipments that MOL actually space protected, MOL has no basis to claim a speculative amount of space protection damages to avoid crediting SeaMaster and Summit for their overpayments to MOL.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 9 -
OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

**D.     MOL is not entitled to an award of punitive damages.**

The Court did not award punitive damages to MOL, and it denied MOL's renewed request for punitive damages in its post-trial briefing.  (Order, Dkt. No. 309, 07/18/13, 17:15-18.)  MOL did not appeal the Court's denial of punitive damages, and the Court of Appeals did not suggest that this Court should award any.  In an abundance of caution, however, SeaMaster and Summit explain why an award of punitive damages would be inappropriate.  Simply stated, the facts of this case do not call for punitive damages.  Also, punitive damages are not allowable in this case because California punitive damages law cannot be applied to foreign conduct, and MOL did not present the required financial evidence upon which to base an award of punitive damages.

**1.     The facts of this case do not meet the requirements of California's punitive damages statute, Civil Code §3294.**

A plaintiff that seeks to obtain punitive damages under California law must meet certain statutory requirements.  The plaintiff must prove by "clear and convincing evidence" that the defendant has been guilty of oppression, fraud, or malice.  Cal. Civ. Code § 3294(a).  "Fraud" for this purpose means an intentional misrepresentation intended to harm the plaintiff.  Cal. Civ. Code §3294(c)(3).  The evidence does not meet the statute's requirements under the clear and convincing evidence standard.

MOL's Michael Yip created and was the driving force behind the Shenzhen door arrangements.  Huang of SeaMaster agreed to Yip's enticements to join in the Shenzhen door arrangement, but his motive was not to hurt MOL but to attempt to guarantee space protection for SeaMaster (which, as described above, turned out to be unnecessary).  Lau of Summit SCM inherited the arrangement (started years before between Yip and Cheng of Kesco) when Summit SCM took over some of the business from Kesco, and she just continued the arrangement as before.  While the Court found that Huang and Lau had reason to suspect that Yip's Shenzhen trucking arrangement would cause MOL to lose money, that suspicion is not equivalent to clear and convincing evidence of intent to harm MOL, rather than act for the benefit of their own companies.

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

In addition, to justify an award against a corporation the California punitive damages statute requires clear and convincing proof that an "officer, director, or managing agent" was either (1) personally guilty of oppression, fraud, or malice; or (2) had advance knowledge of the unfitness of the offending employee and employed him or her with conscious disregard of the rights or safety of others; or (3) authorized or ratified the wrongful conduct for which damages are awarded.  Cal. Civ. Code § 3294(b).   Cheng and Lau were not officers or directors of Summit; Cheng was a consultant for Summit SCM and Lau was hired to run day-to-day operations of that company, which handled the shipments in China under the MOL-Summit service contracts.  (FF ¶51.)  Cheng and Lau cannot be considered "managing agents" of Summit US under the punitive damages statute:  managing agents are "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy."  *White v. Ultramar, Inc.* (1999) 21 Cal. 4th 563, 566-67; *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421.  There is no evidence, let alone clear and convincing evidence, that either Cheng or Lau in Hong Kong had any role in determining corporate policy for the U.S. defendant, Summit.

Huang was the managing director of SeaMaster HK, the subsidiary that handled the shipments in China for SeaMaster under the MOL-SeaMaster service contracts, and he was a director of SeaMaster.  But O'Neill, Agresti, and the other principals at SeaMaster, the U.S. corporate defendant, had no knowledge of the Shenzhen door arrangement.  (See FF ¶58.)  Certainly there is no clear and convincing evidence that SeaMaster had a corporate policy endorsing the Shenzhen door arrangement.

### 2.   California punitive damages law cannot be applied to regulate foreign conduct.

Imposing punitive damages under California law to foreign conduct would violate the Due Process Clause and Commerce Clause.  As a general rule a State does not have "a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction."  *State Farm Mutual Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 421; *White v. Ford Motor Co.* (9th Cir. 2002) 312 F.3d 998, 1012-1020.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1    The harm that the Court found Defendants caused MOL occurred in Hong Kong and

2    China, not in California, and MOL is a Japanese corporation. No California interest would be

3    vindicated in imposing punitive damages under Civil Code §3294.

