Erich P. Wise/SBN 63219
Alisa Manasantivongs/SBN 260227
FLYNN, DELICH & WISE LLP
One World Trade Center, Suite 1800
Long Beach, CA 90831-1800
Telephone:    (562) 435-2626
Facsimile:    (562) 437-7555
Email:        erichw@fdw-law.com

James B. Nebel/SBN 69626
FLYNN, DELICH & WISE LLP
505 Montgomery Street, 11th Floor
San Francisco, CA  94111
Telephone:    (415) 693-5566
Facsimile:    (415) 693-0410
Email:        jamesn@fdw-law.com

Conte C. Cicala/SBN 173554
CLYDE & CO. US LLP
101 Second Street, 24th Floor
San Francisco, CA 94105
Telephone:    (415) 365-9800
Facsimile:    (415) 365-9801
Email:        Conte.Cicala@clydeco.us

Attorneys for Plaintiff
MITSUI O.S.K. LINES, LTD.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITSUI O.S.K. LINES, LTD. | Case Nos.    11-cv-02861 SC |
| | 10-cv-05591-SC |
| Plaintiff, | [Consolidated] |
| vs. | |
| | **PLAINTIFF MITSUI O.S.K. LINES, LTD.'S** |
| SEAMASTER LOGISTICS, INC., SUMMIT | **OPENING BRIEF ON THE ISSUES** |
| LOGISTICS INTERNATIONAL, INC., | **PENDING ON REMAND** |
| KESCO CONTAINER LINE, INC.; KESCO | |
| SHIPPING, INC., and DOES 1 through 20, | Hearing Date:  None set |
| | Before:        Hon. Samuel Conti |
| Defendants. | |

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF THE CASE ..................................................................................... 2

    A.  The Court Of Appeals Memorandum Decision ................................................ 2

    B.  Facts And Findings Relevant To Issues On Remand ....................................... 3

        1.  The Conspiracies to Defraud MOL ........................................................ 3

        2.  Damages ................................................................................................... 8

III. LEGAL ARGUMENT ................................................................................................. 12

    A.  MOL Has Established Its RICO Claims Because It Proved That Defendants' Enterprise Conducted Its Affairs Through A Pattern of Racketeering That Injured MOL In Its Business And Property ........................................................... 12

    B.  This Case Does Not Involve The Extraterritorial Application Of RICO ..................... 13

    C.  The Pattern Of Racketeering Activity Was Conducted In The United States ................... 14

        1.  Racketeering Activity ............................................................................ 14

        2.  Pattern .................................................................................................... 16

    D.  MOL Has Established The Remaining Elements Of A RICO Claim Enterprise ............. 27

        1.  The Yip/Summit US Enterprise ............................................................ 28

        2.  The Yip/SeaMaster US Enterprise ....................................................... 29

        3.  Conduct .................................................................................................. 30

    E.  Proximate Cause ............................................................................................... 32

    F.  Defendants Cannot Establish The *In Pari Delicto* Defense To Defeat MOL's RICO Claims ........................................................................................... 35

        1.  Conspiracy under civil RICO ................................................................ 36

        2.  Summit US is jointly and severally liable under RICO with Kesco Container for acts within the limitation period ........................................ 37

    G.  Applicable Statutes Of Limitations .................................................................. 40

    H.  MOL Is Entitled To Recover Treble Damages Under RICO ........................... 43

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

-i-

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

I.   MOL Is Entitled To Recover Attorneys' Fees and Interest ................................. 43

IV. MOL IS ENTITLED TO DAMAGES IN THE FULL AMOUNT OF ITS LOSSES RESULTING FROM THE FAKE TRUCK PAYMENTS, THE ORIGIN RECEIVING CHARGE DIFFERENTIALS, AND THE FREE SPACE PROTECTION ........................... 43

A.   The Amount Of The Losses Incurred For The Truck Payments And Origin Receiving Charge Differentials Are Not In Dispute ................................... 45

B.   The Arbitrary Payments Made To MOL By Summit US And SeaMaster To Cover Up The Fraud Provide A Reasonable Approximation Of The Actual Damages Incurred By MOL For The Lost Space Protection Premium ................................. 46

C.   MOL's RICO Damages Overlap With And Treble The Recovery Under State Law And Include Additional Amounts For Shipments By KESCO Container From June, 2007 Through May, 2008 ................................. 57

D.   An Award Of Prejudgment Interest On The Damages Incurred Is Appropriate Under State Law ................................. 59

E.   An Award Of Punitive Damages To MOL Is Appropriate ................................. 60

V.  CONCLUSION ................................. 61

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Aetna Cas. Sur. Co. v. P&B Autobody*

   43 F.3d 1546 (1st Cir. 1994) ................................................................. 38

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*

   483 U.S. 143 (1987) ............................................................. 39, 40, 43

*Baumer v. Pachl*

   8 F.3d 1341 (9th Cir. 1993) ................................................................. 37

*Bendzak v. Midland Nat. Life Ins. Co.*

   440 F.Supp.2d 970 (S.D. Iowa 2006) ................................................. 42

*Beneficial Standard Life Ins. Co. v. Madariaga*

   851 F.2d 271 (9th Cir. 1988) .............................................................. 41

*Blazevska v. Raytheon Aircraft Co.*

   522 F.3d 948 (9th Cir. 2008) .............................................................. 13

*Boyle v. United States*

   556 U.S. 938 (2009) ........................................................................... 27

*Brady v. Dairy Fresh Prods. Co.*

   974 F.2d 1149 (9th Cir. 1992) ............................................................ 31

*Cedric Kushner Promotions, Ltd. v. King*

   533 U.S. 158 (2001) ..................................................................... 12, 27

*Chemetron v. Business Funds, Inc.*

   682 F.2d 1149 (5th Cir. 1982) ............................................................ 38

*Compare Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*

   437 F.3d 1145 (11th Cir. 2006) .......................................................... 35

*Cullen v. Margiotta*

   811 F.2d 698 (2nd Cir. 1987) ............................................................. 43

*Doyle v. Hasbro, Inc.*

   103 F.3d 186 (1st Cir. 1996) .............................................................. 28

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

-iii-

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*DSPT International, Inc. v. Nahum*
    624 F.3d 1213 (9th Cir. 2010) ........................................................................ 48

*Fitzgerald v. Chrysler Corp.*
    116 F.3d 225 (7th Cir. 1997) .......................................................................... 28

*Georgia v. Pennsylvania R.R. Co.*
    324 U.S. 439 (1945) ........................................................................................ 37

*Gimmett v. Brown*
    75 F.3d 506 (9th Cir. 1996) ............................................................................ 41

*H.J. Inc. v. Northwestern Bell Telephone Co.*
    492 U.S. 229 (1989) ........................................................................................ 16

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*
    392 U.S. 481 (1968) ........................................................................................ 54

*Havoco of America, Ltd. v. Shell Oil Co.*
    626 F.2d 549 (7th Cir. 1980) .......................................................................... 40

*Hawk v. Perillo*
    643 F.Supp. 380 (N.D. Ill. 1985) ................................................................... 38

*Hemi Group, LLC v. City of New York*
    559 U.S. 1 (2010) ............................................................................................ 32

*Hennegan v. Pacifico Creative Service, Inc.*
    787 F.2d 1299 (9th Cir. 1986) ........................................................................ 42

*Hodas v. Sherburne, Powers & Needham, P.C.*
    938 F.Supp. 60 (D. Mass. 1996) ..................................................................... 42

*Holmes v. Sec. Investor Prot. Corp.*
    503 U.S. 258 (1992) ............................................................................ 13, 32, 38

*Hourani v. Mirtchev*
    ___ F.3d ___ [2015 WL 4590324] (July 31, 2015, D.C. Cir.) ....................... 34

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

-iv-

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

1

2

**TABLE OF AUTHORITIES**

**Federal Cases**

*Hourani v. Mirtchev*
  943 F.Supp.2d 159 (D.D.C. 2013) ................................................................. 34

*Humana Inc. v. Forsyth*
  525 U.S. 299 (1999) ........................................................................................ 61

*Ikuno v. Yip*
  912 F.2d 306 (9th Cir. 1990) .......................................................................... 16

*Illinois Brick Co. v. Illinois*
  431 U.S. 720 (1977) ........................................................................................ 54

*In re ClassicStar Mare Lease Litig.*
  727 F.3d 473 (6th Cir. 2013) .......................................................................... 28

*In re Cotton Yarn Antitrust Litigation*
  505 F.3d 274 (4th Cir. 2007) .......................................................................... 37

*In re Lower Lake Erie Iron Ore Antitrust Litigation*
  710 F.Supp. 152 (E.D. Pa. 1989) ................................................................... 39

*Industrial Building Materials, Inc. v. Interchemical Corporation*
  437 F.3d 1336 (9th Cir. 1970)......................................................................... 39

*Kansas v. Utilicorp United, Inc.*
  497 U.S. 199 (1990) ........................................................................................ 54

*Kuhn Const. Co. v. Ocean and Coastal Consultants, Inc.*
  723 F.Supp.2d 676 (D. Del. 2010) .................................................................. 37

*Living Designs, Inc. v. E.I. de Nemours and Company*
  431 F.3d 353 (9th Cir. 2005) .......................................................................... 28

*Marsu, B.V. v. Walt Disney Co.*
  185 F.3d 932 (9th Cir. 1999)........................................................................... 47

*McFarland v. McFarland*
  684 F.Supp.2d 1073 (N.D. Iowa 2010) .......................................................... 38

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-v-

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Miller v. Yokohama Tire Corp.*
    358 F.3d 616 (9th Cir. 2004) ..................................................................... 31

*Morrison v. National Australia Bank, Ltd.*
    581 U.S. 247 (2010) ......................................................................... 13, 14

*Myzel v. Fields*
    3866 F.2d 718 (8th Cir. 1967) .................................................................. 38

*Neibel v. Trans World Assurance Co.*
    108 F.3d 1123 (9th Cir. 1997) ................................................................. 61

*O'Melveny & Myers v. F.D.I.C.*
    512 U.S. 79 (1994) ................................................................................ 36

*Odom v. Microsoft Corp.*
    486 F.3d 541 (9th Cir. 2007) ........................................................ 13, 15, 27

*Oki Semiconductor Co. v. Wells Fargo Bank*
    298 F.3d 768 (9th Cir. 2002) ....................................................... 34, 37, 38

*Pace Industries, Inc. v. Three Phoenix Co.*
    813 F.2d 234 (9th Cir. 1987) .................................................................. 42

*Pacific Shores Properties, LLC v. City of Newport Beach*
    730 F.3d 1142 (9th Cir. 2013) ................................................................ 47

*Pasquantino v. United States*
    544 U. S. 349 (2005) ............................................................................ 15

*Pereira v. United States*
    347 U.S. 1 (1954) ................................................................................. 15

*Pincay v. Andrews*
    238 F.3d 1106 (9th Cir. 2001) ................................................................ 41

*Pinkerton v. United States*
    328 U.S. 640 (1946) ............................................................................. 38

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Pinter v. Dahl*
    486 U.S. 622 (1988) ............................................................................... 36

*Republic of Iraq v. ABB AG*
    768 F.3d 145 (2d Cir. 2014) ................................................................... 35

*Reves v. Ernst & Young*
    507 U.S. 170 (1993) ............................................................................... 30

*Rotella v. Wood*
    528 U.S. 549 (2000) ............................................................................... 41

*Samsung Electronics Co. v. Panasonic Corp.*
    747 F.3d 1199 (9th Cir. 2014) ............................................................... 42

*Schmuck v. United States*
    489 U.S. 705 (1989) ............................................................. 15, 16, 19, 34

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*
    806 F.2d 1393 (9th Cir. 1986) ............................................................... 15

*Sec. Investor Prot. Corp. v. Vigman*
    908 F.2d 1461 (9th Cir. 1990) ............................................................... 38

*Sedima, S.P.R.L. v. Imrex Co., Inc.*
    473 U.S. 479 (1985) ......................................................................... 12, 25

*Slaney v. Int'l Amateur Athletic Fed'n*
    244 F.3d 580 (7th Cir. 2001) ................................................................. 37

*Stinnett v. Damson Oil Corp.*
    813 F.2d 1394 (9th Cir. 1987) ........................................................... 47, 48

*Story Parchment Co. v. Paterson Parchment Paper Co.*
    282 U.S. 555 (1931) ............................................................................... 47

*Ticor Title Ins. Co. v. Florida*
    937 F.2d 447 (9th Cir. 1991) ................................................................. 16

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Tymohenko v. Firtash*
2013 WL 1234821 (S.D.N.Y. March 26, 2013) ................................................... 35

*United States v. Blinder*
10 F.3d 1465 (9th Cir. 1993) ........................................................................... 28

*United States v. Chao Fan Xu*
706 F.3d 965 (9th Cir. 2013) ................................................................... passim

*United States v. Fernandez*
388 F.3d 1199 (9th Cir. 2004) ................................................................. 37, 61

*United States v. Garlick*
240 F.3d 789 (9th Cir. 2001) ........................................................................... 15

*United States v. Georgiou*
777 F.3d 125 (3d Cir. 2015) ........................................................................... 15

*United States v. Green*
592 F.3d 1057 (9th Cir. 2010) ......................................................................... 19

*United States v. Jinian*
725 F.3d 954 (9th Cir. 2013) ........................................................................... 34

*United States v. Lane*
474 U.S. 438 (1986) ......................................................................................... 34

*United States v. Lo*
231 F.3d 471 (9th Cir. 2000) ........................................................................... 34

*United States v. Lyons*
740 F.3d 702 (1st Cir. 2014) ........................................................................... 15

*United States v. Maze*
414 U.S. 395 (1974) ......................................................................................... 34

*United States v. Philip Morris USA*
316 F.Supp.2d 19 (D.D.C. 2004) ..................................................................... 38

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

**TABLE OF AUTHORITIES**

**Federal Cases**

*United States v. Redcorn*

 528 F.3d 727 (10th Cir. 2008) ............................................................... 34

*United States v. Rude*

 88 F.3d 1538 (9th Cir. 1996) ................................................................. 33

*United States v. Sampson*

 371 U.S. 75 (1962) ................................................................................. 34

*United States v. Turkette*

 452 U.S. 576 (1981) ............................................................................... 27

*United States v. Vaughn*

 797 F.2d 1485 (9th Cir. 1986) ............................................................... 41

*Wallace v. Midwest Financial & Mortgage Services, Inc.*

 714 F.3d 414 (6th Cir. 2013) ................................................................. 32

**Federal Statutes**

18 U.S.C. §1341 ....................................................................... 14, 15, 26

18 U.S.C. §1343 ....................................................................... 14, 15, 26

18 U.S.C. §1961 ............................................................................ passim

18 U.S.C. §1962 ............................................................................ passim

18 U.S.C. §1964 ................................................................. 1, 12, 32, 43

46 U.S.C. 40502 ................................................................................ 17, 18

**California Cases**

*Boeken v. Philip Morris Inc.*

 127 Cal.App.4th 1640 (2005) ................................................................ 61

*Bullis v. Security Pac. Nat. Bank*

 21 Cal.3d 801 (1978) ............................................................................ 60

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**California Cases**

*Clayworth v. Pfizer, Inc.*

   49 Cal.4th 758 (2010)................................................................. 54

*Fladeboe v. American Isuzu Motors, Inc.*

   150 Cal.App.4th 42 (2007)........................................................ 46

*Fragale v. Faulkner*

   110 Cal.App.4th 229 (2006)...................................................... 46

*GHK Assoc. v. Mayer Group, Inc.*

   224 Cal.App.3d 856 (1990)....................................................... 48

*Lackner v. North*

   135 Cal.App.4th 1188 (2006).................................................... 61

*Power Standards Lab, Inc. v. Fed. Exp. Corp.*

   127 Cal.App.4th 1039 (2005).................................................... 61

*Ward v. Taggart*

   51 Cal.2d 736 (1959)................................................................ 46

**California Statutes**

Civil Code §1709 ................................................................................. 46, 48

Civil Code §3288 ......................................................................... 48, 59, 60

Civil Code §3294 ............................................................................... 48, 60

Civil Code §3333 ............................................................................... 46, 48

**Other Authorities**

16 AM. JUR 2d, *Conspiracy* § 57 (2007) ......................................... 38

19 C.F.R. §4.7 ................................................................................... 19

Cal. Const., Article XV, §1 .............................................................. 60

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

# I.     INTRODUCTION

The Court of Appeals has remanded this case for further proceedings on the claims of plaintiff Mitsui O.S.K., Lines, Ltd. ("MOL") under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c), and for recalculation of the damages to be awarded to MOL on its claims for misrepresentation under California law.  For the reasons set forth below, judgment should be entered in favor of MOL on the RICO claims in the amounts of $8,285,511.01 against Summit Logistics International, Inc. ("Summit US")[1] and $3,453,615 against SeaMaster Logistics, Inc. ("SeaMaster"), subject to an additional award of attorneys' fees in an amount to be determined on later motion.  Damages on the misrepresentation claims should be recalculated to award MOL the amounts of $2,365,023.05 against Summit US and $1,151,205.00 against SeaMaster, with an additional 31% ($733,157.13 against Summit and $356.873.55 against SeaMaster) in prejudgment interest on those principal amounts.  The RICO damages include those recoverable under state law, except for the prejudgment interest sought pursuant to California law.  For Summit US, the RICO claim adds additional sums for MOL's trucking payments made and the origin receiving charges saved on Kesco Container Line, Inc. ("Kesco") shipments from June 10, 2007 through May 24, 2008.  The RICO damages are trebled as required by the federal statute. To the extent that the damages awarded on the RICO claims overlap with the amounts awarded on the misrepresentation claims, MOL does not claim a double recovery.  The aggregate damage sums requested by MOL are, therefore, $8,285,511.01 plus $733,157.13 in interest under state law against Summit US, and $3,453,615 plus $356.873.55 in interest against SeaMaster.