**3.    MOL failed to present evidence of Defendants' financial condition, which is essential for a punitive damages award.**

6    For punitive damages to be awarded the plaintiff must present evidence of the defendant's

7    financial condition as of the time of trial to permit determination whether the amount of punitive

8    damages exceeds the level necessary to punish and deter. *Adams v. Murakami* (1991) 54 Cal. 3d

9    105, 111. Thus, "an award of punitive damages cannot be sustained on appeal unless the trial

10   record contains meaningful evidence of the defendant's financial condition" at the time of trial.

11   *Adams*, 54 Cal. 3d at 109, 119; see also *Mike Davidov Co. v. Issod* (2000) 78 Cal. App. 4th 597,

12   607 (evidence of a named defendant's financial condition at the time of trial is a "legal

13   precondition to the award of punitive damages"); *Kelly v. Haag* (2006) 145 Cal. App. 4th 910,

14   915 (evidence must date to the time of trial). This must include evidence of both the assets and

15   the liabilities of the defendant. *Soto v. BorgWarner Morse TEC Inc*. (2015) 239 Cal. App. 4th

16   165, 194-94. The trial record in this case is devoid of such evidence, which MOL as the plaintiff

17   had the burden to produce. *Adams,* 54 Cal. 3d at 119. The Court has no financial evidence upon

18   which to base a punitive damages award.

**III.    MOL cannot assert a valid RICO claim.**

20   MOL has asserted a claim under the Racketeer Influenced and Corrupt Organizations Act

21   ("RICO"), 18 U.S.C. § 1962. To establish RICO liability a plaintiff must prove "conduct" of an

22   "enterprise" through a "pattern" of "racketeering" activity. *Odom v. Microsoft Corp.* (9th Cir.

23   2007) 486 F.3d 541, 547; *Sedima, S.P.R.L. v. Imrex Co., Inc.* (1985) 473 U.S. 479, 496, 105 S.Ct.

24   3275, 87 L.Ed.2d 346. Each element is a term of art. Racketeering activity is defined to include

25   the commission of federal statutory and state common law offenses, known as "predicate acts."

26   The predicate acts MOL alleges are mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C.

27   §1343). The Court need not reach the elements of RICO, however, because RICO does not apply

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 12 -
OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1   to extraterritorial conduct (*United States v. Xu* (9th Cir. 2013) 706 F.3d 965, 974-75 [hereafter,

2   *Xu*]), and the relevant predicate acts in this case were in Hong Kong and China, not in the U.S.

3       **A.       The rule against extraterritorial application bars MOL's RICO claim.**

4       MOL seeks an impermissible extraterritorial application of RICO. This Court concluded

5   that MOL could not state a RICO claim against SeaMaster or Summit because the Shenzhen door

6   arrangement was extraterritorial. (FF/CL, pp. 63-64.) In deciding that question the Court applied

7   the "nerve center" test. The Court of Appeals ruled that, in deciding the issue of extraterritoriality,

8   the Court should have used the test stated in *Xu*, which focuses on the pattern of racketeering, and

9   remanded the case for further proceedings on the RICO issues. (Memorandum decision, pp. 7-9.)

10  The Court of Appeals did not rule that this Court's result was wrong, only that it must reconsider

11  the issue using the *Xu* test.

12      Under the *Xu* test the result is the same: the Shenzhen door arrangement was

13  extraterritorial. All the significant aspects of the arrangement, including the misrepresentations

14  themselves (the Shenzhen door bookings), took place in Asia, primarily in Hong Kong. The

15  injury to MOL occurred in Hong Kong when MOL paid Rainbow there.

16      In analyzing this issue after the trial this Court cited its findings of fact that the Shenzhen

17  door arrangement was set up in Hong Kong by Yip, Cheng, and Huang, that all three of these

18  individuals worked in Hong Kong and directed the arrangement from there, that the Shenzhen

19  door shipments were booked in Hong Kong, that Rainbow ("the key to the entire arrangement")

20  was located in Hong Kong, and that although Summit, SeaMaster, and Kesco were U.S.

21  corporations, their Hong Kong offices or agents ran the arrangement and their U.S. offices had

22  very little involvement. (FF/CL, 64:5-22.) These are still the driving facts in the analysis.