//

---

[1] Subsequently renamed Toll Global Forwarding (Americas), Inc.

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

## II.     STATEMENT OF THE CASE

**A.     The Court Of Appeals Memorandum Decision**

The Court of Appeals reversed this court's dismissal of MOL's RICO claim and remanded that claim for further proceedings, holding that this court "erred when it applied the nerve center test" to conclude that application of RICO in this case would be impermissibly extraterritorial. (Dkt. No. 332 at 8).[2] As the Court of Appeals noted, because this court "made its findings under the erroneous nerve center test, [it] made no specific findings regarding Appellants' pattern of racketeering activity" pursuant to the "pattern of racketeering" test adopted by in the Ninth Circuit in *United States v. Chao Fan Xu,* 706 F.3d 965 (9th Cir. 2013). (*Id.* at 8).  The Court of Appeals remanded MOL's RICO claim "with instructions for the district court to apply the test set forth in *Chao Fan Xu.*"  (*Id.* at 8-9).

The Court of Appeals also held this court's damage award was erroneous because it "fail[ed] to use a reasonable basis of computation to calculate the actual damages incurred by MOL for reimbursed trucking costs, origin receiving charge differentials, and lost space premium protections" and "conflat[ed] compensatory and punitive damages."  (Dkt. No. 332 at 4-6). The Court reversed and remanded that award for "recalculation in accordance with California law."  (*Id.* at 6).  The appellate court's Memorandum decision gave no specific instructions regarding how to apply California law to this case or what the proper amount of damages should be.

//

//

//

---

[2] The citations herein are to the docket in Case No. 11-cv-02861-SC.

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

**B.      Facts And Findings Relevant To Issues On Remand[3]**

**1.      The Conspiracies to Defraud MOL**

This court dismissed MOL's RICO claim based on its conclusion that RICO applies only to domestic enterprises.  As the Court of Appeals noted, this court did not address whether the evidence otherwise establishes MOL's RICO claims. The evidence and the findings of this court pertinent to the Defendants' liability and damages under California law, however, strongly support MOL's RICO claims.

The centerpiece of this court's findings and conclusions is the determination that there were at least two conspiracies to defraud MOL.  (Dkt. No. 261 at 61).  The first of these began in 2000, when Raymond Cheng, on behalf of Kesco Container, agreed to enter the Shenzhen door arrangement with Michael Yip who was a corrupt manager at MOL.  (*Id.*, citing FF ¶¶37-38).  Before the conspiracy concluded in June 2010, it was joined by Summit US.  The second conspiracy started in 2009, when Jerry Huang, on behalf of SeaMaster US, agreed to the Shenzhen door arrangement with Yip.  (*Id.* at 62, citing FF ¶55).

The conclusion that these conspiracies existed was based upon detailed findings that:

1.      In 1997, Kesco Container, a company headquartered in New York, began to service the ocean transportation needs of Fashion Merchandising, Inc. ("FMI"), a New Jersey

---

[3] The court issued its Findings of Fact and Conclusions of Law in a comprehensive 78-page opinion.  (Dkt. No. 261).  Those findings set forth the nature of the ocean transportation business as it relates to both vessel-operating common carriers (VOCCs) such as MOL and non-vessel operating common carriers (NVOCCs) such as Summit US and SeaMaster US.  (*Id.* at 4-7 [FF ¶¶1-9]).   The opinion identifies the key players, summarizes the evolution of the entities affiliated with the NVOCC defendants and describes the "Shenzhen door arrangement," which was a key component of the fraud that the defendants perpetrated on MOL.  (*Id.* at 7-32 [FF ¶¶10-74]).  MOL will not generally set forth all of those findings in this Memorandum but will focus on those facts relevant to the issues on remand.  Recognizing that more than two years have passed since the trial of this matter, MOL refers the court to its Findings of Fact and Conclusions of Law for a comprehensive description of the evidence pertaining to the claims in this case.

3

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

company that performed warehousing and trucking services for a number of garment manufacturers. (*Id.* at 9-10 [FF ¶17]; Trial Exhibits P-105 and P-106). FMI eventually became Kesco's biggest customer, comprising over 50% of its business. (*Id.* at 9-10 [FF ¶17]).

2.       One of FMI's major customers was the Jones Apparel Group ("Jones Apparel"), a large garment company, located in the United States. (*Id.*; Lau, RT 167-68). It grew substantially, eventually becoming a company composed of 19 divisions, including Jones New York, Nine West and Gloria Vanderbilt. (Lau, RT 174; O'Neill, RT 1728). All of the Kesco and Summit US shipments at issue in this case were delivered to Jones companies in the United States. (Lau, RT 243-44).

3.       Kesco Container's handling agent in Hong Kong was Kesco Container HK. (Dkt. No. 261 at 9 [FF ¶16]). Raymond Cheng was a key employee at Kesco Container HK. (*Id.*)

4.       Geoffrey Tice held senior positions at both FMI and Kesco Container, and then later at a predecessor to Summit US. (*Id.* at 10 [FF ¶19]). He managed Jones Apparel's ocean transportation needs. (*Id.*) During the time he worked at Kesco, Tice was FMI's "implanted employee." (*Id.*) Among other things, Tice worked with Raymond Cheng to handle Kesco's service contract negotiations with MOL. (*Id.*)

5.       The fraudulent "Shenzhen door arrangement" was conceived sometime in 2000, when Jones Apparel acquired Nine West and its need for ocean services increased significantly. (*Id.* at 16-17 [FF ¶37]). When customers' cargo exceeded available space on MOL ships, MOL's local offices generally made decisions as to how to allocate space among customers. (*Id.* at 17 [FF ¶37 n.5]). In Hong Kong and Shenzhen, decisions about space allocation were often left to the discretion of an employee who reported to Yip Kwok-Wai, a.k.a. "Michael Yip." Yip was the district director of MOL HK from sometime in 2009 through 2011. (*Id.* at 8 [FF ¶11]).

4

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

Before that time, he was MOL's General Manager of Sales and Customer Service for Hong Kong and South China. (*Id.*)

6.     Beginning in 2000, "there were various discussions at Kesco and FMI about the strategies for obtaining freight rates needed to secure the Jones Apparel business and also obtaining 'adequate space protection,' an arrangement to ensure that MOL reserved adequate space for Jones Apparel cargo on its ships." (*Id.* at 16-17 [FF ¶37]).

7.     Cheng, who was then assistant general manager of Kesco Container HK, took these concerns to Yip, who recommended the Shenzhen door arrangement. (*Id.*)  He agreed to provide space protection for Kesco cargo. (*Id.* at 17 [FF ¶38]).  In return, Cheng agreed Kesco would declare "false Shenzhen door" shipments, meaning Kesco would request MOL to arrange for trucking Kesco cargo between inland origins, typically Shenzhen, and ports in and around Hong Kong. (*Id.*)  In reality, Kesco did not require any trucking from MOL because the manufacturers or exporters transported the cargo to the port. (*Id.*)  Yip suggested, and Cheng agreed, to nominate Rainbow Transportation Co., Ltd. ("Rainbow") to perform the purported truck moves. (*Id.*)  MOL paid Rainbow's invoices for this service, but, in reality, Rainbow never performed any service. (*Id.* at 18 [FF ¶39]).  It merely received payments from MOL and made payments to Kesco Container HK.  Kesco Container HK, in turn, kicked back funds to Kesco, which ultimately paid MOL for the door moves. (*Id.*)  MOL paid more to Rainbow than it charged for the fake trucking moves. (*Id.*)  Kesco was fully compensated by Rainbow for payments made to MOL for the non-existent door moves. (*Id.* [FF ¶40]).

8.     The "end result" of the deal struck between Michael Yip and the Defendants to defraud MOL "was guaranteed space and lower shipping charges for Defendants and revenues for Rainbow." (*Id.* at 2).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

5

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

9. "[U]nder the Shenzhen door arrangement, Kesco received adequate space on MOL's ships in return for declaring false Shenzhen door shipments and was fully compensated by Rainbow for payments made to MOL for the non-existent door moves." (*Id.* at 18 [FF ¶49]).

10. Although Michael Yip was a manager of MOL's Hong Kong agency, he lacked authority to enter into the fraudulent scheme. The court found and concluded that Yip was acting adversely to MOL's interests. (*Id.* at 19, 28-29 [FF ¶¶ 42, 67]).

11. In 2006, a group of companies known as Summit Group acquired FMI. (*Id.* at 12 [FF ¶24]). The Summit Group, comprised of Summit Global Logistics, Inc. ("SGL") and its subsidiaries, provided logistics services for cargo coming into the U.S. from Asia, as well as U.S. trucking and warehousing services. (*Id.* [FF ¶25]).[4] Tice continued to negotiate the Shenzhen door rates on behalf of the Summit Group after its acquisition of FMI in 2006. (*Id.* at 21 [FF ¶48]). In January 2009, a joint venture, known as Summit Logistics International (SCM HK) Limited ("Summit SCM"), supplanted Kesco Container HK as the agent in Hong Kong. (*Id.* at 15 [FF ¶ 33]).

12. Summit US became directly involved with the conspiracy through its joint venture with the Kesco partners, Summit SCM. (*Id.* at 62). From January 2009 to June 2010, Summit SCM took a part in the arrangement in substantially the same manner as Kesco. (*Id.* at 22 [FF ¶51]). The arrangement continued uninterrupted through June, 2010. (*Id.* at 20-21 [FF ¶ 46]).

13. In January 2008, SGL and its subsidiaries filed for bankruptcy. This did not interrupt the operations of the former Summit Group companies, which had now become Summit

---

[4] At trial, the SGL subsidiaries were referred to collectively as "SeaMaster HK." (*Id.* [FF ¶ 25 & n.4]).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

US and SeaMaster HK.   Both companies continued the operations of the former SGL subsidiaries.   (*Id.* at 13-14 [FF ¶29]).

14.     SeaMaster US entered into the Shenzhen door arrangement in early 2009.  (*Id.* at 23 [FF ¶53]).  Jerry Huang had become concerned that MOL was not providing enough vessel space for SeaMaster's shipments to the U.S.  He expressed those concerns to MOL.  (*Id.*) MOL offered to block additional space for SeaMaster through a "fixed space allocation" plan, but Huang rejected the offer.  (*Id.* at 23-24 [FF ¶¶ 53, 54, 56]).

15.     Huang met with Yip in Hong Kong in early 2009. Yip said he could solve SeaMaster's space problems if Huang agreed to the Shenzhen door arrangement.  (*Id.* at 25-26 [FF ¶59]).  SeaMaster would declare false Shenzhen door shipments and pay an arbitrary for the non-existent trucking.   In return Yip would provide space protection and a trucking company would reimburse SeaMaster for the arbitrary.  (*Id.* at 23-24 [FF ¶55]).

16.     Each of the service contracts that the defendants negotiated with MOL contained rates for Shenzhen door shipments.   As required by law, MOL filed each of those service contracts with the Federal Maritime Commission ("FMC").  (Devine, RT 1839).  The filing was done electronically.  (Berardi, RT 582).

17.      For each shipment, based on the information provided by Summit US and its predecessors and co-conspirators as well as that provided by SeaMaster US, MOL issued bills of lading that incorrectly identified the shipments' place of receipt as Shenzhen.  (*Id.* at 20, 26 [FF ¶¶45, 60]).   The house bills of lading that Summit US and SeaMaster US issued to its own customers correctly identified a port place of receipt.  (*Id.*)

//

//

7

18. Between 2000 and 2010, Cheng, Tice, Lau and others had booked thousands of false Shenzhen door shipments through Kesco, Summit US and Summit SCM. (*Id.* at 22-23 [FF ¶52]). Similarly, SeaMaster US booked thousands of shipments through the Shenzhen door arrangement. (*Id.* at 27 [FF ¶63]). As will be shown below, each and every shipment, Kesco/Summit US and SeaMaster tendered to MOL, was covered by a Shenzhen door rate in the service contract rates that MOL had to file electronically with the FMC, as required by law... They also caused MOL to submit, through U.S. wire transmissions, false master bill of lading information to the Custom and Border Patrol Agency of the Department of Homeland Security. In addition, Kesco/Summit US and SeaMaster used U.S. courier services and U.S. wire transmission services to transmit documents and information to its customers and agents in the United States. Each of these transmittals and transmissions constituted violations of U.S. mail and wire fraud statutes.

### 2. Damages

There is no dispute that MOL paid Rainbow Transportation $2,230,532.05[5] for the fake Shenzhen door transport of Summit US and Kesco Container Line shipments from 2008 through June, 2010, and $1,080,073.07 for the SeaMaster shipments from January, 2009 through June, 2010. (Dkt. No. 261 at 27, 74, 78; Dkt. No. 309 at 17, 18). It is also undisputed that Summit US paid MOL $1,233,063 and SeaMaster paid $484,740 as "arbitraries" for the phantom Shenzhen trucking. (Dkt. No. 257 at 5, 7; Dkt. No. 303 at 3). The amount of the differential between the fraudulent misrepresentations about the point of origin of the shipments was $134,491 for Summit US and $71,132 for SeaMaster. (Dkt. No. 253-1 at App. G; Dkt. No. 257 at 5, 7).

---

[5] This is the sum of $1,987,883.34, attributed to Summit US' own shipments, plus $242,648.71 for the May 27, 2008 through December 30, 2008 Shenzhen door shipments attributable to Kesco Container Line. (Dkt. No. 309 at 16-17).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

Defendants do not dispute that they are liable to MOL for at least MOL's net losses for the fake trucking payments plus the THC/ORC differential, i.e., $1,131,960 for the Summit US/Kesco shipments ($997,469 plus $134,491) and $666,465 ($595,333 plus $71,132) for the SeaMaster shipments.  This computation, however, does not account for any of the space premium protection losses incurred by MOL as a result of the Defendants' schemes.