23      The Court's findings of fact verify that the meaningful predicate acts for purposes of

24  RICO, the Shenzhen door booking misrepresentations, occurred in Hong Kong, not in the U.S.

25  The alleged U.S. domestic connections with the arrangement were insubstantial, and they were not

26  the cause of injury to MOL. MOL knows this makes the RICO claim extraterritorial. Therefore

27  rather than address whether the Hong Kong predicate acts constitute an extraterritorial RICO

28  claim, which is the correct analysis, MOL asserts that the significant predicate acts in this case

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

- 13 -
OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1    were the post facto mailing or emailing of the bills of lading to the U.S.  Sending the bills of

2    lading to the U.S., however, does not turn this essentially foreign arrangement, accomplished

3    through foreign predicate acts, into a domestic U.S. RICO claim.

        1.    **RICO does not apply extraterritorially, but only to a pattern of**
4              **racketeering activity in the U.S.**

5

6        The Ninth Circuit in *Xu* concluded in a criminal RICO case that the statute does not apply

7    extraterritorially in a civil or criminal context.  *Id.* at 974-5.  The *Xu* panel grappled with the

8    question of what standard to apply when determining for purposes of RICO whether conduct

9    should be considered extraterritorial, namely whether the focus should be on the enterprise or on

10   the pattern of racketeering activity.  *Id.* at 975-78.  The *Xu* court concluded that the focus should

11   be on the pattern of racketeering activity, although the court did not appear to make that an

12   absolute rule, stating that "[t]he geographic location of an enterprise may be relevant under certain

13   factual scenarios, like the criminal schemes at issue in …Mitsui O.S.K. Lines" [i.e., the case at

14   bar].  *Id.* at 977.  However, the court said, that would not be the best analytical methodology to

15   apply to a case like *Xu*, where the brains of the operation were located overseas but the enterprise

16   violated United States immigration law.  *Id.*  In that kind of case, the court held, the analysis

17   should focus on the pattern of racketeering activity.  In the *Xu* case the indictment described two

18   parts of the enterprise.  The first part involved diverting funds from the Bank of China to a holding

19   company in Hong Kong, which was conducted "predominantly" in China, and the court held that

20   to the extent it was predicated on extraterritorial activity, it was beyond the reach of RICO even if

21   the bank fraud resulted in some of the money reaching the U.S.  *Id.* at 978.  The second part of the

22   enterprise, however, involved racketeering activities conducted within the U.S. that violated U.S.

23   immigration laws, including using fraudulent visas and passports to enter the U.S., traveling

24   within the U.S. to execute documents in furtherance of the immigration fraud, and opening bank

25   accounts in the U.S., leading to defendants' arrest in the U.S. in possession of the fraudulent

26   immigration documents.  The court concluded that the defendants' violation of U.S. immigration

27   laws while the defendants were in the U.S. justified the convictions under RICO, but the fraud

28   they accomplished in China did not.  *Id.* at 978-79.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 14 -

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

*European Community v. RJR Nabisco, Inc.* (2d Cir. 2014) 764 F.3d 129 [hereafter, "*RJR*"] is consistent with *Xu*, as the *RJR* court itself noted. *Id.* at 139, n. 6. The plaintiffs were the European Community and its member states, and the defendants were RJR Nabisco and related entities. The complaint alleged that RJR directed, managed, and controlled a global money-laundering scheme with organized crime groups, laundered money through New York based financial institutions, repatriated the profits of the scheme to the U.S., and committed various common law torts in violation of New York state law. The facts were complicated, but the alleged nexus with the U.S. was pervasive. The court in *RJR* noted that RICO incorporates by reference numerous specifically identified and generically described criminal statutes ("predicates") and adds new criminal and civil consequences to the predicate offenses when they are committed in a pattern. *Id.* at 135. The *RJR* court held that "RICO applies extraterritorially if, and only if, liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate offenses." *Id.* at 136. When a RICO claim depends on violations of a statutory predicate offense that Congress manifestly intended to apply extraterritorially, the *RJR* court stated, RICO will apply to that extraterritorial conduct. When a RICO claim depends on violations of a statutory predicate offense that Congress did not manifestly intend to apply extraterritorially, however, then RICO will not apply extraterritorially either. *Id.* The *RJR* court concluded that mail fraud and wire fraud were not intended to apply extraterritorially, so RICO could apply to those claims only if they involved sufficient domestic U.S. conduct. *Id.* at 139, confirmed at 2015 U.S. App. Lexis 5991 (2d Cir. 2015).

Thus alleged mail fraud or wire fraud will not support a RICO claim unless they are the relevant predicate offenses and took place in the U.S.