In its March 21, 2013, Findings of Fact and Conclusions of Law, this court concluded that MOL was damaged by the misrepresentations of the Defendants and their agents, because:

> As result of these misrepresentations, MOL made payments to Rainbow for trucking that never took place, and these payments were higher than the trucking arbitrary paid to MOL by Defendants. See, e.g., FF ¶ 39 supra.  Further, Defendants' misrepresentations allowed them to avoid the higher origin receiving charges assessed by MOL at the Hong Kong ports. Id. ¶ 40. Finally, MOL was damaged because, as part of the Shenzhen door arrangement, Yip gave Defendants free space protection, a service for which MOL generally charges a premium. See id. ¶¶ 38, 54.

(Dkt. No. 261 at 60).

These findings were undisturbed on appeal.  This court did not allocate the damage award among the three components of damages---truck payments, origin receiving charges, and space protection---but stated:

> "[T]he appropriate damage award for these claims is equivalent to the total amount of MOL's payments to Rainbow over the course of the Shenzhen door arrangement and that MOL has presented credible evidence of these payments."

(*Id.* at 73-74).

Other findings relevant to the damage calculation included:

1.   "MOL took a loss on the trucking leg of the Shenzhen door moves, meaning that MOL paid more to Rainbow than it charged Defendants for trucking."  (*Id.*)

//

9

2.     "[T]he arrangement allowed Kesco to avoid higher surcharges. The origin receiving charge at Shenzhen was about $269 per forty-foot container, while the origin receiving charge at Hong Kong was about $369…. Accordingly, Kesco saved about $100 per forty-foot container by booking Hong Kong port shipments as Shenzhen door shipments." (*Id.*)

3.     "When asked what Kesco was paying MOL for if no door moves were taking place, Lau could only respond that she was 'not sure.'" (*Id.* at 20 [FF ¶44]).

4.     "Cheng, Tice, and Yip needed to keep Kesco's arbitrary lower than MOL's payments to Rainbow in order to make the arrangement feasible." (*Id.* at 21 [FF ¶47]).

5.     "From January 2009 to June 2010, Summit SCM took part in the arrangement in substantially the same manner as Kesco…." (*Id.* at 22 [FF ¶51]).

6.     "If, as Defendants suggest, MOL had wanted to provide Kesco with lower rates and free space protection in order to keep its business, then MOL presumably could have done so without funneling money through a fake trucking company and asking Kesco to declare false places of receipt." (*Id.* at 19 [FF ¶42]).

7.     "Jerry Huang credibly testified that SeaMaster did not enter into the Shenzhen door arrangement until early 2009…. Around that time, Huang was concerned that MOL was not providing enough vessel space for SeaMaster's shipments to the United States." (*Id.* at 23 [FF ¶53]).

8.     "Huang testified that Prado and Hiller were unable to resolve SeaMaster's space issue…. In fact, Prado had offered to block additional space for SeaMaster through a 'fixed space allocation' plan, but Huang rejected the offer because of the higher rates involved. (*Id.* at 23 [FF ¶54]).

//

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

9. "Yip indicated that he could solve SeaMaster's space problem if Huang agreed to the Shenzhen door arrangement.... The arrangement proposed by Yip was substantially similar to the one he had proposed to Cheng nine years earlier: SeaMaster would declare false Shenzhen door shipments and pay an arbitrary for the non-existent trucking, and in return Yip would provide space protection and a trucking company would reimburse SeaMaster for the arbitrary.... Yip did not reveal that the trucking company was Rainbow until a subsequent telephone conversation…. As in the arrangement with Cheng, SeaMaster was able to obtain lower origin receiving charges by booking Hong Kong port shipments as Shenzhen door shipments." (*Id.* at 23-24 [FF ¶55]).

10. "Huang's prior conversations with Hiller and Prado established that MOL was unwilling to provide the type of deal that Yip was offering. Hiller and Prado offered to provide SeaMaster with space protection for additional money, whereas Yip essentially offered to provide free space protection along with lower fees than SeaMaster was already paying." (*Id.* at 24 [FF ¶56]).

11. "Huang testified that he agreed to the Shenzhen door arrangement because it was suggested by Yip, because he had been directed to Yip by Yang, because he needed to resolve SeaMaster's space issue, and because it had the added benefit of allowing SeaMaster to avoid higher origin receiving charge." (*Id.* at 24-25 [FF ¶57]).

12. "This line of argument [that MOL profited from the scheme] is belied by the testimony of Huang and Cheng, who admitted that they entered into the arrangement because they were having difficulty securing space for Defendants' cargo on MOL's ships. See FF ¶¶ 37-38, 53-55 supra. Thus, if Defendants had taken their business elsewhere, MOL could have found other customers to take their place. Further, Huang and Cheng could have legitimately obtained

11

space protection by paying a premium to MOL. See id. ¶ 54. Instead, they opted to strike an under-the-table deal with Yip to obtain free space protection in exchange for misrepresenting the origin of their cargo. Id. ¶¶ 38, 55. Thus, the Shenzhen door arrangement caused MOL to give away a valuable service -- space protection -- for free. It also allowed Defendants to avoid paying the higher origin receiving charges that MOL assessed at Hong Kong ports. Id. ¶¶ 40, 55."

13. "When customers' cargo exceeded space on MOL's ships, cargo was not loaded on a first-come-first-serve basis.... Instead, MOL's local offices would generally make the decision as to how to allocate space among customers." (*Id.* at 17, n.5 [FF ¶37]).

### III. LEGAL ARGUMENT

**A. MOL Has Established Its RICO Claims Because It Proved That Defendants' Enterprise Conducted Its Affairs Through A Pattern of Racketeering That Injured MOL In Its Business And Property**

MOL has asserted claims pursuant to the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c), which allows: "[a]ny person injured in his business or property by reason of a violation of" 18 U.S.C. §1962 to sue for damages based thereon. Section 1962(c) prohibits the "participat[ion] … in the conduct of [an] enterprise's affairs through a pattern of racketeering activity" if that enterprise is "engaged in, or the activities of which affect, interstate or foreign commerce." Under section 1962(d), it is unlawful to conspire to violate §1962(c). Section 1961(1) defines "racketeering activity" as, *inter alia,* "any act which is indictable under any of [several enumerated] provisions of title 18, United States Code." To establish liability under §1962(c), a plaintiff must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001);

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

*Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007). In addition to establishing that a given group of defendants conducted the affairs of a qualifying enterprise through a pattern of racketeering activity, civil RICO plaintiffs must show that the RICO violation was the proximate cause of the injury to their business or property. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992). The evidence at trial established that Summit US, SeaMaster, and Kesco violated 18 U.S.C. §1962(c) and (d) and that MOL was "injured in [its] business or property" by those violations.

**B.     This Case Does Not Involve The Extraterritorial Application Of RICO**

There is a presumption that RICO does not apply extraterritorially in a civil or criminal context. *See Chao Fan Xu*, 706 F.3d at 974-75, citing *Morrison v. National Australia Bank, Ltd.,* 581 U.S. 247 (2010). Application of the statute does not, however, implicate issues of extraterritoriality or the presumption simply because the factual background of the case involves conduct occurring abroad. *Blazevska v. Raytheon Aircraft Co.,* 522 F.3d 948, 952 (9th Cir. 2008). The approach in the Ninth Circuit, which is to determine whether RICO applies by focusing on the "pattern of racketeering activity" that constitutes the alleged offense, was recently established in *Chao Fan Xu*, 706 F.3d at 977-78. A court must "look 'not upon the place where the deception originated' but instead upon the connection of the challenged conduct to the proscription of the statute." *Id.* at 979. Thus, if domestic conduct constitutes part of the "pattern of racketeering activity," RICO is violated regardless of whether additional conduct occurred outside of the United States. *Id.* at 978-79. Because this court had applied a test that focused on the "nerve center of the enterprise," (Dkt. No. 261 at 63:22-64:4), the Ninth Circuit reversed and remanded with instructions for this Court to consider the application of RICO under the approach set forth in *Chao Fan Xu*. (*See* Dkt. No. 332 at 7-9).

13

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

The inquiry into whether the application of RICO here is permissibly territorial or impermissibly extraterritorial is merit-based, rather than jurisdictional. *Morrison,* 581 U.S. at 253-54.   Thus, MOL's discussion of the question of whether RICO can be properly applied here will include the substantive issues of "pattern" of "racketeering activity."   MOL will then address the remaining substantive elements of RICO -- "conduct," "enterprise" and "proximate cause."

**C.    The Pattern Of Racketeering Activity Was Conducted In The United States**

    **1.    Racketeering Activity**

The provisions of the United States Code that prohibit mail and wire fraud, 18 U.S.C. §1341 and §1343, respectively, are among those that the RICO statute includes in its definition of "racketeering activity."   *See* 18 U.S.C. §1961(1).[6]   The "racketeering activity" that gives rise

---

[6] The mail fraud statute, 18 U.S.C. §1341, provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, … places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or *causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier*, or takes or receives therefrom, any such matter or thing, *or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed*, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both…  (Emphasis added).

The wire fraud statute, 18 U.S.C. §1343, provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud,… *transmits or causes to be transmitted* by means of wire … communication *in interstate or foreign commerce*, any writings … for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both…  (Emphasis added).

Neither statute requires that the posting (in the case of mail) or transmission (in the case of wire) and the receipt must both take place in the United States.   Instead, either triggers application of the statute.   The wording of the mail fraud statute applies to things "deposited to be sent or

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

14

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

to MOL's RICO claims was the use of U.S. mails and wires as an integral part of the scheme to defraud MOL.  The mail and wire fraud statutes "proscribe the use of the mails or wires in any situation where it is closely entwined with fraudulent activity."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986).  "The charged mailing or wire transmission need not be an essential element of the scheme, just a 'step in the plot.'" *United States v. Garlick*, 240 F.3d 789, 794 (9th Cir. 2001), quoting *Schmuck v. United States*, 489 U.S. 705, 711 (1989).

The elements of mail fraud are:  (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.  *Pereira v. United States*, 347 U.S. 1, 8 (1954).[7] The Supreme Court has adopted a parallel construction of the wire-fraud statute, 18 U.S.C. §1343.  *Pasquantino v. United States,* 544 U. S. 349, 355 n.2 (2005).  Thus, a wire fraud violation consists of: (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to defraud.  *Odom*, 486 F.3d at 554.

The gravamen of both offenses is a scheme to defraud.  Any mailing or wire transmission that is incidental to an essential part of the scheme satisfies the mailing or transmission transactional element even if the mailing or transmission itself contains no false information.

---

delivered" or caused "to be delivered."  The wire fraud statute applies specifically to transmissions in "foreign commerce."  *See United States v. Georgiou*, 777 F.3d 125, 138 (3d Cir. 2015) (the wire fraud statute does not expressly require entirely domestic transactions, only that a communication be transmitted through interstate or foreign commerce for the purpose of executing a scheme to defraud); *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014) *cert. denied,* 134 S.Ct. 2743, 189 L.Ed.2d 777 (2014) (either the sender or receiver can be in the United States for the statute to apply).

[7] Use of private carrier services such as FedEx or United Parcel Service can constitute mail fraud because the mail fraud statute as amended in 1994 refers to mail delivered by "Postal Service, or … any private or commercial interstate carrier."  18 U.S.C. §1341, Historical and Statutory Notes, 1994 Amendments.

15

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1  *Schmuck v. United States*, 489 U.S. at 712.  The requirement of "… specific intent under these

2  statutes is satisfied by the existence of a scheme which was reasonably calculated to deceive

3  persons of ordinary prudence and comprehension, and this intention is shown by examining the

4  scheme itself."  *Schreiber*, 806 F.2d at 1400 (internal citations omitted); *Ikuno v. Yip*, 912 F.2d

5  306, 310-311 (9th Cir. 1990).

6  **2.      Pattern**

7  A "…'pattern of racketeering activity' requires at least two acts of racketeering activity,

8  one of which occurred within ten years … after the commission of a prior act of racketeering

9  activity." 18 U.S.C. §1961(5).  The term "pattern" "requires [both] the showing of a relationship

10  between the predicates … and …. the threat of continuing activity."  *H.J. Inc. v. Northwestern*

11  *Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (internal citations omitted).

12  The relationship prong is satisfied where the allegedly patterned conduct "… embraces

13  criminal acts that have the same or similar purposes, results, participants, victims, or methods of

14  commission, or otherwise are interrelated by distinguishing characteristics and are not isolated

15  events."  *Id.* at 240.  The continuity requirement is "centrally a temporal concept," and can be

16  either "closed- [or] open-ended …," that is, "either [involving a] … closed period of repeated

17  conduct, or … past conduct that by its nature projects into the future with a threat of repetition."

18  *Id.* at 241-42.  "A party alleging a RICO violation may demonstrate continuity over a closed

19  period by proving a series of related predicates extending over a substantial period of time."  *Id.*

20  at 242, *see e.g., Ticor Title Ins. Co. v. Florida,* 937 F.2d 447, 450 (9th Cir. 1991) (three related

21  acts of racketeering committed over thirteen months found to be a "threat of continued criminal

22  activity" sufficient to meet RICO's pattern requirement).

23  //

24  16

FLYNN, DELICH & WISE LLP

ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1   The "relationship" requirement was satisfied here because the evidence at trial

2   established that all of the shipments served the central purpose of the scheme.  For Summit US

3   and Kesco Container that purpose was to effectively serve the perceived needs of a major United

4   States customer, Jones Apparel, by ensuring that adequate space was available on MOL ships

5   without paying a premium for it.  (Tice, RT 634-35).  That this scheme was directed to the

6   United States is demonstrated, in part, by the fact that the "Rainbow arrangement" was used only

7   for Jones Apparel cargo imported into the United States.  (Lau, RT 243).  For SeaMaster, the

8   purpose was to secure space on vessels for the U.S.-bound cargo of its NVOCC customers, many

9   of which were U.S.-based.  (Huang, RT 1594; Agresti, RT 1421; Liu, RT 1672-1673).

10      As to the "continuity requirement," the pattern here was closed-ended.  The scheme

11   began in 2000 and continued, uninterrupted until 2010.  (Dkt. No. 261 at 20-23 [FF ¶¶44, 46,

12   52]).  Pursuant to the scheme, defendants made thousands of shipments to the United States and

13   each one involved the mailing or wire transmission of documents and information to the United

14   States that were incidental to essential parts of the scheme to defraud MOL.

15      There were three aspects to the scheme that were particularly significant to the

16   perpetration of the fraud on MOL, and mailings and wire transmissions were particularly integral

17   to them.  The first aspect of the scheme was conceived at the very beginning of the relationship

18   between MOL and Kesco Container and continued throughout all subsequent corporate changes.

19   It related to the service contracts between MOL and the defendants.  Specifically, it related to the

20   requirement that all such contracts, as well as amendments to them, must be filed with the

21   Federal Maritime Commission ("FMC").  (Devine, RT 1839; Prado, RT 2021). *See* 46 U.S.C.

22   §40502(b)(1):  "[E]ach service contract entered into under this section by an individual ocean

23   common carrier …shall be filed confidentially with the Federal Maritime Commission."

17

FLYNN, DELICH & WISE LLP

ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

From the very beginning of the relationship, each of the defendants made sure that the service contracts they negotiated contained rates for "Shenzhen door" shipments.   On the Kesco/Summit side, the practice began with Geoff Tice, who negotiated on behalf of Kesco Container, in approximately 2000.  (Costa, RT 72).  It continued with Samantha Scott at Summit US and its predecessor from approximately 2008 to 2011.  (Costa, RT 89-91; Scott, RT 1101). Occasionally, Raymond Cheng at Kesco Container Hong Kong and Summit SCM "jumped in" to conduct negotiations but, for the most part, they were conducted on the "U.S. side."  (Cheng, RT 1054).  On the SeaMaster side, the negotiations for the service contracts were conducted by Jerry Huang.  (Agresti, RT 1455; Huang, RT 942, 1516).  The practice continued after Summit US and SeaMaster were purchased by the Toll Group.  (Huang, RT 857).  The request for the Shenzhen door rates always came from the customer.  (Costa, RT 72).