> **2.    In assessing extraterritoriality, only predicate acts in the U.S. that are substantial, material, and proximately cause injury to the plaintiff can constitute a pattern of racketeering activity in the U.S.**

To constitute a pattern of racketeering activity in the U.S. the defendants' predicate acts in the U.S. must be substantial and material, and they also must be the proximate cause of injury to the plaintiff.

To find a U.S. domestic pattern of racketeering activity requires more than passing or

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1   tangential U.S. contacts with a foreign based offense.  In *Morrison v. National Australia Bank Ltd.*

2   (2010) 561 U.S. 247, 266 the Supreme Court stated: "For it is a rare case of prohibited

3   extraterritorial application that lacks *all* contact with the territory of the United States.  But the

4   presumption against extraterritorial application would be a craven watchdog indeed if it retreated

5   to its kennel whenever some domestic activity is involved in the case."

6       In *Xu* the court held that the part of the defendants' bank fraud that centered in China was

7   beyond the reach of RICO even if it resulted in some of the money reaching the United States.

8   See 706 F.3d at 978, favorably citing *Cedeño v. Intech Grp., Inc.* (S.D.N.Y. 2010) 733 F. Supp. 2d

9   471, 472, aff'd, sub nom., *Cedeño v. Castillo* (2d Cir. 2012) 457 F. App'x 35 (RICO inapplicable

10  even though a foreign based offense had contacts with the U.S. consisting of the movement of

11  funds into and out of U.S.-bank accounts) and *Norex Petroleum Ltd. v. Access Indus., Inc.* (2d Cir.

12  2010) 631 F. 3d 29, 33 (court dismissed the RICO claims as extraterritorial even though plaintiff

13  had alleged numerous acts in the U.S. that allegedly constituted racketeering, including mail and

14  wire fraud, because the alleged conspiracy primarily involved foreign actors and foreign acts).

15      Ancillary U.S. contacts with a foreign-based fraud or illegal scheme are insufficient to

16  support the application of RICO.  In *Petroleos Mexicanos v. SK Engineering & Construction Co.*

17  (S.D.N.Y. Jul. 30, 2013) Case No. 12 Civ. 9070 (LLS) 2013 U.S. Dist. LEXIS 107222, aff'd (2d

18  Cir. 2014) 572 Fed. Appx. 60, plaintiff PEMEX, a Mexican company, alleged a scheme by a

19  Korean company and a German company to defraud it by bribing its officials in Mexico to

20  approve cost overruns and expense payments.  Defendants financed the scheme through U.S.

21  financial institutions guaranteed by the Export-Import Bank of the U.S.  As a result of the scheme

22  PEMEX made seven substantial payments from its trust, organized under Delaware law and

23  managed in New York, to defendants' bank account in New York.  PEMEX asserted that the

24  scheme was domestic because U.S. entities financed the project and because it involved U.S.

25  domestic wire fraud since defendants sent faxes from New York and induced PEMEX to pay the

26  seven invoices by wire to defendants in New York.  The *Petroleos Mexicanos* court dismissed the

27  RICO claim under Rule 12(b)(6), finding it was extraterritorial because it was primarily foreign,

28  and the U.S. contacts "fail[ed] to shift the weight of the fraudulent scheme away from Mexico,"

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 16 -

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

and thus "the thrust of the pattern of racketeering activity" was not directed at the U.S.  *Id.* at *8, 9, quoting *Republic of Iraq v. ABB AG* (S.D.N.Y. 2013) 920 F. Supp. 2d 517, 546.

Following *Morrison*, courts consistently have refused to apply RICO when the gist of the alleged illegal scheme was extraterritorial even though the scheme involved some related U.S. activity that arguably constituted predicate offenses:  *Cedeño, id.,* 457 Fed. App'x 35 (Venezuelan government use of plaintiff's movement of funds into and out of U.S.-based bank accounts as a pretext for his wrongful incarceration in Venezuela cannot support domestic application of RICO); *U.S. v. Philip Morris USA* (D.D.C. 2011) 783 F. Supp. 2d 23 (communications between foreign and U.S. actors, visits to the U.S., and the use of an experimental farm in the U.S. to further the alleged foreign-based scheme does not support application of RICO); *Republic of Iraq*, 920 F. Supp. 2d at 542-46 (RICO complaint for Iraq based money laundering and bribery scheme dismissed under Rule 12(b)(6) as extraterritorial despite U.S. contacts with both kinds of illegal activities because the "key aspects of the alleged scheme were focused abroad"); *Tymoshenko v. Firtash* (S.D.N.Y. Mar. 26, 2013) Case No. 11-CV-2794 (KMW), 2013 U.S. Dist. Lexis 42754 (RICO complaint for Ukraine-based extortion scheme dismissed under Rule 12(b)(6) as extraterritorial because the money laundering in the U.S. that was part of the scheme was insufficient to support RICO claim).