The inclusion of the Shenzhen door rates in each of the contracts was an integral part of the fraudulent scheme that the defendants perpetrated on MOL, because none of the defendants actually needed the service or rates for it in those contracts.  (E. Chan, RT 384-85; Lau, RT 421-22; Scott, RT 1108-09, 1123; T. Chan, RT 1316). It was also a necessary part of that scheme because of the FMC filing requirement, under 46 U.S.C. §40502(c), that:

> Each service contract shall include—
> (**1**) the origin and destination port ranges;
> (**2**) the origin and destination geographic areas in the case of
> through intermodal movements….

As the defendants' expert, James Devine, confirmed, it is the responsibility of the ocean carrier to make the required FMC filings.  (Devine, RT 1832).  MOL did so, electronically, through the FMC's website.  (Berardi, RT 582).

To constitute a violation of the mail or wire fraud statutes, it is not necessary to show that the wrongdoers actually mailed or wired anything themselves; it is sufficient if they "caused" it

18

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1    to be done. *United States v. Green*, 592 F.3d 1057, 1070 (9th Cir. 2010).  "Where one does an

2    act with knowledge that the use of the mails or wires will follow in the ordinary course of

3    business, or where such use can reasonably be foreseen, even though not actually intended, then

4    he 'causes' the mails to be used." *Pereira*, 347 U.S. at 8-9.  By insisting on unnecessary

5    Shenzhen door rates in their service contracts, the defendants caused MOL to make wire

6    transmissions to the FMC.  Whether representations about the Shenzhen door rates were

7    themselves false is inconsequential because the submissions were certainly more than "just a step

8    in the plot." *See Schmuck*, 489 U.S. at 712.  Instead, they were, in fact, essential to the scheme

9    because without the filing with the FMC, there would have been no Shenzhen door rates.  *(Id.)*

10   The filing falsely gave the appearance of legitimacy to the scheme to MOL and the FMC.

11          The second aspect of the scheme related to every shipment that was made that reflected

12   Shenzhen door rates.  It also involved fraud perpetrated on a United States government agency as

13   well as MOL.  Regulations promulgated by the Customs and Border Protection ("CBP") of the

14   Department of Homeland Security require VOCCs to transmit cargo information to the CBP

15   electronically through the CBP's Automated Manifest System ("AMS") 24 hours before the

16   cargo is laden aboard the vessel in a foreign port.  19 C.F.R. §4.7(b)(2).  The information must

17   be submitted by Inward Cargo Declaration (CBP Form 1302) and include the first foreign place

18   of receipt by the carrier and the first foreign port where the cargo is laden aboard.  19 C.F.R.

19   §4.7a(c)(1-2) and (4)(vi and xi).[8]  An exemplar of an Inward Cargo Declaration (CBP Form

20   1302) is attached as Appendix A.

---

[8] See also U.S. Customs and Border Protection, FAQs on "Inbound Vessel Only – Trade Act of
2002 Final Rule" at No. 9, http://www.cbp.gov/sites/default/files/documents/vessel_faq_3.doc
(last visited Sept. 4, 2015), attached as Exh. B to MOL's Request for Judicial Notice filed
concurrently.  According to FAQ No. 9, the "filing carrier must indicate: 'The first foreign port
where the carrier takes possession of the cargo destined to the United States'."  In response to the

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

Joanne Yourcheck was the Director of Customs and Trade Compliance at MOL. She was involved in MOL's compliance with AMS electronic filings for 25 years. (Yourcheck, RT 152). The data that was sent to Customs through AMS was maintained on MOL's electronic "Starnet" system. Ms. Yourcheck confirmed that no cargo comes into the U.S. without bill of lading data submitted to Customs. (Yourcheck, RT 139). The false information relating to the origin of the thousands of shipments was provided to MOL in Hong Kong for preparation of the master bills of lading. (Lau, RT 252-254; Lau, RT 1100; Chan, RT 1296-1300). On the basis of information that Kesco, Summit and SeaMaster provided to it, MOL made AMS filings with the CBP. (Yourcheck, RT 136-137). As a result of the information provided by SeaMaster, MOL issued master bills of lading that incorrectly identified the shipments' place of receipt as Shenzhen. (Dkt. No. 261 at 26 [FF ¶60]). Thus, MOL's CBP filings uniformly declared a false place of receipt. (Yourcheck, RT 135-14; McCahill, RT 17).

NVOCCs have similar declaration requirements. They may either electronically transmit the information directly to CBP through the AMS system or fully disclose and present the required cargo declaration information to the vessel carrier which then presents the information to CBP via AMS. 19 C.F.R. §4.7(b)(3)(i). Ms. Yourcheck confirmed that to be the case when MOL is carrying cargo on behalf of an NVOCC. (Yourcheck, RT 141).

Throughout the history of the scheme, Kesco Container, Summit US and SeaMaster US submitted their information directly, or through their agents, to the CBP. (Tice, RT 631-632;

question "Does 'foreign port' mean 'port' or place where the filing carrier takes possession," the example given is for a pickup of a container in Berlin (an inland point) for trucking to the port of Hamburg. The answer given is that the "'first foreign port where the carrier takes possession of the cargo destined to the United States' – is Berlin." In accordance with this example, in this case the filing carrier (MOL) would have to indicate that the first foreign port where the carrier takes possession of the cargo is the point of the door pickup for trucking, i.e., Shenzhen.

20

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

Huang, RT 884-885; Lau, RT 1102-1103; O'Neill, RT 1184-1185; T. Chan, RT 1294-1295). If an NVOCC makes a direct filing, MOL does not have access to that information. (Yourcheck, RT 154). The defendants' AMS filings contained the true place of receipt of the cargo at the ports of loading. (Dkt. No. 261 at 20 [FF ¶45]). None of the defendants provided that information to MOL. (*Id*.; Huang, RT 889; Chan, RT 1473).

The defendants knew that, as a result of the master bill of lading and the house bill of lading containing contradictory information relating to the place of origin of the cargo, the respective AMS submissions by MOL and the defendants would be different. For example, Winnie Lau made AMS filings for Kesco Container and Summit SCM. (Lau, RT 1102). She understood that AMS filings track data points from the bill of lading by the carrier. (Lau, RT 1102-03). She also knew that that each shipment that showed a Shenzhen door receipt on the master bill of lading showed a Hong Kong port receipt on the house bill of lading. (Lau, RT 1100). Similarly, one of Tommy Chan's responsibilities, as VP Operations for Summit US and SeaMaster, was to establish procedures relating to Customs regulations in the U.S. (T. Chan, RT 1283). Chan developed and distributed Standard Operating Procedures regarding FMC compliance when using SeaMaster and Summit service contracts. (T. Chan, RT 1284). One FMC required topic was the AMS filings. (T. Chan, RT 1293-94). By causing MOL to submit false documentation to CBP, the defendants committed wire fraud on each shipment of cargo to the United States.

The third aspect of the scheme that is of particular significance to the issue of racketeering activity relates to the documentation necessary for U.S. customers to obtain delivery of their cargo and how that documentation is transmitted. The defendants or their agents routinely transmitted their house bill of lading (which included the true port place of receipt) and

21

the MOL master bill of lading (reflecting the false "Shenzhen door" place of receipt) to their U.S. based agents, by courier or wire.  (Huang, RT 959-960; Huang, RT 1601-1603; Cheng, RT 1025-1026; Lau, RT 1100-1101; Liu, RT 1255; Scott, RT 1128).  While these documents serve many purposes, perhaps the most significant use is that the originals or copies are used by the consignee to obtain delivery of the cargo.  (Cheng, RT 1025-1028, 1031; Exhibit P-109 – KESO1365).

For SeaMaster, from 2008 to 2011, 90% of the shipments to the United States were "freight collect," meaning that the freight charges were paid by the customer at the destination port.  (Huang, RT 1501, 1508; Trial Exhibits P-265-277).  These payments included payments for trucking even though SeaMaster knew trucking was not, in fact, provided.  (Huang, RT 1550-1551).  The freight charges must be paid by the consignee before a carrier such as MOL releases the cargo.  (Dkt. No. 261 at 6 [FF ¶7]).  Thus, without the customers' receipt of the documentation (by courier and wire) that included MOL's erroneous master bills of lading, those customers could not have obtained their cargo.[9]

---

[9]  One of SeaMaster US's major customers was American Global Links ("AGL"), an American-based NVOCC.  James Briles, AGL's Chief Operating Officer, described in detail the process relating to shipments when AGL booked cargo on SeaMaster's service contract.  His description makes clear the extent to which the use of courier services and wire transmissions are integral to the process of the importation of cargo into the United States.

SeaMaster's origin offices began the process by sending a spreadsheet by e-mail daily that contained that day's bookings.  (Briles, RT 1346).  The spreadsheet contained the date, customer's name, consignee's name, volume, container size, shipper name, origin port, final destination and cargo ready date.  (Briles, RT 1348).  It also included a first choice option regarding routing.  (*Id.*)

AGL then received a pre-shipping report.  (Briles, RT 1350).  Initially, that came by e-mail, but beginning about in 2009, it came by "direct feed."  (*Id.*)  AGL then sent an Excel report to its customer by e-mail or by electronic feed.  (Briles, RT 1352).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1    Frances Gaskins-Kennedy of TAG/ICIB Services supervised an audit relating to the

2    discrepancies in the house and master bills of lading.  She obtained information for that audit

3    from two sources.  One source was information that was obtained from the defendants in

4    discovery and was based on data in their electronic e-freight and Leo systems.  (Gaskins-

5    Kennedy, RT 694-95).  "E-freight" was SeaMaster's operating system.  (Liu, RT 1704-05).  Its

6    staff used the system in issuing bills of lading, documentation and customer invoices.  (*Id.*)  Ms.

7    Gaskins-Kennedy's team audited 7,500 house bills of lading from that source.  (Gaskins-

8    Kennedy, RT 694).  The second source of information was from Datamyne, a third-party service

9    provider that obtains information from CBP and makes it available to its service subscribers.

10   (Gaskins-Kennedy, RT 662, 688; McCahill, RT 6-8).  The team audited 14,000 house bills of

11   lading based on Datamyne information.  (Gaskins-Kennedy, RT 694-95).  Where there was

12   overlap in the house bills of lading that came from the defendants' systems and those that came

13   from Datamyne, the information corresponded, regardless of the source.  (Gaskins-Kennedy, RT

14   695).  The house bill of lading includes the master bill of lading number so the auditors could

15   compare information included in the separate documents.  (Gaskins-Kennedy, RT 716).  Thus,

16   the auditors were able to confirm that the place of receipt on the master bills of lading differed

17   from that on the corresponding house bills of lading.  (*See* Trial Exhibit P-216).

18

19

20

21

22

23

24    Once the cargo was en route, AGL received a packet from origin that came either by courier or

25   e-mail.  (Briles, RT 1354; Huang RT 959).  The packet contained the master bill of lading, the
     house bill of lading and an invoice.  (Briles, RT 1354).  The next step was to clear Customs.
     (Briles, RT 1356).  AGL received an arrival notice from the carrier.  It then issued its own arrival

26   notice and sent that to its customer by e-mail so that the customer could obtain delivery.  (*Id.*)

27    Trial Exhibit P-96 is an exemplar packet of documents that SeaMaster sends to AGL.  The

28   documents include MOL's waybill, SeaMaster's house bill of lading, an invoice and a credit
     note.  (Briles, RT 1359, et seq.).

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1   The master bills of lading that MOL issued showed the place of receipt of the cargo as

2   Shenzhen and the Datamyne data relating to the house bills of lading showed the correct place of

3   receipt of the cargo.  (Minck, RT 538-39).  Thus, the defendants committed more than 14,000

4   violations of the mail and wire fraud statutes pursuant to their scheme.  (Trial Exhibit P-216).

5   In sum, the documentation and communications submitted to the CBP and transmitted to

6   customers in the United States were all part of the process necessary to secure entry of the cargo

7   into the United States, delivery to the customer, and payment.  Each set of documents reinforced

8   the falsehood that each shipment was as-described to MOL, i.e., that the cargo was transported

9   by inland truckers from "Shenzhen door" to inland destinations in the United States, when that

10   was not, in fact, the case.  Based thereon, MOL believed it was receiving the trucking services

11   for which it paid and was induced to continue accepting more of the Shenzhen door bookings

12   from the defendants, allowing the overall scheme to continue without interruption over the

13   course of years.

14   *Chao Fan Xu* strongly supports MOL's position that RICO should be applied here.

15   There, four Chinese nationals were convicted of federal crimes they committed as part of a

16   scheme to steal funds from the Bank of China and to escape prosecution through immigration

17   fraud in the United States.  As an essential part of the scheme, each defendant entered into a

18   fraudulent marriage with a spouse who held valid United States immigration status.  After the

19   Bank of China discovered the scheme, the defendants fled to the United States using their

20   falsified immigration documents.

21   One part of the scheme consisted of racketeering activities conceived and primarily

22   conducted in China and the other consisted of racketeering activities in the United States.  *See*

23   *Chao Fan Xu,* 706 F.3d at 978.  The U.S. activities bound the enterprise to the territorial United

24

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

States.  It involved racketeering activities conducted within the United States, including the commission of RICO predicate crimes based on violations of United States immigration laws. *Id.*  The essence of the defendants' scheme was to steal large sums of money in China and "get away with it in the United States." *Id.* at 978-79.

The recent Second Circuit case, *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *rehearing denied*, 764 F.3d 149 (2d Cir. 2014), *rehearing en banc denied*, 783 F.3d 123 (2d Cir. 2015), also supports MOL's position on this issue.  There, a domestic corporation was accused of managing a foreign enterprise that orchestrated a fraudulent global scheme that harmed a foreign plaintiff.   The case is pertinent here for at least four reasons.  First, in analyzing the extraterritorial issue, the Second Circuit focused on the nature and scope of the predicate acts underlying the RICO claims.  *European Community*, 764 F.3d at 135-137.  That is essentially the same as the "pattern of racketeering activity" approach of the Ninth Circuit in *Chao Fan Xu* because "racketeering activity" consists of the commission of RICO's predicate acts.  *Sedima S.P.R.L.*, 473 U.S. at 495.  Second, the alleged predicate offenses involved in that case included violations of the mail and wire fraud statutes.  *European Community*, 764 F.3d at 139-143.  Third, the complaint included allegations that the defendants filed large volumes of false documents with the U.S. Customs Service and the Bureau of Alcohol, Tobacco and Firearms to further their scheme.  *Id.* at 134.  Fourth, the court concluded that a party is not precluded from seeking relief under RICO merely because the injury resulting from otherwise actionable predicate acts is not domestic.  *Id.* at 150-52.  In allowing the action to proceed under RICO, the Second Circuit concluded that "[i]f domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

violated even if some further conduct contributing to the violation occurred outside the United States." *Id.* at 142.

Application of RICO here is not extraterritorial. This case involved a scheme, carried out in Hong Kong/Shenzhen and by "racketeering activities" in the United States. The immigration fraud in the United States in *Chao Fan Xu* was the key to the success of the enterprises in that case. Similarly, Summit US and SeaMaster US's domestic conduct in furtherance of the scheme to defraud included the use of the mails or air courier services as well as wire transmissions in violation of 18 U.S.C. §§1341 and 1343. (Huang, RT 944, 959-960; Cheng, RT 1024-1026; Lau, RT 1100-1101, 1255). This racketeering activity of the enterprise in the United States was a necessary key to the success of the fraud in this case. Just as the mail and wire fraud in *European Community* involved false filings with U.S. governmental agencies, *European Community*, 764 F.3d at 142, Summit US, SeaMaster US and their overseas agents induced MOL to transmit service contract information having no legitimacy to the FMC and false declarations of the place of receipt of the Shenzhen door cargo to the CBP.