For RICO to apply, not only must the focus of the racketeering activity be centered in the U.S., but the U.S. based activity must be the proximate cause of the injury to the plaintiff.  MOL's alleged predicate offenses of mail fraud and wire fraud would be relevant in the analysis of extraterritoriality only if those acts, not the Hong Kong aspects of the Shenzhen door arrangement, were the proximate cause of the injury to MOL, but they were not.

To state a civil RICO claim a plaintiff is required to show that a RICO predicate act "not only was a 'but for' cause of his injury, but was the proximate cause as well."  *Holmes v. Sec. Investor Protection Corp.* (1992) 503 U.S. 258, 268.  Proximate cause for RICO purposes requires a "direct relation" between the injury asserted and the alleged predicate act.  "[W]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.* (2006)

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 17 -
OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

547 U.S. 451, 461; *Poulos v. Caesars World, Inc.* (9th Cir. 2004) 379 F.3d 654, 664 ("It is well settled that, to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury.").

In *Hourani v. Mirtchev* (D.D.C. 2013) 943 F. Supp. 2d 159, the complaint alleged RICO claims for extortion, money laundering, and other crimes in connection with the takeover of plaintiff's media businesses in Kazakhstan. The district court, applying the *Xu* racketeering-focused test, dismissed the complaint on the ground that it sought extraterritorial application of RICO. The court agreed that the claims had some domestic U.S. contact: the individual plaintiff and defendant were both U.S. citizens, the defendant approved of the extortion scheme from the U.S., and the defendant corporation received payment in U.S. bank accounts for participating in the extortion. But the court concluded that these U.S. contacts were too isolated and peripheral to support a RICO claim and did not change the "essentially foreign" nature of the activity in that case. *Id.* at 165-67. The court also noted a second reason why the alleged U.S. contacts did not support a RICO claim: they did not proximately cause the injuries alleged. The court ruled that the U.S. predicate acts not only must be substantial, they must proximately cause the injuries to the plaintiff. *Id.* at 167, following *Cedeño*, 457 Fed. App'x at 38. The court in *Hourani* concluded that the extortion in Kazakhstan, not the post-extortion money laundering in the U.S., was the proximate cause of the plaintiff's injuries. *Id.* at 168; see also *Republic of Iraq v. ABB AG* (S.D.N.Y. 2013) 920 F. Supp. 2d 517, 549. To the same effect are *Hemi Grp. LLC v. City of New York* (2010) 559 U.S. 1; *Oki Semiconductor Co. v. Wells Fargo Bank* (9th Cir. 2002) 298 F.3d 768, 774 (affirming dismissal of RICO claims after finding that theft, not money laundering of theft proceeds, was the proximate cause of plaintiff's injury).

Thus to avoid preclusion of RICO due to extraterritoriality, MOL must do more than prove a pattern of mail fraud or wire fraud in the U.S. MOL must prove that the pattern of mail fraud or wire fraud in the U.S.—and not the foreign based aspects of the Shenzhen door arrangement—proximately caused its damages.

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA 94105

- 18 -
OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

**3.    The Shenzhen door arrangement took place in Hong Kong, and the alleged U.S. connections with the arrangement were insubstantial, immaterial, and did not proximately cause injury to MOL.**

The Court has found that the Shenzhen door arrangement was extraterritorial in all its important aspects.  (FF/CL 64:5-22.)  The booking misrepresentations from SeaMaster and Summit in Hong Kong to MOL in Hong Kong, leading to the payments by MOL in Hong Kong to Rainbow in Hong Kong, was the proximate cause of the loss to MOL.  The subsequent sending of the bills of lading or bill of lading data to the U.S. did not cause the loss, let alone proximately cause it.