If the Service Contracts had not been submitted to the FMC and the thousands of mail and wire transmissions to the CBP in the United States had not occurred, the cargo would not have cleared Customs, trucking companies would not have been able to pick up the cargo at the U.S. terminals, consignees would not have had the necessary documentation to enable them to receive the cargo, MOL would not have been paid for its services, and MOL, in turn, would have stopped providing service to the defendants. In short, the scheme would have come to a grinding halt within days, rather than continuing for years. Those transmittals were integral to the scheme and necessary for Summit US and SeaMaster to achieve their goal of servicing the U.S. import business of their customers by obtaining preferred space without paying for it. (Dkt. No. 261 at

23-24 [FF ¶¶54, 56]; Tice, RT 634-635).  That goal, the unlawful means used to achieve it, and the benefit to Summit US, SeaMaster, and their U.S. customers, continued throughout the history of the fraudulent scheme, through all the changes in the corporate structure of the participants. (Huang, RT 1542-1554, 1577-1578).

**D.      MOL Has Established The Remaining Elements Of A RICO Claim Enterprise**

An "enterprise" is defined in the RICO statute as "… any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. §1961(4).  The definition is "not very demanding." *Odom*, 486 F.3d at 548.  An association-in-fact "enterprise" is a "group of persons associated together for a common purpose of engaging in a course of conduct," and its existence "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates functions as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 582-83 (1981).

An association-of-fact enterprise does not require any particularized organizational structure and need not have a purpose or economic significance beyond or independent of the group's racketeering activity.  *Boyle v. United States*, 556 U.S. 938 (2009).  The structure that it must have is limited to three features:  (1) There must be relationships among those associated with the enterprise; (2) the enterprise must have a purpose; and (3) it must have longevity to permit the associates to pursue the enterprise's purpose.  *Id*. at 946.

Here, there were two enterprises.[10]  The first consisted of Michael Yip and, initially, Kesco Container Line and Fashion Merchandising, Inc. ("FMI"), acting through their key

---

[10] As a preliminary matter, to establish liability under §1962(c) one must prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name.  *Cedric Kushner Promotions, Ltd.*, 533 U.S. 158.  A "person" is

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

27

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

employees and agents. Later, this enterprise evolved to consist of Yip and the Summit Group of companies, primarily Summit Global Logistics, Inc. Finally, and for most of the period that is pertinent here, this enterprise further evolved to consist of Yip, Summit SCM and Summit US. This will be referred to as the "Yip/Summit US enterprise." The second enterprise consisted of Michael Yip and SeaMaster HK and SeaMaster US. This will be referred to as the "Yip/SeaMaster US enterprise."

The structures of both enterprises included each of the three features required under *Boyle*. The court's findings and conclusions as well as the evidence at trial establish the following:

**1.      The Yip/Summit US Enterprise**

(1)      The "relationships" in what became the Yip/Summit US enterprise began in 2000, when Raymond Cheng and Michael Yip negotiated the details of their agreement. (Dkt. No. 261

---

defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. §1961(3). A majority of courts have concluded that because of the distinctness requirement, a single entity cannot be both a RICO "enterprise" and a RICO "person." *Compare, e.g., Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir. 1996) *with Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226-28 (7th Cir. 1997). But the question here is not whether one corporation and its employees and agents can meet the distinctiveness requirement, but whether two or more separate entities and their respective employees and agents -- working together with a third-party -- can meet the distinctness requirement.

In *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493 (6th Cir. 2013), the court addressed a situation in which the alleged enterprise consisted of a corporation, two of its subsidiaries and other entities that were neither controlled by the parent nor its agents. The court concluded that each of these entities was integral to the success of the scheme and distinct from the target corporation. Citing *Cedric Kushner*, 533 U.S. at 164, the court observed that it "would be strange indeed to absolve a parent corporation of liability for doing precisely what RICO was designed to prevent: the use of an association of legally distinct entities 'as a vehicle through which unlawful ... activity is committed.'" *ClassicStar*, 727 F.3d at 493; *see also Living Designs, Inc. v. E.I. de Nemours and Company*, 431 F.3d 353, 361 (9th Cir. 2005), (a corporation and its outside law firms were sufficiently distinct that they could constitute a RICO enterprise); *cf. United States v. Blinder*, 10 F.3d 1465 (9th Cir. 1993). Whatever theoretical restrictions apply to the issue of the "enterprise," Yip's presence in both enterprises establishes the requisite distinction between the defendants (i.e., the "persons") and the enterprises here.

at 16-17 [FF ¶¶37-38]).  The arrangement required Kesco Container HK to misrepresent the place of receipt of the cargo and pay MOL for non-existent trucking to maintain the illusion that Rainbow was actually providing trucking services.  (*Id.* at 17-18 [FF ¶¶38-39]).  Cheng informed Tice about the arrangement in 2000 and Tice, then a high level employee at Summit US's predecessor worked with Cheng and Winnie Lau at Kesco Container to carry out the scheme.  (*Id.* at 61-62).  Tice continued to negotiate the Shenzhen door rates on behalf of the Summit Group after its acquisition of FMI in 2006.  (*Id.* at 21 [FF ¶48]).  Summit US became involved in the conspiracy through its joint venture with the Kesco partners, Summit SCM.  (*Id.* at 62).

(2)     The central "purpose" of the scheme for Kesco Container and Summit US was to serve a major U.S. customer, Jones Apparel, by ensuring adequate space availability on MOL ships without having to pay a premium.  (Tice, RT 634-35).

(3)     The arrangement had "longevity" as it continued uninterrupted through June, 2010.  (Dkt. No. 261 at 20-21 [FF ¶46]).  Between 2000 and 2010, Cheng, Tice, Lau and others had booked thousands of false Shenzhen door shipments through Kesco, Summit US and Summit SCM.  (*Id.* at 22-23 [FF ¶52]).  The Rainbow arrangement was in place for every shipment that Kesco or the Summit entities initiated with MOL that had a Hong Kong or Shenzhen loading port throughout the period of the operating conspiracy.  (Lau, RT 244).

**2.     The Yip/SeaMaster US Enterprise**

(1)     The "relationship" between Yip and SeaMaster US began in early 2009, when Jerry Huang expressed his concerns to MOL that MOL was not providing enough vessel space for SeaMaster's shipments to the United States.  (Dkt. No. 261 at 23 [FF ¶53]).  MOL offered to block additional space for SeaMaster through a "fixed space allocation" plan but Huang rejected the offer.  (*Id.* at 23-24 [FF ¶¶53, 54, 56]).  Huang met with Yip in early 2009, and Yip informed

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

29

Huang that he could solve SeaMaster's space problems if Huang agreed to the Shenzhen door arrangement. (*Id.* at 25-26 [FF ¶59]). On or about March 5, 2009, Huang instructed his assistant to start booking false Shenzhen door shipments. (*Id.*)

(2) For SeaMaster US, the "purpose" of the scheme was to secure free space protection on vessels for its NVOCC customers. (Agresti, RT 1421; Huang, RT 1594; Liu, RT 1672-73).

(3) The arrangement had "longevity" because between 2009 and 2010, SeaMaster booked thousands of shipments through the Shenzhen door arrangement. (Dkt. No. 261 at 27 [FF ¶63]). The arrangement ended in June, 2010, when MOL removed the Shenzhen door and through rates from its service contracts. (*Id.* at 28 [FF ¶65]).

MOL has proven each of the features required under *Boyle* to establish the "enterprise" element of its RICO claim.

### 3. Conduct

To "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs under 18 U.S.C. §1962, "… one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. *Id.* at 184. An enterprise may also be 'operated' or 'managed' by others 'associated with' the enterprise or who exert control over it." *Id.* Merely having "… some part in directing the enterprise's affairs" is enough for liability under RICO. *Id.* at 179.

Each of the defendants participated in the operation and management of the enterprise. With respect to the Yip/Summit US enterprise, Cheng was the head of Kesco Container HK.

30

(Dkt. No. 261 at 47).  Cheng managed the Shenzhen door arrangement beginning in 2000.  (*Id.*)  Cheng also acted as Kesco Container's agent by, among other things, negotiating MOL service contracts.  (*Id.*)  Later, Cheng consulted for the joint venture, Summit SCM.  (*Id.*)  Tice and Lau worked under Cheng.   (*Id.*)   Both were aware of and helped manage the Shenzhen door arrangement.  (*Id.*)  Tice worked directly for Kesco Container and the Summit Group and negotiated MOL service contracts and the false Shenzhen door rates on their behalf.  (*Id.*)  At Cheng's direction, Lau booked false Shenzhen door shipments at Kesco Container HK and later at Summit SCM, where she ran day-to-day operations.  (*Id.* at 47-48).  As a result of the efforts of Cheng, Lau and Tice, Kesco Container HK booked Shenzhen door shipments under Summit US's service contracts with MOL.  (*Id.* at 48).

SeaMaster US had only two employees.  (*Id.* at 14 [FF ¶30]).  As a consequence, SeaMaster HK and Jerry Huang were primarily responsible for running the day-to-day operations of the NVOCC wholesale business.  (*Id.*)  In fact, SeaMaster US's service contracts with MOL list Huang as managing director of SeaMaster US.  (*Id.*)  Huang was also on the Board of Directors of SeaMaster US from 2008 through 2010.  (*Id.*)

After trial, the court imputed the misrepresentations and scienter of Huang, Cheng, Lau and Tice to defendants Kesco Container, SeaMaster US and Summit US.  (*Id.* at 48).  The basis of the court's imputation was California law.  (*Id.* at 46).  Under RICO, an employer that is benefitted by its employee's violations of §1962(c) may be held liable under the doctrines of *respondeat superior* and agency when the employer is distinct from the enterprise.  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004); *Brady v. Dairy Fresh Prods. Co.,* 974 F.2d 1149, 1153-55 (9th Cir. 1992).  Thus, the result is the same under RICO as under California law.

**E.      Proximate Cause**

RICO permits "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962 … [to] sue" and recover treble damages and the cost of the suit, including a reasonable attorney's fee.  18 U.S.C. §1964(c).  To have standing, a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was "by reason of" the RICO violation -- which requires the plaintiff to establish proximate causation.  *Holmes*, 503 U.S. at 268.  A factor is a proximate cause if it is "a substantial factor in the sequence of responsible causation."  *Id.*  Proximate cause is a "flexible concept" that must be assessed on a case-by-case basis.  *Wallace v. Midwest Financial & Mortgage Services, Inc.*, 714 F.3d 414, 419 (6th Cir. 2013), citing *Bridge*, 553 U.S. at 654.  It requires only "some direct relation between the injury asserted and the injurious conduct alleged," and excludes only those "link[s] that are too remote, purely contingent, or indirect." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 2 (2010) (internal quotation marks omitted).

In their briefs in the Ninth Circuit, SeaMaster/Summit asserted that it was the booking of the Shenzhen door shipments and the issuance of the bills of lading in Hong Kong that created the obligation and the cover to pay Rainbow, thus causing damage to MOL, and not the subsequent forwarding of the bills of lading and other documents to the United States.  Based on this assertion, they contended that the *post facto* transmissions and communications cannot constitute predicate acts under RICO.  They assert, essentially, that the tortious acts were completed and the damage done before they made or caused transmittals and communications to the United States.

As a matter of fact, the transmissions and communications here were clearly an integral part of the overall scheme and a proximate cause of MOL's losses.  But for those transmittals

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

and communications, the entire scheme would have collapsed and there would have been no Shenzhen door trucking or free space protection arrangements. At the inception of the scheme, the availability of the Shenzhen rates in the service contracts on file with the FMC was necessary for MOL to accept what turned out to be false bookings to carry the cargo under the arrangement. As the scheme was carried out, the transmittals by courier and transmissions by wire were necessary for CBP to allow the cargo to enter the country and for the defendants' customers to obtain delivery of their cargo. MOL has established the proximate cause element of its RICO claims.

In *United States v. Rude*, 88 F.3d 1538 (9th Cir. 1996), the Ninth Circuit considered and rejected a similar attempt to parse acts from their consequences relating to the issue of proximate cause. That case involved a scheme to defraud a Hawaiian non-profit corporation, among other investors, in connection with investments in "prime bank note" transactions. *Id.* at 1542. The perpetrators assisted the non-profit corporation in opening a Swiss bank account and transferring investment funds to that account. (*Id.*) The perpetrators then transferred all of the funds that had been deposited in the Swiss bank account to their own account in a domestic bank. (*Id.*) Later, they transferred a portion of the funds back to the non-profit corporation, characterizing the transfer as profits from the investment rather than what it actually was -- a return of part of the original investment. (*Id.*) The defendants were prosecuted for, among other things, wire fraud -- not for the transfer of the original funds from Hawaii to the Swiss bank -- but rather for their transfers of funds from the Swiss bank to their own bank as well as the portion of the funds back to the non-profit corporation that they falsely characterized as profit. *Id.* at 1544. The defendants contended that these transfers of funds were not in furtherance of the fraud because

33

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

the fraud was completed -- that is, the investor had suffered injury -- at the time of the original investment. (*Id.*)

The court concluded that each of the transfers was, 'at a minimum, either "incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Id.* at 1544, quoting *Schmuck v. United States,* 489 U.S. at 711. The return of the money to the investor, for example, was intended to create the impression that the investor had earned a substantial, immediate return. "This transfer therefore was not only relevant to the fraudulent conspiracy but extended the overall scheme by 'lull[ing] the victims into a false sense of security, postpone[ing] their ultimate complaint to authorities, and therefore mak[ing] the apprehension of the defendants less likely than if no [transfers] had taken place.'" *Id.* citing *United States v. Lane*, 474 U.S. 438, 451-52 (1986), and quoting *United States v. Maze*, 414 U.S. 395, 403 (1974); s*ee also, United States v. Redcorn*, 528 F.3d 727, 740-41 (10th Cir. 2008).

Although a wire or mail communication cannot be '"part of an after-the-fact transaction that, while foreseeable, was not in furtherance of the defendant's fraudulent scheme, … the issue is not purely one of time sequence.'" *United States v. Jinian*, 725 F.3d 954, 960-61 (9th Cir. 2013), quoting *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000). The "relevant question at all times" is whether a wire "is part of the execution of the scheme as conceived by the perpetrator at the time," *Jinian*, 735 F.3d at 961, quoting *Schmuck*, 489 U.S. at 715, "not whether the defendant, prior to the writing, 'had obtained all the money [he] expected to get,'" *Jinian*, 735 F.3d at 961, quoting *United States v. Sampson*, 371 U.S. 75, 79 (1962).[11] The mail

---

[11] Thus, the cases that involve money laundering activities in the United States or investments in U.S.-based companies that took place after completion of an underlying fraudulent scheme are distinct from the case here where the wire and mail transfers were necessary to the execution of the underlying fraud itself. *Compare, e.g., Hourani v. Mirtchev*, 943 F.Supp.2d 159, 167 (D.D.C. 2013), *aff'd*, ___ F.3d ___ [2015 WL 4590324] (July 31, 2015, D.C. Cir.) *and Oki*

34

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

transmittals and wire transmissions here – both at conception relating to the service contracts and as involved in each shipment - were clearly an integral part of the overall scheme and a proximate cause of MOL's losses. At the conception of the scheme, the availability of the Shenzhen rates in the service contracts was necessary for MOL to carry the cargo under the arrangement. As the scheme was carried out, the transmittals by courier and transmissions by wire were necessary for CBP to allow the cargo to enter the country and for the defendants' customers to obtain delivery of their cargo. MOL has established the proximate cause element of its RICO claims.