The Shenzhen door arrangement was similar to the bank fraud in China in the *Xu* case, which the Ninth Circuit found was extraterritorial for purposes of RICO, even though the fraud resulted in some of the money reaching the U.S.  *Xu*, *id.* at 978.  The Shenzhen door arrangement is also analogous to the circumstances in the *Cedeño, Norex*, *Petroleos Mexicanos, Philip Morris, Republic of Iraq*, and *Tymoshenko* cases cited above in which the courts concluded that the ancillary U.S. activity in all those cases would not shift the "weight" or "thrust" or "focus" of the foreign predicate offenses to the U.S.  Indeed those cases seem to have had more arguably U.S. predicate acts than the case at bar.  Conversely, SeaMaster and Summit have found no analogous case in which the court found the application of RICO would not be extraterritorial.

On appeal, MOL argued that the domestic U.S. predicate activity consisted of:  (1) SeaMaster's Hong Kong agent and Summit's Hong Kong agent mailing or emailing the MOL bills of lading together with the SeaMaster and Summit house bills of lading to their own U.S. customers for shipments made under the Shenzhen door arrangement; and (2) MOL's Hong Kong agents' electronic submission of "bill of lading data" to U.S. Customs for shipments made under the arrangement at or around the time the ships left China for the U.S.  MOL made sweeping generalizations that this constituted mail fraud or wire fraud.

SeaMaster and Summit sent their own "house" bills of lading together with the MOL "master" bills of lading to the U.S.  SeaMaster's bills of lading and Summit's bills of lading stated the correct point of origin for the Shenzhen door shipments.  (FF ¶60, 26:11-13; FF ¶71, 30:26-27.)  Only the MOL bills of lading contained the inaccurate Shenzhen door point of origin.  The

governing bills of lading between SeaMaster and Summit with their customers were the house bills of lading, which were accurate.  The MOL bills of lading were issued only to SeaMaster or Summit.  (FF ¶4.)  No one was relying on the incorrect MOL bills of lading, which were issued to SeaMaster and Summit, not to their customers, and SeaMaster and Summit knew the correct point of origin.  This absence of reliance is not directed to whether mail fraud or wire fraud occurred but to whether—assuming it did occur—it was the proximate cause of MOL incurring damages.  It was not.  The Shenzhen door booking misrepresentations in Hong Kong, which created the excuse for MOL to pay Rainbow, and not the subsequent routine forwarding of the bills of lading to the U.S. was the proximate cause of MOL's loss.

For any U.S. inbound shipment the carrier (MOL) is supposed to inform U.S. Customs of the basic shipment data, and sometimes an NVOCC does that as well.  If SeaMaster or Summit sent Customs the data on their own bills of lading, that was accurate because their bills of lading showed the correct points of origin.  On appeal MOL conceded that it was not claiming that the data SeaMaster and Summit submitted to Customs was inaccurate.  If MOL sent inaccurate information to Customs, that was MOL's own doing.  In any event, that would not have been the proximate cause of the loss to MOL either.

As part of its argument on appeal about purported U.S. connections with the Shenzhen door arrangement, MOL cited some U.S. activities of Kesco.  But MOL never asserted a RICO claim against Kesco.  (MOL 2nd Amend. Complaint, ¶¶78-91.)  Kesco's conduct has no bearing on the RICO cause of action asserted against SeaMaster and Summit.

This Court's detailed findings as to how the Shenzhen trucking arrangement damaged MOL do not mention SeaMaster's or Summit's mailing or emailing bills of lading to its own customers in the U.S., or electronically submitting bill of  lading data to U.S. Customs.  There is no evidence that anyone in the U.S. attached any importance to the Shenzhen door place of receipt in the MOL bills of lading transmitted here.

MOL has based its RICO argument on essentially the same kind of peripheral U.S. activity that the courts in *Hourani, Cedeño, Norex, Oki Semiconductor*, and *Republic of Iraq* found insufficient to support a RICO claim because it could not be considered the proximate cause of the

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1    plaintiff's injury.  The Hong Kong based aspects of the Shenzhen door arrangement, not the

2    routine ancillary U.S. activity of sending the bills of lading from Hong Kong to the U.S., was the

3    proximate cause of MOL's damages.

4    **B.      MOL has failed to prove the substantive RICO elements.**

5            Because MOL's RICO claim is extraterritorial, the Court need not address the

6    substantive elements of the claim.  Nevertheless, MOL has failed to substantively prove those

7    elements.  In addressing this issue two general points are relevant.  One is that courts "are

8    cautious about basing a RICO claim on predicate acts of mail and wire fraud" because it will be

9    the unusual fraud that does not enlist the mails and wires in its service in some way, and to

10   prevent application of RICO to "garden-variety fraud claims" better prosecuted under state law.