**F.      Defendants Cannot Establish The *In Pari Delicto* Defense To Defeat MOL's RICO Claims**

After trial, the court concluded that the actions and knowledge of Michael Yip could not be imputed to MOL. (Dkt. No. 261 at 53-58, 65). That conclusion was based upon California state law. An analysis of cases deciding the issue under RICO confirms that the result is the same under federal law.

While not unanimous, the majority of federal courts considering the *in pari delicto* defense in connection with a RICO claim have concluded that the defense is theoretically available. *Compare Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152-54 (11th Cir. 2006), *cert. denied,* 549 U.S. 811 (2006) *with Republic of Iraq v. ABB AG*, 768 F.3d 145, 162 (2d Cir. 2014). In general, the defense of *in pari delicto* shields a defendant from a plaintiff's claim if the plaintiff was (1) "an active, voluntary participant in the unlawful activity that is the subject of the suit," and (2) either the degrees of fault between the plaintiff and defendant are "essentially indistinguishable," or the "plaintiff's responsibility [is]

---

*Semiconductor Co. v. Wells Fargo Bank,* 298 F.3d 768, 774 (9th Cir. 2002), *with Tymohenko v. Firtash*, 2013 WL 1234821 at *13 (S.D.N.Y. March 26, 2013).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

clearly greater." *Republic of Iraq*, 768 F.3d at 162; *Pinter v. Dahl,* 486 U.S. 622, 635–36 (1988) ("Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed....").

The defendants can establish the *in pari delicto* defense only if the actions of Michael Yip can be imputed to MOL and only if that imputation results in a degree of fault that is indistinguishable from or clearly greater than the degree of the defendants' fault. An application of the *in pari delicto* defense is precluded here both by the previous findings and conclusions of the court that Yip's conduct is not imputed to MOL, and by the law pertaining to imputation of the acts of an employee or agent to a corporation under RICO. The result is the same under RICO as under California law because California state law applies to the issue of imputation to determine whether MOL is responsible for Yip's acts in the context of the "unclean hands" affirmative defense. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 84 (1994) (noting that there "is no federal common law" and directing the Ninth Circuit to apply California state law to the issue of imputation in connection with an affirmative defense to a claim based on federal law). The court's previous findings and conclusions firmly establish that Yip's acts cannot be imputed to MOL to defeat MOL's RICO claims.

## 1.     Conspiracy under civil RICO

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To establish a claim for §1962(d) conspiracy, a plaintiff must prove that the defendant agreed (1) to maintain an interest in or control of an enterprise or to participate in the affairs of the enterprise through a pattern of racketeering activity; and (2) that someone would commit at least two predicate acts to accomplish those goals. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP

ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

2001), *cert. denied*, 534 U.S. 828 (2001).   The elements of a conspiracy offense may be established solely by circumstantial evidence.  *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *cert. denied*, 544 U.S. 1043 (2005); *Oki Semiconductor Co.*, 298 F.3d at 775. An agreement is vital to a RICO conspiracy claim and the assent of each defendant is required, but it is not necessary that each defendant knew all of the details of the conspiracy.  *Baumer v. Pachl*, 8 F.3d 1341, 1346-47 (9th Cir. 1993).[12]

### 2. Summit US is jointly and severally liable under RICO with Kesco Container for acts within the limitation period

The court has concluded that there were two operative conspiracies during the course of the "Shenzhen door" scheme.  The first began in 2000, when Raymond Cheng, on behalf of Kesco Container, agreed to enter the Shenzhen door arrangement with Yip.  (Dkt. No. 261 at 16-17 [FF ¶¶37-38], 61).  Before the conspiracy concluded in 2010, it was joined by Summit US. (*Id.* at 61).  In 2006, Tice, a high-level employee at Summit US's predecessor, agreed to the arrangement and worked with Cheng and Winnie Lau at Kesco to carry it out.  (*Id.* at 20-21 [FF ¶¶44, 46], 61, 62).  Summit US was directly involved with the conspiracy in 2009 through its joint venture with the Kesco partners, Summit SCM.  (*Id.* at 22 [FF ¶51], 62).  At Summit SCM, the Shenzhen door arrangement was managed by Winnie Lau, a former Kesco Container HK employee who ran Summit SCM's day-to-day operations.  (*Id.*)  Lau continued to report to Cheng about the arrangement after she transitioned to Summit SCM.  (*Id.*)  Under these facts, the court concluded that there was an agreement to carry out the arrangement between Cheng at Kesco Container and Lau at Summit SCM.  (*Id.* at 62). The second conspiracy started in 2009,

---

[12] Co-conspirators are not necessary parties.  A plaintiff can prove the existence of a conspiracy in an action against just one member of the conspiracy.  *In re Cotton Yarn Antitrust Litigation*, 505 F.3d 274, 284 (4th Cir. 2007), citing *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 463 (1945); *see also Kuhn Const. Co. v. Ocean and Coastal Consultants, Inc.*, 723 F.Supp.2d 676, 689 (D. Del. 2010).  Thus, Yip's absence from this action is of no moment.

37

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

when Huang, on behalf of SeaMaster US, agreed to the Shenzhen door arrangement.  (*Id.* at 23-24 [FF ¶55], 62-63).  The issue of joint and several liability relates to the first conspiracy involving Yip, Kesco Container and Summit US.

As a general matter, if a RICO conspiracy is demonstrated, all conspirators are liable for the acts of their co-conspirators.  *Oki Semiconductor,* 298 F.3d at 775 ("Holding RICO conspirators jointly and severally liable for the acts of their co-conspirators reflects the notion that the damage wrought by the conspiracy 'is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole,'" quoting *Sec. Investor Prot. Corp. v. Vigman,* 908 F.2d 1461, 1468 (9th Cir. 1990)*, rev'd on other grounds sub nom. Holmes,* 503 U.S. 258; *see also, Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994); *United States v. Philip Morris USA*, 316 F.Supp.2d 19, 27 & n.8 (D.D.C. 2004) (noting that every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participating in the enterprise are responsible for the RICO violations).  Under traditional civil conspiracy principles, co-conspirators are generally liable for the acts of all other conspirators undertaken in furtherance of the conspiracy both prior and subsequent to the co-conspirators joining the conspiracy.  *See McFarland v. McFarland*, 684 F.Supp.2d 1073, 1085 (N.D. Iowa 2010), citing, *inter alia*, *Myzel v. Fields*, 3866 F.2d 718, 738 n.12 (8th Cir. 1967); *see also Hawk v. Perillo*, 643 F. Supp. 380, 387 (N.D. Ill. 1985) *and Chemetron v. Business Funds, Inc.,* 682 F.2d 1149, 1180 (5th Cir. 1982) (applying Texas law but noting that this "immemorial common-law principle has been widely accepted…"); *and see generally*, 16 AM. JUR 2d, *Conspiracy* § 57 (2007); *Cf. Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946).

//

FLYNN, DELICH & WISE LLP

ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

MOL's research has not disclosed any cases in which the issue of the scope of joint and several liability for late joining conspirators was considered in the specific context of a RICO claim. Yet, because Congress modeled RICO's treble damage remedy on antitrust laws, the Supreme Court has generally concluded that courts should look to antitrust cases for guidance in interpreting RICO. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150-51 (1987). The manner in which courts have analyzed the issue of joint and several liability under antitrust law fully supports MOL's position here. *Industrial Building Materials, Inc. v. Interchemical Corporation*, 437 F.2d 1336 (9th Cir. 1970), for example, involved an antitrust conspiracy claim against two defendants that were successive owners of a division of a company that manufactured sealing products. The division decided to terminate the services of a distributor and essentially by-pass that distributor, selling directly to customers. *Id.* at 1337-38. The defendants contended that there should be a clear delineation between the actions taken by the division during the times when the different corporations owned it. *Id.* at 1343. The claimant contended that the two successive parent corporations conspired with each other and that the acts of either could be charged to the other. The Ninth Circuit agreed with the claimant, concluding that:

> [o]ne who enters a conspiracy late, with the knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.
>
> *Id.*

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, 710 F.Supp. 152 (E.D. Pa. 1989), also addressed the liability of a late-joining conspirator for the torts of the co-conspirators committed before the latecomer existed. In that case, antitrust conspiracy claims were asserted against several railroads, including Conrail. The conspiracy began in 1958, but Conrail was not

39

created until 1976 when an act of Congress established it to operate the rail business of predecessor railroads that had engaged in the conspiracy. *Id.* at 153. Conrail retained the employees of the previous railroads and they continued with the same conspiracy as they had previously. Conrail contended that subjecting it to liability for the entire period of the conspiracy would be contrary to Congress' intent to give the railroad a chance to begin with a "clean slate." *Id.* at 154. The court stated the rule of liability of late joining conspirators for the prior conduct of the co-conspirators and noted that nothing suggested Congress wished to enable Conrail to engage in an antitrust conspiracy. *Id.* at 155. The court concluded that Conrail could be held liable for damages caused by the conspiracy, including those predating its formation, where it joined in the conspiracy after it was created. *Id.; see also, Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980), citing *Industrial Building Materials, Inc.*, 437 F.2d at 1343.

Summit US is liable for Kesco's prior tortious conduct because it had full knowledge of that prior conduct when it joined the conspiracy and joined the conspiracy with the intent to pursue the fraudulent objectives of the ongoing conspiracy. The agents and employees who got Summit US involved were the same people who had participated on behalf of Kesco, and they adopted the same fraudulent mechanisms for Summit US that Kesco had employed since 2000. After it joined, Summit US actively pursued the conspiracy's fraud by thousands of its own unlawful acts.  (Dkt. No. 261 at 46-48).

**G.     Applicable Statutes Of Limitations**

The statute of limitations for civil RICO actions is four years. *Agency Holding Corp.*, 483 U.S. at 156. The Ninth Circuit has continuously followed the "injury discovery" statute of limitations rule for civil RICO claims. *See Pincay v. Andrews,* 238 F.3d 1106, 1110 (9th Cir.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

2001), citing *Gimmett v. Brown,* 75 F.3d 506, 511 (9th Cir. 1996).  This approach has achieved at least tacit approval by the United States Supreme Court.  *See Rotella v. Wood*, 528 U.S. 549, 554 & n.2 (2000) ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock.").  There are two aspects to this rule in RICO cases.  First, the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action.  *Gimmett*, 75 F.3d at 510.  This aspect of the "injury discovery" rule creates a disjunctive two-prong test of actual or constructive notice and the statute begins running under either prong.  *Pincay*, 238 F.3d at 1109.  A "plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud."  *Id.* at 1110, quoting *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988) (internal quotation marks omitted); *see also Living Designs, Inc. v. E.I. Dupont de Nemours & Co*., 431 F.3d 353, 365 (9th Cir. 2005).  The second aspect of the rule in a RICO case is that a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury occurred more than four years before.  *Gimmett*, 75 F.3d at 510-11.

Under the mail and wire fraud statutes, each mailing or transmission in furtherance of the scheme constitutes a separate violation.  *United States v. Vaughn*, 797 F.2d 1485, 1493 (9th Cir. 1986) (mailing); *Garlick*, 240 F.3d at 792 (wire transmission).  Thus, under RICO, each mailing or transmission constitutes a predicate act.  The question then becomes, does each act constitute a new injury so as to re-start the running of the statute.  Under the antitrust laws, to state a continuing violation that is not time-barred, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria:  "1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and

accumulating injury on the plaintiff." *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203 (9th Cir. 2014), *cert. denied*, 135 S.Ct. 1157, 190 L.Ed.2d 912 (2015), quoting *Pace Industries, Inc. v. Three Phoenix Co.,* 813 F.2d 234, 238 (9th Cir. 1987).

In *Hennegan v. Pacifico Creative Service, Inc.,* 787 F.2d 1299 (9th Cir. 1986), the Ninth Circuit considered an arrangement in which a tourism company agreed to steer customers to preferred souvenir shops.  The court held that an antitrust cause of action accrued each and every time that a tourist was shepherded away from the plaintiff's non-preferred shop because, in essence, a new injury occurred each time.  *Id.* at 1300-01.  The rationale for a new injury under the antitrust laws is equally applicable under RICO.  Each shipment here established a new and independent injury to MOL.

The court has found that Summit US entered into the Shenzhen door arrangement, through Kesco Container HK, shortly after its incorporation in 2008.  (Dkt. No. 261 at 21-22 [FF ¶49]).  SeaMaster entered into the arrangement in early 2009.  (*Id.* at 23 [FF ¶53]).  MOL filed the trucking case against Summit US and SeaMaster on June 10, 2011.  (*Id.* at 67).  All of the transactions in which Summit US and SeaMaster were directly involved occurred within four years of the filing date.  None is affected by the limitations period.

Like the applicable limitations period under the substantive civil RICO provisions, the statute of limitations for civil RICO conspiracy claims is four years.  *Bendzak v. Midland Nat. Life Ins. Co.*, 440 F.Supp.2d 970, 983 (S.D. Iowa 2006), citing *Hodas v. Sherburne, Powers & Needham, P.C.,* 938 F.Supp. 60, 65 (D. Mass. 1996).  This court previously held Summit US jointly and severally liable for the acts of Kesco Container under California law beginning in May, 2008 when Summit US joined the conspiracy.  Under RICO, Summit US, as a later joining conspirator with knowledge of the prior conduct and an intent to continue it, is liable for

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

42

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

transactions that injured MOL and in which Kesco Container was involved from June 10, 2007, i.e. from four years prior to the filing of MOL's complaint. As set out below in Part IV.C of this Brief at page 58, this renders Summit US liable for an additional $354,841.67 in payments by MOL to Rainbow Transportation plus the $41,839 ORC/THC differentials for those shipments.

**H.     MOL Is Entitled To Recover Treble Damages Under RICO**

Under RICO, an aggrieved party may sue to recover "threefold the damages he sustains." *See* 18 U.S.C. §1964(c). Where a plaintiff successfully obtains a judgment of civil liability under RICO, an award of treble damages is mandatory. *See Cullen v. Margiotta,* 811 F.2d 698, 713 (2nd Cir. 1987), *cert. denied*, 483 U.S. 1021 (1987), *overruled on other grounds by Agency Holding Corp.,* 483 U.S. 143. The computation of the amount of MOL's RICO damages is set forth in the Damages section of this Memorandum. (See Part IV.C, pp. 57-59, *infra*.)

**I.     MOL Is Entitled To Recover Attorneys' Fees and Interest**

If MOL prevails in its RICO claims, it is entitled to attorneys' fees under §1964(c), a mandatory, one-way fee shifting provision.

**IV.     MOL IS ENTITLED TO DAMAGES IN THE FULL AMOUNT OF ITS LOSSES RESULTING FROM THE FAKE TRUCK PAYMENTS, THE ORIGIN RECEIVING CHARGE DIFFERENTIALS, AND THE FREE SPACE PROTECTION**

As noted above, this court found that MOL suffered three separate categories of damage as a result of the defendants' fraud---its payments for the phantom trucking, the defendants' avoidance of the higher terminal handling charges at Hong Kong, and the loss of space protection premiums. (Dkt. No. 261 at 60). The court then concluded that the "the appropriate damage award for these claims is equivalent to the total amount of MOL's payments to Rainbow

43

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

over the course of the Shenzhen door arrangement…," but it did not set out any allocation of the damage amount among the three categories of harm and did not make any finding about the quantum of MOL's damages with respect to the space protection premium loss.  (*Id.* at 73-74).  Instead, referring to the net amount of the payments by and to MOL for the phantom Shenzhen trucking, the court noted that the award as it was framed, gave MOL "more than it lost as a result of the Shenzhen door arrangement."  (*Id.* at 76).  The Court of Appeals stated that the error was both in giving MOL "more than it lost" and the failure "to use a reasonable basis of computation to calculate the actual damages incurred by MOL for reimbursed trucking costs, origin receiving charge differentials, and lost space protection premiums," i.e. all three categories of damages.  (Dkt. No. 332 at 4-5).