11   *Al-Abood v. El-Shamari* (4th Cir. 2000) 217 F. 3d 225, 238.  Second, the purpose of RICO was

12   to fight organized crime, and RICO claims in commercial contexts "are more frequently an effort

13   to construct a treble damage suit from what, at best, is a civil wrong, something that was never

14   the intention of those who drafted the statute in the Justice Department or of Congress when it

15   became law."  *Kimm v. Lee* (E.D.N.Y. 2005) 2005 U.S. Dist. Lexis 727, at *16.

16   **1.      MOL has failed to establish the proximate cause element of RICO.**

17           To state a civil RICO claim a plaintiff is required to show that a RICO predicate act "not

18   only was a 'but for' cause of his injury, but was the proximate cause as well."  *Holmes v. Sec.*

19   *Investor Protection Corp*. (1992) 503 U.S. 258, 268.  This is explained above in the context of

20   what predicate acts may be considered when assessing extraterritoriality.  As is also explained

21   above, the proximate cause of damage to MOL was the Shenzhen door arrangement that took

22   place in Hong Kong, not the subsequent standard acts of sending the bills of lading from Hong

23   Kong to the U.S.  To the extent MOL is basing its RICO claim on mail fraud and wire fraud, the

24   claim fails for lack of proximate cause.

25   **2.      MOL has failed to prove the conduct element of RICO.**

26           MOL has failed to prove the "conduct" element of 18 U.S.C. §1962(c).  What constitutes

27   "conduct" under 18 U.S.C. §1962(c) is determined according to the "operation or management"

28   test established in *Reves v. Ernst & Young* (1993) 507 U.S. 170, 179, 185.  *Reves* requires that the

EMARD DANOFF PORT
TAMULSKI & WALOVICH LLP
49 Stevenson Street
Suite 400
San Francisco, CA  94105

- 21 -

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC

1  defendant have "some degree of direction," not just participation. *Walter v. Drayson* (9th Cir.

2  2008) 538 F.3d 1244, 1248.  A defendant's conduct is not "operation or management" of the

3  enterprise merely because the defendant has assisted the enterprise or had influence over it.  *High*

4  *v. The Choice Mfg. Co.* (N.D. Cal., July 24, 2012) No. C-11-5478 EMC, 2012 U.S. Dist. Lexis

5  103161, at *8.  Simply performing services for the enterprise does not rise to the level of direction,

6  whether one is inside or outside the enterprise.  *Walter,* 538 F.3d at 1249.

7        The actions of SeaMaster and Summit did not reach the level of operation and

8  management of the enterprise that *Reves* requires.  Without doubt, MOL's Yip controlled this

9  enterprise.  (FF ¶12.)  When Summit SCM took over some the business of Kesco, Lau just

10  continued to process the bookings the same way Kesco had, and no evidence was adduced that

11  Lau ever communicated with Yip or had anything to do with the arrangement with SeaMaster or

12  anyone else.  Her activity can only be characterized as participation, not operation or management.

13  Huang of SeaMaster agreed to the arrangement and then followed the instructions of Yip about

14  how to go about it.  He had nothing to do with the arrangement with Summit or anyone else.

15  SeaMaster's actions also fall into the category of participation rather than operation or

16  management.  MOL cannot prove the essential element of "conduct" to support a RICO claim.

17  **IV.     Conclusion.**

18        MOL is entitled to recover compensatory damages for its losses, but not more.  The

19  Court should award MOL $666,425 in damages from SeaMaster.  The Court should award MOL

20  $889,311 in damages from Summit (in addition to the amount for Summit's joint liability with

21  Kesco).  This will make MOL whole.  The Court should deny MOL's claims for any other

22  damages, including those under RICO.

23  Dated:  September 4, 2015    EMARD DANOFF PORT TAMULSKI & WALOVICH LLP
                      Eric Danoff

24                        Katharine Essick

25                   _____/s/ Eric Danoff_____

26                   By Eric Danoff
                 Attorneys for Defendants

27                   SeaMaster Logistics, Inc.
                 Toll Global Forwarding (Americas) Inc.

28

OPENING BRIEF BY DEFENDANTS SEAMASTER/SUMMIT ON REMAND
Case Nos. C-10-5591-SC and C-11-2861-SC