As set out below, the amount of the MOL's losses on the phantom truck payments and the ORC/THC differentials are readily ascertainable and not in dispute.  An award limiting MOL's recovery to these two categories of damages only would be contrary to California law, however, because it would not compensate MOL for all of the damages, including the loss of space protection premiums that MOL incurred as a result of the Defendants' fraud.  Although the Defendants' cover-up of their fraud renders it impossible to determine exactly what that space premium loss is in this case, it is possible reasonably to estimate that loss based on the volume of the shipments that were provided that protection, the amounts that the Defendants were willing to pay as arbitraries to allow the space protection fraud to continue, and the evidence regarding what MOL charged for various types of space protection that was legitimately obtained by other customers or sought by SeaMaster in this case.  For the reasons set out below, the Defendants' arbitrary payments provide the court a reasonable value for the space protection illicitly obtained

44

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

by the Defendants and an award in the amount of those payments is a fair compensation for the MOL loss arising from that element of the Defendants scheme.

A.    **The Amount Of The Losses Incurred For The Truck Payments And Origin Receiving Charge Differentials Are Not In Dispute**

It is not disputed that MOL paid $1,080,073.07 to Rainbow Transportation for the falsely declared Shenzhen door transport for SeaMaster and $2,230,532.05 for the Summit US and Kesco shipments in the period from 2008 to 2010. (Dkt. No. 261 at 27, 74, 78; Dkt. No. 309 at 17, 18). The amount paid for the Summit US shipments represents the MOL payments to Rainbow Transportation for the fake Shenzhen door on Summit US' own shipments from 2008 through June, 2010 in the amount of $1,987,883.34, plus an additional amount of $242,648.71 for the May 27, 2008 through December 30, 2008 Shenzhen door shipments attributable to Kesco Container Line. (Dkt. No. 309 at 16-17). It is also undisputed that Summit US paid MOL $1,233,063 and SeaMaster paid MOL $484,740 as "arbitraries" to cover up the scheme. (Dkt. No. 257 at 5, 7; Dkt. No. 303 at 3). The net amount of the MOL payments to Rainbow and arbitraries paid by the Defendants is, therefore, $595,333 for the SeaMaster shipments ($1,080,073.07-$484,740) and $997,469 ($2,230,532.05-$1,233,063) for the Summit US shipments.

It is also undisputed that the differential between the Shenzhen Origin Receiving Charge ("ORC") and the Hong Kong Terminal Handling Charge ("THC") that Summit and SeaMaster were able save by making their fraudulent misrepresentations about the point of origin of the shipments was $134,491 for Summit US and $71,132 for SeaMaster. (Dkt. No. 253-1 at App. G; Dkt. No. 257 at 5, 7). Defendants do not dispute, therefore, that they are liable to MOL for MOL's net losses for the fake trucking payments plus the THC/ORC differential, i.e., $1,131,960 for the Summit US/Kesco shipments ($997,469 plus $134,491) and $666,465 ($595,333 plus

45

$71,132) for the SeaMaster shipments. These computations, however, do not take into account or award any sum for the space premium protection losses incurred by MOL as a result of the Defendants' schemes.

**B.    The Arbitrary Payments Made To MOL By Summit US And SeaMaster To Cover Up The Fraud Provide A Reasonable Approximation Of The Actual Damages Incurred By MOL For The Lost Space Protection Premium**

The amount of damages recoverable for fraud is governed in California by California Civil Code §§1709 and 3333. Section 1709 provides:

> One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable *for any damage* which he thereby suffers.
>
> [Emphasis added].

Section 3333 provides:

> For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for *all the detriment* proximately caused thereby, whether it could have been anticipated or not.
>
> [Emphasis added].

California decisions have labeled the damages recoverable under these statutes as "out-of-pocket losses," *Ward v. Taggart*, 51 Cal.2d 736, 740 (1959), but this does not require strict mathematical computation. *Fladeboe v. American Isuzu Motors, Inc.,* 150 Cal.App.4th 42, 66 (2007). The "out of pocket" label is shorthand for the broader principle that this measure of damages:

> …restores a plaintiff to the financial position he enjoyed prior to the fraudulent transaction, awarding the difference in actual value between what the plaintiff gave and what he received.
>
> *Fragale v. Faulkner*, 110 Cal.App.4th 229, 236 (2006).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

46

*Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932, 938-39 (9th Cir. 1999), outlined how California decisions apply these statutory standards:

> It is within the sound discretion of the trier of fact to select the formula most appropriate to compensate the injured party….The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where ... it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits…. [T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery.

> [Citations omitted].

Because this is a case of fraud, and because the extensive efforts by Summit US, SeaMaster, Kesco, and Yip to cover up the fraud made it impossible to calculate the exact quantum of the damage arising from the free space protection, MOL was not able to show the quantum of those damages with precision.  Nor was it required to do so.  As the Ninth Circuit Court recently quoted in *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1170-71 (9th Cir. 2013), the United States Supreme Court, in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*See also, Stinnett v. Damson Oil Corp.*, 813 F.2d 1394, 1398 (9th Cir. 1987) (once the "fact of damages" has been demonstrated recovery will not be denied because the precise amount of

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

47

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

damages cannot be determined); *GHK Assoc. v. Mayer Group, Inc.,* 224 Cal.App.3d 856, 873 (1990); *DSPT International, Inc. v. Nahum*, 624 F.3d 1213, 1223-24 (9th Cir. 2010).

In this case, MOL unwittingly gave three things – truck payments, the origin fee differential, and free space protection. In return, it received only the pass-through truck payments. Under California Civil Code §§1709 and 3333, therefore, MOL's damages are measured by the aggregate value of the net truck payments, the origin fee differential, and the free space protection. It was also within the discretion of the court to award pre-judgment interest as damages and to assess a punitive damage award against Summit/SeaMaster because they defrauded MOL. Cal. Civil Code §§3288, 3294.

As set out above, Summit/SeaMaster concede MOL's aggregate damages on its state law claims were at least $1,131,960 for the Summit US/Kesco shipments and $666,465 for the SeaMaster shipments, representing the net loss on the payments to Rainbow and the ORC/THC differentials. They have argued that MOL's recovery should be limited to these amounts, but this ignores the damage to MOL arising out of the free space protection. The result Summit/SeaMaster seeks is contrary to California law because it would not compensate MOL "for all the detriment proximately caused" (Cal. Civil Code §3333) by the fraud and would allow Summit/SeaMaster to escape liability for damages caused by the free space protection component of the fraud. (Cal. Civil Code §1709). As a matter of law, MOL is entitled to an award of damages based on the harm caused by the free space allocation because the "fact of damages" arising from the free space protection has been established. *Stinnett v. Damson Oil Corp.*, 813 F.2d 1394, 1398 (9th Cir. 1987). (*See* Dkt. No. 261 at 60).

The finding that Summit/SeaMaster participation in the space protection giveaway caused harm to MOL is supported by the evidence. The principal commodity sold by MOL is space on

48

its ships.  (Sheehan, RT 30-34).   MOL allocated the space among its customers on a weekly

basis. (Sheehan, RT 30-34; Prado, RT 2041-2042).  The allocation was not done on a first-come

first-served basis, but any customer, including SeaMaster, Summit and Kesco, could secure

guaranteed space for its containers by paying a premium rate for that guarantee.  (Cheng, RT

1027; Rosenberg, RT 1208; Prado RT 2040).   In the China-U.S. trade, Yip was in charge of the

MOL department that controlled the weekly allocation of space.  (Dkt. No. 261 at 8 [FF ¶11]).

In exchange for participation in the fraud by Summit US, SeaMaster, and Kesco, Yip arranged

for these entities to get guaranteed space protection without paying the usual premium for that

guarantee.  (*Id.* at 17-18, 22-26 [FF ¶¶38, 40, 51, 52, 55, 57]; Cheng, RT 1012-1013, 1018-1019;

Huang, RT 1544-1546, 1551).

The guarantee of free space on a weekly basis allowed Summit US and Kesco to secure

and retain their contracts for the Jones/Nine West cargo because it gave them a competitive

advantage over other NVOCCs who either could not obtain space protection or had to pay a

premium for it. As Geoffrey Tice testified, the Shenzhen door arrangement was the means by

which Kesco and Summit US secured "adequate space protection" in order to secure the Jones

Apparel business:

> Like I mentioned earlier, Jones and Nine West were growing rapidly
> and we needed to make sure that we were never not given the
> necessary space on ships.

(Tice, RT 634-635; *see also* Dkt. No. 261 at 16-17 [FF ¶37]).

Similarly, the evidence showed that when Huang approached high level MOL marketing

personnel – Richard Hiller in the U.S. and David Prado in Hong Kong – with concerns about

adequate space for SeaMaster in early 2009, Prado offered Huang additional space through a

"fixed space allocation" plan, but Huang rejected the offer because it required him to pay higher

FLYNN, DELICH & WISE LLP

ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

49

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

rates.  (Dkt. No. 261 at 23 [FF ¶¶53, 54]; Huang, RT 897, 964-965, 1543).  Unwilling to play by MOL's rules, Huang was directed to Yip for a solution by Rebecca Yang, his "window" or confidant at MOL's U.S. subsidiary.  (Dkt. No. 261 at 23-27 [FF ¶¶54, 57]; Huang, RT 897-898, 1541-1544).  Huang took it from there, and, with Yip, set up the Shenzhen truck fraud scheme for all of SeaMaster's Hong Kong/Shenzhen cargo in exchange for the "free space protection" he needed to enhance his competitive position in the Asia-to-U.S. logistics market.  (Dkt. No. 261 at 15, 23-24 [FF ¶¶34, 55]; Huang, RT 898-902, 1544-1547, 1594).

Yip's allocation of free space to Summit US, SeaMaster, and Kesco damaged MOL because:

> [I]f Defendants had taken their business elsewhere, MOL could have found other customers to take their place. Further, Huang and Cheng could have legitimately obtained space protection by paying a premium to MOL.

> (Dkt. No. 261 at 57).

In theory, MOL might have proved that for a given container on a given ship, Yip allocated space to Summit US, SeaMaster or Kesco, that, but for the fraud, would have gone to another customer. In theory, it might also have provided evidence about the premium amount that the other customer would have paid for that space or the amount SeaMaster or Summit US would have had to pay to guarantee space protection for that container.   In fact, however, there was no way for MOL to prove the exact amount of the damages by either means because of the defendants' cover-up of the fraud.  The scope and precise mechanism of the space protection arrangement was never revealed by the Defendants, even after the fact that there was some arrangement became apparent from the Defendants' communications and testimony. MOL, therefore, had no way to prove which SeaMaster, Summit US or Kesco containers on which ships would have bumped other cargo willing to pay a premium because the participants in the

50

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

fraud were the only parties that knew how many or which containers received preferential treatment over competing cargo on which ships and on what dates that occurred. To complete this proof, MOL also would have to identify the customers who would have but did not ship cargo because the space was given to the Defendants and what those potential customers would have paid for the space. The Defendants, however, went to great lengths to cover up their fraud, and none of the parties participating in the fraud identified how many or which containers on which ships were given preference over competing cargo or exactly how the free space protection scheme worked. Moreover, they never identified any containers that were not given preference. There was no way for MOL to reconstruct a profile of its potential customers or the amounts those customers would have paid for space on a particular ship on a particular date here where the fraud was not uncovered until many years after the shipments were made.

The space protection afforded to Summit US and SeaMaster was a prospective benefit and applied in some way to every container shipped by the Defendants. As stated by Geoff Tice, that they "were *never* not given the necessary space on ships." (Tice, RT 635 [emphasis added]). The Defendants recognized that in order to obtain this type of guaranteed space from MOL in the absence of the fraud, they would have had to pay extra for each container for which they wanted to guarantee space. The scheme arranged through Yip, however, allowed them to get guaranteed space for every container they shipped without the premium payment or commitment to space on specific ships that this type of guarantee would have required. That this guarantee was of significant value is confirmed by the admissions from Tice and Huang that they entered into the scheme to obtain space protection to enhance their competitive positions, the evidence that the Defendants went to great lengths to participate in and cover-up the elaborate Shenzhen trucking arrangement in order to get that free space, and the fact that they continued to pursue that space

51

FLYNN, DELICH & WISE LLP

ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

protection guarantee up to the very last day when the scheme was rendered unprofitable by the increased arbitraries.

Against this background, the arbitraries paid by Summit US and SeaMaster to cover up the fraud provide a reasonable measure of the value of the free space protection and the loss incurred by MOL as a result of this component of the fraud. These payments are tied to the objective evidence of the container volumes shipped and the amount that the Defendants were willing to pay to secure their free space protection. They are also consistent with the evidence presented regarding what MOL charged its customers for legitimate space protection.

From March 2009 through June 2010, SeaMaster shipped 3,998 containers subject to the fraud. Summit US and Kesco shipped 8,053 containers under the scheme between May 2008 and June 2010. (Dkt. No. 261 at 27 [FF ¶63]; Dkt. No. 309 at 16-17). The portion of the awards about which Summit/SeaMaster complain are the amounts of $413,608[13] for the award against SeaMaster and $1,098,572[14] for the award against Summit US, representing damages of $103.45 per container ($413,608/3,998 containers) for SeaMaster and $136.42 per container ($1,098,572/8,053 containers) for Summit US.

The amounts paid by the Defendants to cover-up their fraud are significantly less than the evidence showed MOL charged for guaranteed space protection. For example, as MOL's Dennis

---

[13] This figure was reached by taking the $1,080,073 MOL paid Rainbow, less the $484,740 SeaMaster paid MOL, and adding $71,132 for the THC/ORC differential, which equates to $666,465. (Dkt. 261 at 74; E. Chan, RT 1469; Dkt. 253-1 at App G). SeaMaster thus alleges that the court overcompensated MOL by $413,608 ($1,080,073 - $666,465).

[14] This figure was reached by taking the $1,987,883 MOL paid Rainbow, less the $1,233,063 Summit paid MOL, and adding $134,491 for the THC/ORC differential, which equates to $889,311. (Dkt. No. 309 at 16-17; Lau, 1091-97; Trial Exhibits D-579 at 1 and D-580 at 1; Dkt. 253-1 at App G). Summit US thus alleges that the court overcompensated MOL by $1,098,572 ($1,987,833 - $889,311).

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1  Sheehan testified, when the demand for space was particularly tight in 2010, MOL offered a

2  Priority Plus Program by which MOL would charge a premium of "say a thousand dollars" and

3  "stipulate the ship…the day of departure as well as the port pairs." (Sheehan, RT 47). Other

4  variations on the space protection premiums included the $300 per container premium offered by

5  the MOL through Dave Prado and Frank Costa in 2010 (Costa, RT 95-96), the $200-300

6  premium described by Jerry Huang to his U.S. customer Chad Rosenberg (Rosenberg, RT 1208),

7  and the dead freight premium arrangement offered to Huang by Dave Prado that Huang rejected

8  (Huang, RT 964-965).

9

10      The difficulty in proving exact damages because of the fraud and cover-up is

11  compounded by the commercial setting in which this fraud occurred. For the Transpacific

12  maritime cargo transportation industry, the rates, volumes, and allocations of space were subject

13  to ongoing negotiations and ever-shifting market conditions. (Sheehan, RT 44-47; Costa, RT 67-

14  68, 72-73). Summit US, SeaMaster and MOL recognized this difficulty of assessing MOL's

15  losses incurred in this market even for something as simple as the failure to ship promised

16  annualized volumes. As the parties agreed in each of the Service Contracts at issue in this case

17  with reference to the Minimum Quantity Commitments ("MQC," the guaranteed annual cargo

18  volumes to be shipped by Summit/SeaMaster and carried by MOL):

19

20          MOL and Shipper recognize failure to tender the MQC causes
            revenue losses to MOL and adverse impact on marketing, logistics
21          and operation by MOL, and a precise quantification of these
            damages is difficult to calculate.
22

23          (Trial Exhibits P-194 to P-200).

24  Therefore, "to avoid the difficulty and expense of proving actual losses…." the parties agreed to

25  liquidated damages at the rate of "$250 per FEU" for the shipper's failure to tender the

26  guaranteed MQC. (*Id.*) The same difficulty of proof exists in this case with respect to the

27

28

53

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

1    "adverse impact" on MOL's "marketing, logistics and operation" caused by the free space

2    protection element of the fraud, and "a precise quantification of these damages is difficult to

3    calculate."[15]

4        The amounts paid by SeaMaster and Summit for the fake trucking arbitrary were paid in

5    order to make sure that the scheme and free space protection afforded by Yip could continue.

6    SeaMaster and Summit US ask this court to apply those payments against the payments made by

7    MOL to Rainbow as part of the false trucking scheme.  Deduction of the arbitrary payments from

8    the trucking payments does not diminish MOL's entitlement to space protection damages or

9    reduce the amount of those damages recoverable from the Defendants.  Because the Defendants

10   paid the arbitraries to allow the space protection fraud to continue, the court can reasonably

11   conclude that those payments represent a reasonable minimum value of the space protection

12   given to the Defendants and the space protection loss incurred by MOL as a result of the fraud.

13   This amount should, therefore, be included in the damage award to MOL.  Given the difficulty in

14   proof arising from the Summit/SeaMaster fraud and cover-up and the inchoate nature of the

15   damage caused to MOL's business by the fraud, the use of the arbitrary payments to approximate

16   MOL's damages is a just and reasonable means to approximate the space premium protection

17   loss incurred by MOL.  Consistent with the Court of Appeals decision that requires a reasonable

18   basis for computation of that loss, the amounts of the arbitrary payments should be added to the

19

20

21

22

23   [15] The fraud made proof of the revenue loss and adverse effect on MOL's marketing, logistics,
     and operations extremely difficult if not impossible to calculate.  Compare *Kansas v. Utilicorp
24   United, Inc*., 497 U.S. 199, 208-10, 214-15 (1990); *Illinois Brick Co. v. Illinois*, 431 U.S. 720,
     740-742, 746 (1977); *Hanover Shoe, Inc. v. United Shoe Machinery Corp*., 392 U.S. 481, 493
25   (1968); *Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 785-86 (2010).  These cases acknowledge the
     complexity of calculating the full extent of damages when defendants sabotage a market as
26   Summit/SeaMaster have done here.  They did not allow reduction of plaintiff's damages by set-
     off for plaintiff's pass-through sales in anti-trust cases.  They support the notion that MOL's
27   recovery of the full truck payments is the only means by which MOL can be made whole for all
     the damage it has suffered as a result of the fake truck scheme.

28

54

amounts that Summit US and SeaMaster concede are owed for the separate damage items of trucking and origin fee differentials as set forth above.

Specifically, therefore, MOL should be awarded damages against Summit US and SeaMaster in the following amounts based on the claims under California law for misrepresentation as follows:

**Summit US:**

a.  Net Trucking Payments to Rainbow:           $   997,469.00

b.  ORC/THC Differential                        $   134,491.00

c.  Space Protection Premium Loss Value         $ 1,233,063.00
       (measured by the payment of the arbitraries
       to MOL)

<u>**TOTAL**</u>                                    **$ 2,365,023.05**

**SeaMaster:**

a.  Trucking Payments to Rainbow:               $   595,333.00

b.  ORC/THC Differential                        $    71,132.00

c.  Space Protection Premium Loss               $   484,740.00
       (measured by the payments of the arbitraries
       to MOL)

<u>**TOTAL**</u>                                    **$ 1,151,205.00**

On appeal, Summit and SeaMaster suggested that the space protection component of the Defendants' scheme did not cause any damage to MOL. They relied principally on their failure to meet their Minimum Quantity Commitments ("MQC") under the Service Contracts as evidence that they never had to use the space protection because they had ample space on the ships to meet their MQCs. There are at least three things wrong with this argument. First, the MQCs were not specific to the Hong Kong/Shenzhen ports but pertained to all of the port pairs

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

set forth in the Service Contracts.  Thus, an inability to meet the MQC does not establish that

SeaMaster or Summit did or did not have sufficient space for the Hong Kong/Shenzhen cargo or

did or did not need the space protection they received as the quid pro quo for their participation

in the fraud.  Second, the MQC commitment and the space protection afforded by Yip are two

entirely different and unrelated categories of space allocation.   The MQC is an annualized

volume that does not guarantee the contracting shipper any space on any particular ship.  (*See*

Sheehan, RT 34).  Thus, for example, a shipper with an MQC of 10,000 container loads is not

entitled to ship any or all of those 10,000 on a particular ship on a particular day, but the free

premium space protection allowed the defendants to guarantee slots for their cargo on particular

dates and ships.  Although the particulars of the space protection obtained by Kesco, Summit US

and SeaMaster have never been fully described by the Defendants, it somehow allowed them to

make sure they were "*never* not given the necessary space on ships."  (Tice, RT 635 [emphasis

added]).  In other words, whenever they needed space on a particular ship, they got it, for free.

The third element of differentiation between the space protection and MQC is reflected

by the scheme itself and the conduct of the Defendants.  As the court found in its March 21,

2013, Findings of Fact and Conclusions of Law:

> If, as the Defendants suggest, MOL had wanted to provide Kesco
> with lower rates and free space protection in order to keep its
> business, then MOL presumably could have done so without
> funneling money through a fake trucking company and asking
> Kesco to declare false places of receipt.

> (Dkt. No. 261 at 19 [FF ¶42]).

In a similar manner, if the MQC agreement had been sufficient to provide the Defendants with

the space protection they required, there would have been no reason for them to go through the

elaborate exercise of false declaration of origin and pass through kick-backs and arbitrary

56

payments. As both Tice and Huang testified, they agreed to the Shenzhen trucking scheme *because* they needed space protection above and beyond what they were getting under the terms of their Service Contracts. The MQCs obviously did not give them that protection and do not rebut the evidence that MOL was injured by the space protection component of the fraud.

**C.     MOL's RICO Damages Overlap With And Treble The Recovery Under State Law And Include Additional Amounts For Shipments By KESCO Container From June, 2007 Through May, 2008**

As noted above, once the plaintiff establishes its claim under RICO, trebling of the plaintiff's damages is mandatory. *Cullen v. Margiotta,* 811 F.2d at 731. The damages recoverable by MOL are the same under state law of misrepresentation and RICO, i.e. the net trucking payments, the ORC/THC differentials, and the space premium protection loss, but the RICO claims do not include prejudgment interest. In addition, the rule of joint and. several liability under RICO, unlike California law, renders Summit liable for the harm done to MOL by Kesco Container and Yip before Summit US joined the conspiracy, subject to the four-year statute of limitation. Because the Shenzhen fraud complaint was filed in Case No. 11-cv-02861 SC on June 10, 2011 (Dkt. No. 1), Summit US' joint and several liability for Kesco Container's conduct extends back to June 10, 2007. The court has already held Summit US jointly liable with Kesco for Kesco's shipments from May, 25, 2008 through June, 2010. (Dkt. No. 261 at 61-62). Thus, the additional period for which Summit US can be liable for Kesco's conduct is during the window from June 10, 2007, through May 24, 2008. As reflected by Exhibit P-262 there were 1189 containers shipped by Kesco during this period which were falsely declared to originate Shenzhen door, and the amount paid by MOL to Rainbow for the fake trucking for these

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

57

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

containers was $354,841.67.[16]  (Trial Exhibit P-262; *see also* n.14, *supra*).  Furthermore, 429 of these containers were delivered to Hong Kong, allowing Kesco to realize the ORC/THC differential of at least $97 per container or $41,839.[17]  (Trial Exhibits P-262, P-273).  Thus, the amount of actual damages incurred by MOL for purposes of RICO are:

**Summit US:**

| | | |
|---|---|---|
| a.  Net Trucking Payments to Rainbow: | $  1,352,310.67 | |
| | ($997,469.00 + $354,841.67) | |
| b.  ORC/THC Differential | $   176,330.00 | |
| | ($134,491.00 + $41,839) | |
| c.  Space Protection Premium Loss Value | $  1,233,063.00 | |
| (measured by payments of the arbitraries to MOL) | | |
| **SUB-TOTAL** | **$  2 ,761,703.67** | |

**SeaMaster:**

| | | |
|---|---|---|
| a.  Trucking Payments to Rainbow: | $   595,333.00 | |
| b.  ORC/THC Differential | $    71,132.00 | |

---

[16] MOL set forth its payments to Rainbow in several spreadsheets.  Exhibit P-262, column AQ (TPO Paid Amount) reflects the actual payments made, in Hong Kong dollars, for movements from Shenzhen door to points in the U.S. under the service contracts for Kesco Container Line.  (Minck, RT 458-464).  To determine the TPO paid amount for the period of June 10, 2007 through May 24, 2008, the spreadsheet was sorted by Bill of Lading date (column B) using the Excel "Sort" function to sort from oldest to newest.  Once sorted, the period of June 10, 2007 through May 24, 2008 is reflected in rows 9747 through 10936.  The TPO Paid Amount for this period can then be determined by using the AutoSum Formula to calculate the sum for TPO Paid Amount (column AQ) for rows 9747 through 10936.  This results in $2,767,765.00 HKD.  Using a 7.8:1 HKD to USD exchange rate, this equates to $354,841.67 USD.  (*See* Minck RT 463).

[17] To determine this amount, Exhibit P-262 was sorted, using the Excel "Sort" function, in order to select Bills of Lading dated from June 10, 2007, through May 24, 2008.  The columns for TPO Dest and TPO Paid Amount were manually filtered to select only the entries for 429 containers showing a Hong Kong Destination and a paid amount of 3080 per container, the charge for the Hong Kong deliveries.  Exhibit P-273 lists the U.S. Dollar amount of the ORC/THC differential, which varied depending on the size of the container, but only the lowest differential of $97 was used to calculate the aggregate differential shown here because the size of the 429 containers is not separately identified in Exhibit P-262.

58

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

c.  Space Protection Premium Loss                                     $   484,740.00
(measured by payments of the arbitraries to MOL)

**SUB-TOTAL**          **$ 1,151,205.00**

Trebling these damages, the total amount to be awarded on the RICO claims is:

**Against Summit US:**          **$  8,285,511.01**
($ 2,761,703.67 x 3)

**Against SeaMaster:**          **$  3,453,615.00**
($ 1,151,205.00 x 3)

**D.      An Award Of Prejudgment Interest On The Damages Incurred Is Appropriate
Under State Law**

In its decision after trial, this court rejected MOL's requests for punitive damages and prejudgment interest, stating that "since the Court has chosen not to offset Defendants' damages by their prior trucking payments to MOL, MOL is already receiving more than it lost as a result of the Shenzhen door arrangement" and that "the damages set by the Court already award MOL for more than it lost as a result of the Shenzhen door arrangement." (Dkt. No. 261 at 76-77).  It declined, therefore, "to further multiply MOL's damages or award additional punitive damages" and exercised its discretion to deny pre-judgment interest. (*Id.* at 74 & n.14, 76-77).  As outlined above, however, the award sought here does not give MOL more than it lost, rather it compensates MOL for the actual damages it suffered by reason of the Defendants' conduct. Accordingly, the reasons for the court's initial denial of prejudgment interest no longer pertain.

California Civil Code §3288 provides:

"In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

MOL's state law misrepresentation claims in this case are for breach of non-contractual obligations and this is a case of fraud. Accordingly, it is within the discretion of this court to award prejudgment interest to MOL on the amounts it lost as a result of the fraud. *Bullis v.*

59

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

*Security Pac. Nat. Bank*, 21 Cal.3d 801, 814, n.16 (1978).  In order to make MOL whole on its loss, interest should be awarded on the judgment.

Because Section 3288 does not provide for application of a particular interest rate, 7% is the rate to be applied to actions subject to that statute.  Cal. Const., Article XV, §1. *Michelson v. Hamada*, 29 Cal.App.4th 1566, 1585 (1994).  It is also within the court's discretion to award compound interest.  *Hamada,* 29 Cal.App.4th at 1587.  MOL requests that the court award interest on its state law damages at 7% per year, compounded and commencing on June 10, 2011, the date MOL filed its complaint in the Shenzhen fraud case.  Through June 9, 2015, the compounded interest accumulated at a 7% annual rate would be 31% of the principal amount $(1.07^3 = 1.31)$.  Thus, MOL requests that the judgment in this matter include interest awards of $733,157.13 against Summit and $356,873.55 against SeaMaster as additional damages.

**E.     An Award Of Punitive Damages To MOL Is Appropriate**

The court's rationale for denial of punitive damages in its original decision was that MOL had already been awarded more than it lost and that any specific punitive award would be "additional punitive" damages.  As set out above, however, the calculation of damages under state law is limited to the actual damages incurred by MOL and does not include a punitive component.  Accordingly, MOL request for punitive damages should be reconsidered without the assumption that MOL has received more than it lost.

Section 3294 of the California Civil Code authorizes the recovery of punitive damages by the plaintiff in cases "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice…" Cal. Civ. Code §3294(a). The same statute defines "fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

property or legal rights or otherwise causing injury." Cal. Civ. Code §3294(c)(3). "Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy." *Lackner v. North*, 135 Cal.App.4th 1188, 1210 (2006). The purpose of punitive damages is a public one: "to punish wrongdoing and thereby to protect [the public] from future misconduct, either by the same defendant or other potential wrongdoers." *Power Standards Lab, Inc. v. Fed. Exp. Corp.*, 127 Cal.App.4th 1039, 1047 (2005). California courts look to three factors when determining whether an award of punitive damages is excessive: "(1) the *reprehensibility* of the acts of the defendant in light of the record as a whole; (2) the amount of *compensatory damages* awarded; and (3) the *wealth* of the particular defendant." *Boeken v. Philip Morris Inc.*, 127 Cal.App.4th 1640, 1689 (2005) (emphasis in original).

Here, the defendants engaged in a massive and long-term fraud which used the CBP reporting system and FMC contracting system to continue perpetuate the fraud though the use of the mails and wires. This egregious conduct and fraud warrants an award of punitive damages. If a RICO claim is coupled with a common-law claim for which punitive damages may be awarded, punitive damages may be available under state law in addition to treble damages under RICO. *Humana Inc. v. Forsyth*, 525 U.S. 299, 313 (1999); *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1130-31 (9th Cir. 1997), *implied overruling on other grounds recognized by Fernandez*, 388 F.3d at 1228. Accordingly, MOL requests that the court award punitive damages against Summit US and SeaMaster in an amount it deems appropriate, but not less than equal to the actual damages awarded to MOL.

## V. CONCLUSION

For the foregoing reasons, Plaintiff Mitsui O.S.K. Lines, Ltd., requests that this court enter judgment in its favor against Defendants Summit Logistics International, Inc. and

61

SeaMaster Logistics, Inc. on MOL's claims for intentional misrepresentation, negligent misrepresentation, and conspiracy-intentional misrepresentation and on its claims pursuant to the Racketeering Influenced and Corrupt Organizations Act, 19 U.S.C. §1961 *et seq.*, in the amounts set forth in Parts IV. C, D and E of this Brief.


Dated:  September 4, 2015                    FLYNN, DELICH & WISE LLP
                                            Erich P. Wise
                                            James B. Nebel
                                            Alisa Manasantivongs


                                            CLYDE & CO. US LLP
                                            Conte C. Cicala


                              By:     /s/  Erich P. Wise
                                            Erich P. Wise
                                            Attorneys for Plaintiff
                                            MITSUI O.S.K. LINES, LTD.

Plaintiff Mitsui O.S.K. Lines, Ltd.'s Opening Brief on the Issues Pending on Remand
Case Nos. 11-cv-02861-SC and 10-cv-05591-SC [Consolidated]

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626